No. 24-7001 (and consolidated cases 24-3539, 24-3560, 24-3572, 24-3606, 24-3658, 24-3664, 24-3698, and 24-3728)

# In the United States Court of Appeals for the Sixth Circuit

———————————

*IN RE: NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION DEPARTMENT OF TRANSPORTATION, CORPORATE AVERAGE FUEL ECONOMY STANDARD FOR PASSENGER CARS AND LIGHT TRUCKS FOR MODEL YEARS 2027 AND BEYOND AND FUEL EFFICIENCY STANDARDS FOR HEAVY DUTY PICKUP TRUCKS AND VANS FOR MODEL YEARS 2023 AND BEYOND 89 FED. REG. 52540, PUBLISHED ON JUNE 24, 2024*

———————————

On Petitions for Review of a Final Rule of the National Highway Traffic Safety Administration

———————————

**CORRECTED INITIAL JOINT BRIEF OF INDUSTRY AND STATE PETITIONERS**

———————————

AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS, CONSUMER ENERGY ALLIANCE, DOMESTIC ENERGY PRODUCERS ALLIANCE, and ENERGY MARKETERS OF AMERICA,

*Petitioners*,

v.

NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION,

*Respondent.*

(No. 24-3728)

———————————

*(additional petitioners and counsel listed inside)*

————————————

KENTUCKY CORN GROWERS ASSOCIATION,
MICHIGAN CORN GROWERS ASSOCIATION, and
TENNESSEE CORN GROWERS ASSOCIATION,

*Petitioners*,

v.

NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION,
PETER PAUL MONTGOMERY BUTTIGIEG, in his official capacity as
Secretary of the United States Department of Transportation, and
SOPHIE SHULMAN, in her official capacity as Deputy Administrator
of the National Highway Traffic Safety Administration,

*Respondents*.

(Nos. 24-3539 & 24-3572)

————————————

AMERICAN FREE ENTERPRISE CHAMBER OF COMMERCE,

*Petitioner*,

v.

NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION,
PETER PAUL MONTGOMERY BUTTIGIEG, in his official capacity as
Secretary of the United States Department of Transportation, and
SOPHIE SHULMAN, in her official capacity as Deputy Administrator
of the National Highway Traffic Safety Administration,

*Respondents*.

(No. 24-3606)

————————————

––––––––––––––––

VALERO RENEWABLE FUELS COMPANY, LLC and
DIAMOND ALTERNATIVE ENERGY, LLC,

*Petitioners,*

v.

NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION,
PETER PAUL MONTGOMERY BUTTIGIEG, in his official capacity as
Secretary of the United States Department of Transportation, and
SOPHIE SHULMAN, in her official capacity as Deputy Administrator
of the National Highway Traffic Safety Administration,

*Respondents.*

(No. 24-3658)

––––––––––––––––

AMERICAN PETROLEUM INSTITUTE; AMERICAN FARM BUREAU
FEDERATION; TEXAS FARM BUREAU; NATIONAL CORN GROW-
ERS ASSOCIATION; TEXAS CORN PRODUCERS ASSOCIATION;
BAXTER FORD, INC.; CELEBRITY MOTOR CARS, LLC; CELEBRITY
MOTORS OF TOMS RIVER, LLC; CELEBRITY OF SPRINGFIELD,
LLC; CELEBRITY OF WESTCHESTER, LLC; GATES NISSAN, LLC;
AML AUTOMOTIVE PEORIA, LLC; LOQUERCIO AUTOMOTIVE,
INC.; LOQUERCIO AUTOMOTIVE GOE, LLC; LOQUERCIO AUTO-
MOTIVE GOSHEN; LOQUERCIO AUTOMOTIVE MCH, LLC; LO-
QUERCIO AUTOMOTIVE MCK, LLC; LOQUERCIO AUTOMOTIVE
SOUTH, INC.; LOQUERCIO AUTOMOTIVE WEST, LLC; RAECOM
HOLDINGS, LLC; and TARVER MOTOR COMPANY, INC,

*Petitioners,*

v.

NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION,
PETER PAUL MONTGOMERY BUTTIGIEG, in his official capacity as
Secretary of the United States Department of Transportation, and
SOPHIE SHULMAN, in her official capacity as Deputy Administrator
of the National Highway Traffic Safety Administration,

*Respondents.*

(No. 24-3664)

––––––––––––––––

ii

———————————

ILLINOIS CORN GROWERS ASSOCIATION,
IOWA CORN GROWERS ASSOCIATION,
KANSAS CORN GROWERS ASSOCIATION,
MISSOURI CORN GROWERS ASSOCIATION,
NEBRASKA CORN GROWERS ASSOCIATION,
OHIO CORN AND WHEAT GROWERS ASSOCIATION, and
SOUTH DAKOTA CORN GROWERS ASSOCIATION,

*Petitioners*,

v.

NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION,

*Respondent*.

(No. 24-3698)

———————————

STATE OF WEST VIRGINIA, COMMONWEALTH OF KENTUCKY,
STATE OF ALABAMA, STATE OF ALASKA, STATE OF ARKANSAS,
STATE OF FLORIDA, STATE OF GEORGIA, STATE OF IDAHO,
STATE OF IOWA, STATE OF INDIANA, STATE OF KANSAS,
STATE OF LOUISIANA, STATE OF MISSISSIPPI,
STATE OF MISSOURI, STATE OF MONTANA,
STATE OF NEBRASKA, STATE OF NEW HAMPSHIRE,
STATE OF NORTH DAKOTA, STATE OF OHIO,
STATE OF OKLAHOMA, STATE OF TEXAS,
STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA,
STATE OF UTAH, COMMONWEALTH OF VIRGINIA, and
STATE OF WYOMING,

*Petitioners*,

v.

NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION,
PETER PAUL MONTGOMERY BUTTIGIEG, Secretary, United States
Department of Transportation, and SOPHIE SHULMAN, Deputy
Administrator, National Highway Traffic Safety Administration,

*Respondents*.

(No. 24-3560)

———————————

iii

Paul D. Clement
C. Harker Rhodes IV
Nicholas A. Aquart*
Niccolo A. Beltramo*
CLEMENT & MURPHY PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@
   clementmurphy.com

*Counsel for Petitioners
in No. 24-3664*

*Supervised by principals
of the firm who are
members of the Virginia bar

Eric D. McArthur
Kathleen M. Mueller
Peter A. Bruland
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000
emcarthur@sidley.com

*Counsel for Petitioners
in No. 24-3728*

Jeffrey B. Wall
Morgan L. Ratner
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW
Washington, DC 20006
(202) 956-7500
wallj@sullcrom.com

*Counsel for Petitioners in
No. 24-3658*

Michael B. Buschbacher
James R. Conde
BOYDEN GRAY PLLC
800 Connecticut Avenue, NW,
Suite 900
Washington, DC 20006
(202) 955-0620
mbuschbacher@boydengray.com

*Counsel for Petitioners in
Nos. 24-3539, 24-3572, 24-3606,
24-3658, and 24-3698*

iv

PATRICK MORRISEY
  ATTORNEY GENERAL

Michael R. Williams
  *Solicitor General*
Frankie A. Dame
  *Assistant Solicitor General*
Office of the Attorney General
  of West Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov
frankie.a.dame@wvago.gov

*Counsel for Petitioner
State of West Virginia in
No. 24-3560*

STEVE MARSHALL
  ATTORNEY GENERAL

Edmund G. LaCour Jr.
  *Solicitor General*
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130
 (334) 242-7300
edmund.lacour@
  alabamaag.gov

*Counsel for Petitioner
State of Alabama in
No. 24-3560*

RUSSELL COLEMAN
  ATTORNEY GENERAL

Matthew F. Kuhn
  *Solicitor General*
Jacob M. Abrahamson
  *Assistant Solicitor General*
Office of the Kentucky
  Attorney General
700 Capital Avenue, Suite 118
Frankfort, KY 40601
(502) 696-5300
matt.kuhn@ky.gov
jacob.abrahamson@ky.gov

*Counsel for Petitioner
Commonwealth of Kentucky in
No. 24-3560*

TREG TAYLOR
  ATTORNEY GENERAL

Thomas Mooney-Myers
  *Assistant Attorney General*
Alaska Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, AK 99501
(907) 269-5100
thomas.mooney-myers@alaska.gov

*Counsel for Petitioner
State of Alaska in
No. 24-3560*

v

TIM GRIFFIN
 ATTORNEY GENERAL

Nicholas J. Bronni
 *Solicitor General*
Office of the Arkansas
 Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
nicholas.bronni@
 arkansasag.gov

*Counsel for Petitioner*
*State of Arkansas in*
*No. 24-3560*

CHRISTOPHER M. CARR
 ATTORNEY GENERAL

Stephen J. Petrany
 *Solicitor General*
Office of the Attorney General
 of Georgia
40 Capitol Square, SW
Atlanta, GA 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Petitioner*
*State of Georgia in*
*No. 24-3560*

ASHLEY MOODY
 ATTORNEY GENERAL

Henry C. Whitaker (FBN 1031175)
 *Solicitor General*
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, FL 32399
(850) 414-3300
henry.whitaker@
 myfloridalegal.com

*Counsel for Petitioner*
*State of Florida in*
*No. 24-3560*

RAÚL R. LABRADOR
 ATTORNEY GENERAL

Alan M. Hurst
 *Solicitor General*
Office of the Idaho
 Attorney General
P.O. Box 83720
Boise, ID 83720
(208) 334-2400
alan.hurst@ag.idaho.gov

*Counsel for Petitioner*
*State of Idaho in*
*No. 24-3560*

BRENNA BIRD
  ATTORNEY GENERAL

Eric H. Wessan
  *Solicitor General*
Office of the
  Attorney General of Iowa
1305 East Walnut Street
Des Moines, IA 50319
(515) 823-9117
eric.wessan@ag.iowa.gov

*Counsel for Petitioner*
*State of Iowa in*
*No. 24-3560*

KRIS W. KOBACH
  ATTORNEY GENERAL

Abhishek S. Kambli
  *Deputy Attorney General*
Anthony J. Powell
  *Solicitor General*
Office of the Kansas
  Attorney General
120 SW 10th Avenue
Topeka, KS 66612
(785) 296-2215
abhishek.kambli@ag.ks.gov
anthony.powell@ag.ks.gov

*Counsel for Petitioner*
*State of Kansas in*
*No. 24-3560*

THEODORE E. ROKITA
  ATTORNEY GENERAL

James A. Barta
  *Solicitor General*
Indiana Attorney General's Office
ICGS—5th Floor
302 West Washington Street
Indianapolis, IN 46204
(317) 232-0709
james.barta@atg.in.gov

*Counsel for Petitioner*
*State of Indiana in*
*No. 24-3560*

LIZ MURRILL
  ATTORNEY GENERAL

J. Benjamin Aguiñaga
  *Solicitor General*
Tracy Short
  *Assistant Attorney General*
Louisiana Department of Justice
1885 North Third Street
Baton Rouge, LA 70804
(225) 326-6766
aguinagaj@ag.louisiana.gov
shortt@ag.louisiana.gov

*Counsel for Petitioner*
*State of Louisiana in*
*No. 24-3560*

vii

LYNN FITCH
  ATTORNEY GENERAL

Justin L. Matheny
  *Deputy Solicitor General*
Office of the Mississippi
  Attorney General
P.O. Box 220
Jackson, MS 39205
(601) 359-3825
justin.matheny@ago.ms.gov

*Counsel for Petitioner*
*State of Mississippi in*
*No. 24-3560*

AUSTIN KNUDSEN
  ATTORNEY GENERAL

Christian B. Corrigan
  *Solicitor General*
Peter M. Torstensen, Jr.
  *Deputy Solicitor General*
Montana Department of Justice
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
(406) 444-2026
christian.corrigan@mt.gov
peter.torstensen@mt.gov

*Counsel for Petitioner*
*State of Montana in*
*No. 24-3560*

ANDREW BAILEY
  ATTORNEY GENERAL

Joshua M. Divine
  *Solicitor General*
Missouri Attorney General's Office
P.O. Box 899
Jefferson City, MO 65102
(573) 751-1800
josh.divine@ago.mo.gov

*Counsel for Petitioner*
*State of Missouri in*
*No. 24-3560*

MICHAEL T. HILGERS
  ATTORNEY GENERAL

Lincoln J. Korell
  *Assistant Solicitor General*
Office of the Attorney General
  of Nebraska
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
lincoln.korell@nebraska.gov

*Counsel for Petitioner*
*State of Nebraska in*
*No. 24-3560*

JOHN FORMELLA
  ATTORNEY GENERAL

Brandon F. Chase
  *Assistant Attorney General*
New Hampshire
  Department of Justice
1 Granite Place South
Concord, NH 03301
(603) 271-1210
brandon.f.chase@doj.nh.gov

*Counsel for Petitioner
State of New Hampshire in
No. 24-3560*


DAVE YOST
  ATTORNEY GENERAL

T. Elliot Gaiser
  *Solicitor General*
Mathura J. Sridharan
  *Deputy Solicitor General*
Office of the Ohio
  Attorney General
365 East Broad Street
Columbus, OH 43215
(614) 466-8980
thomas.gaiser@ohioago.gov
mathura.sridharan@ohioago.gov

*Counsel for Petitioner
State of Ohio in
No. 24-3560*

DREW H. WRIGLEY
  ATTORNEY GENERAL

Philip Axt
  *Solicitor General*
Office of Attorney General of
  North Dakota
600 East Boulevard Avenue
Dept. 125
Bismarck, ND 58505
(701) 328-2210
pjaxt@nd.gov

*Counsel for Petitioner
State of North Dakota in
No. 24-3560*


GENTNER DRUMMOND
  ATTORNEY GENERAL

Garry M. Gaskins, II
  *Solicitor General*
Jennifer L. Lewis
  *Deputy Attorney General*
Office of the Attorney General
  of Oklahoma
313 NE Twenty-First Street
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov
jennifer.lewis@oag.ok.gov

*Counsel for Petitioner
State of Oklahoma in
No. 24-3560*

ix

ALAN WILSON
   ATTORNEY GENERAL

Joseph D. Spate
  *Assistant Deputy*
  *Solicitor General*
Office of the Attorney General of
South Carolina
1000 Assembly Street
Columbia, SC 29201
(803) 734-3371
josephspate@scag.gov

*Counsel for Petitioner*
*State of South Carolina in*
*No. 24-3560*

MARTY J. JACKLEY
   ATTORNEY GENERAL

Charles D. McGuigan
  *Deputy Attorney General*
South Dakota
  Attorney General's Office
1302 East Highway 14, Suite 1
Pierre, SD 57501
(605) 773-3215
atgservice@state.sd.us

*Counsel for Petitioner*
*State of South Dakota in*
*No. 24-3560*

x

KEN PAXTON
  ATTORNEY GENERAL

Brent Webster
  *First Assistant*
  *Attorney General*
Aaron L. Neilson
  *Solicitor General*

Lanora C. Pettit
  *Principal Deputy*
  *Solicitor General*
Office of the Attorney General
  of Texas
P.O. Box 12548, MC-066
Austin, TX 78711
(512) 463-2012
lanora.pettit@oag.texas.gov

*Counsel for Petitioner*
*State of Texas in*
*No. 24-3560*

SEAN REYES
  ATTORNEY GENERAL

Stanford E. Purser
  *Solicitor General*

Office of the Utah
  Attorney General
160 E. 300 S., 5th Floor
Salt Lake City, UT 84111
(385) 382-4334
spurser@agutah.gov

*Counsel for Petitioner*
*State of Utah in*
*No. 24-3560*

JASON MIYARES
  ATTORNEY GENERAL

Kevin M. Gallagher
  *Principal Deputy*
  *Solicitor General*
Brendan T. Chestnut
  *Deputy Solicitor General*
Virginia Attorney General's
  Office
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
emaley@oag.state.va.us
kgallagher@oag.state.va.us
bchestnut@oag.state.va.us

*Counsel for Petitioner*
*Commonwealth of Virginia in*
*No. 24-3560*

BRIDGET HILL
  ATTORNEY GENERAL

D. David DeWald
  *Deputy Attorney General*
Office of the Attorney General
  of Wyoming
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895
david.dewald@wyo.gov

*Counsel for Petitioner*
*State of Wyoming in*
*No. 24-3560*

## CORPORATE DISCLOSURE

Petitioners make the following disclosures under Federal Rule of Appellate Procedure Rule 26.1 and Sixth Circuit Rule 26.1:

**American Farm Bureau Federation** (AFBF) is the largest non-profit general farm organization in the United States. Representing about six million member families in all 50 States and Puerto Rico, AFBF's members grow and raise every type of agricultural crop and commodity produced in the United States. AFBF's mission is to protect, promote, and represent the business, economic, social, and educational interests of American farmers and ranchers. AFBF has no parent entity, and no publicly held corporation has a 10 percent or greater ownership stake in it.

**American Free Enterprise Chamber of Commerce** is a business league organization established in a manner consistent with Section 501(c)(6) of the Internal Revenue Code. It has no parent companies, and no publicly held company has a 10 percent or greater ownership interest in it.

**American Fuel & Petrochemical Manufacturers** is a national trade association that represents American refining and petrochemical

xiii

companies. It has no parent corporation, and no publicly held company owns 10 percent or more of its stock.

**American Petroleum Institute** (API) is a national trade association that represents all segments of America's natural gas and oil industry. API's nearly 600 members produce, process, and distribute most of the Nation's energy, and participate in API Energy Excellence, which is accelerating environmental and safety progress by fostering new technologies and transparent reporting. API has no parent entity, and no publicly held corporation has a 10 percent or greater ownership stake in it.

**AML Automotive Peoria, LLC**, d/b/a Peoria Ford, is an Illinois-based Ford dealership that sells light-duty vehicles to consumers and businesses. It has no parent corporation, and no publicly held corporation has a 10 percent or greater ownership stake in it.

**Baxter Ford, Inc.** is a Nebraska corporation that operates a Ford dealership in Nebraska that sells cars, trucks, and SUVs to consumers and businesses. It has no parent corporation, and no publicly held corporation has a 10 percent or greater ownership stake in it.

**Celebrity Motor Cars, LLC**, d/b/a Lexus of Route 10, is a New Jersey-based Lexus dealership that sells light-duty vehicles and trucks.

It has no parent corporation and no publicly held corporation has a 10 percent or greater ownership stake in it.

**Celebrity Motors of Toms River, LLC**, d/b/a Celebrity Ford of Toms River, is a New Jersey-based Ford dealership that sells light-duty vehicles and trucks. It has no parent corporation, and no publicly held corporation has a 10 percent or greater ownership stake in it.

**Celebrity of Springfield, LLC**, d/b/a BMW of Springfield, is a New Jersey-based BMW dealership that sells light-duty vehicles and trucks. It has no parent corporation, and no publicly held corporation has a 10 percent or greater ownership stake in it.

**Celebrity of Westchester, LLC**, d/b/a Mercedes Benz of Goldens Bridge, is a New York-based Mercedes Benz dealership that sells light-duty vehicles and trucks. It has no parent corporation, and no publicly held corporation has a 10 percent or greater ownership stake in it.

**Consumer Energy Alliance** is a nonpartisan, nonprofit organization advocating for balanced energy and environmental policies and responsible access to resources. It has no parent corporation, and no publicly held company owns 10 percent or more of its stock.

**Diamond Alternative Energy, LLC** is a wholly owned direct subsidiary of Valero Energy Corporation, a Delaware corporation whose common stock is publicly traded on the New York Stock Exchange under the ticker symbol VLO.

**Domestic Energy Producers Alliance** is a nonprofit, nonstock corporation organized under the laws of the State of Oklahoma. It has no parent corporation, and no publicly held company owns 10 percent or more of its stock.

**Energy Marketers of America** is a federation of 49 state and regional trade associations representing energy marketers throughout the United States. EMA, which is incorporated under the laws of the Commonwealth of Virginia, has no parent corporation, and no publicly held company owns 10 percent or more of its stock.

**Gates Nissan LLC**, d/b/a Gates Nissan, operates an automobile dealership in Richmond, Kentucky. It has no parent corporation, and no publicly held corporation has a 10 percent or greater ownership stake in it.

**Illinois Corn Growers Association** is an agricultural organization. It has no parent companies, and no publicly held company has a 10 percent or greater ownership interest in it.

**Iowa Corn Growers Association** is an agricultural organization. It has no parent companies, and no publicly held company has a 10 percent or greater ownership interest in it.

**Kansas Corn Growers Association** is an agricultural organization. It has no parent companies, and no publicly held company has a 10 percent or greater ownership interest in it.

**Kentucky Corn Growers Association** is an agricultural organization. It has no parent companies, and no publicly held company has a 10 percent or greater ownership interest in it.

**Loquercio Automotive GOE, LLC**, d/b/a Genesis of Elgin, is an Illinois-based Genesis dealership that sells light-duty motor vehicles to consumers and businesses. It has no parent corporation, and no publicly held corporation has a 10 percent or greater ownership stake in it.

**Loquercio Automotive Goshen, LLC**, d/b/a Buick GMC of Goshen, is an Indiana-based Buick and GMC dealership that sells light-duty vehicles to consumers and businesses. It has no parent corporation,

and no publicly held corporation has a 10 percent or greater ownership stake in it.

**Loquercio Automotive, Inc.**, d/b/a Elgin Hyundai, is an Illinois-based Hyundai dealership that sells light-duty vehicles to consumers and businesses. It has no parent corporation, and no publicly held corporation has a 10 percent or greater ownership stake in it.

**Loquercio Automotive MCH, LLC**, d/b/a Michigan City Hyundai, is an Indiana-based Hyundai dealership that sells light-duty vehicles to consumers and businesses. It has no parent corporation, and no publicly held corporation has a 10 percent or greater ownership stake in it.

**Loquercio Automotive MCK, LLC**, d/b/a Michigan City Kia, is an Indiana-based Kia dealership that sells light-duty vehicles to consumers and businesses. It has no parent corporation, and no publicly held corporation has a 10 percent or greater ownership stake in it.

**Loquercio Automotive South, Inc.**, d/b/a Honda City, is an Illinois-based Honda dealership that sells light-duty vehicles to consumers and businesses. It has no parent corporation, and no publicly held corporation has a 10 percent or greater ownership stake in it.

**Loquercio Automotive West, LLC**, d/b/a Elgin Chrysler, is an Illinois-based Chrysler dealership that sells light-duty vehicles to consumers and businesses. It has no parent corporation, and no publicly held corporation has a 10 percent or greater ownership stake in it.

**Michigan Corn Growers Association** is an agricultural organization. It has no parent companies, and no publicly held company has a 10 percent or greater ownership interest in it.

**Missouri Corn Growers Association** is an agricultural organization. It has no parent companies, and no publicly held company has a 10 percent or greater ownership interest in it.

**National Corn Growers Association** (NCGA) is a national trade association that represents nearly 40,000 dues-paying corn growers and the interests of more than 300,000 farmers who contribute through corn checkoff programs in their states. NCGA and its 50 affiliated state associations and checkoff organizations work together to sustainably feed and fuel a growing world by creating and increasing opportunities for corn growers. NCGA has no parent entity, and no publicly held corporation has a 10 percent or greater ownership stake in it.

xix

**Nebraska Corn Growers Association** is an agricultural organization. It has no parent company, and no publicly held company has a 10 percent or greater ownership interest in it.

**Ohio Corn and Wheat Growers Association** is an agricultural organization. It has no parent company, and no publicly held company has a 10 percent or greater ownership interest in it.

**Raecom Holdings, LLC** is a Delaware limited liability company that operates seven automobile dealerships in Texas and Louisiana selling light- and medium-duty vehicles to consumers and businesses. It has no parent entity, and no publicly held corporation has a 10 percent or greater ownership stake in it.

**South Dakota Corn Growers Association** is an agricultural organization. It has no parent companies, and no publicly held company has a 10 percent or greater ownership interest in it.

**Tarver Motor Company, Inc.**, d/b/a Lake Charles Toyota, is a Louisiana-based corporation that operates a sales and service franchised dealership, facility, and related operations. It has no parent corporation and no publicly held corporation has a 10 percent or greater ownership stake in it.

**Tennessee Corn Growers Association** is an agricultural organization. It has no parent companies, and no publicly held company has a 10 percent or greater ownership interest in it.

**Texas Corn Producers Association** is an agricultural organization. It has no parent companies, and no publicly held company has a 10 percent or greater ownership interest in it.

**Texas Farm Bureau** is a nonprofit membership corporation. It has no parent companies, and no publicly held company has a 10 percent or greater ownership interest in it.

**Valero Renewable Fuels Company, LLC** is a wholly owned direct subsidiary of Valero Energy Corporation, a Delaware corporation whose common stock is publicly traded on the New York Stock Exchange under the ticker symbol VLO.

## <u>TABLE OF CONTENTS</u>

CORPORATE DISCLOSURE ............................................................... xiv

TABLE OF AUTHORITIES ............................................................... xxvi

STATEMENT IN SUPPORT OF ORAL ARGUMENT ...................... xxxv

INTRODUCTION ................................................................................... 1

JURISDICTIONAL STATEMENT ....................................................... 2

STATEMENT OF ISSUES ..................................................................... 3

STATEMENT OF THE CASE ................................................................ 3

I.    Statutory Background ................................................................. 3

      A.    Automobile standards ......................................................... 4

      B.    Heavy-duty standards .......................................................... 7

II.   Regulatory Background .............................................................. 8

      A.    President Biden's Executive Order ....................................... 8

      B.    The automobile standards .................................................. 10

            1.    NHTSA's consideration of the forbidden factors ......... 11

            2.    NHTSA's consideration of civil penalties ................... 17

      C.    The heavy-duty standards .................................................. 18

SUMMARY OF ARGUMENT ............................................................... 20

STANDING ......................................................................................... 23

STANDARD OF REVIEW ................................................................... 26

ARGUMENT ....................................................................... 27

I.   NHTSA's Automobile Standards Are Unlawful ............................ 27

     A.   NHTSA unlawfully considered the forbidden factors .......... 27

          1.   NHTSA may not consider the forbidden factors
               when carrying out §32902(f) ...................................... 27

               a.   Section 32902(h) prohibits NHTSA from
                    considering the forbidden factors when setting
                    fuel-economy standards ..................................... 28

               b.   The major-questions doctrine confirms that
                    Congress did not authorize NHTSA to
                    mandate electric vehicles .................................. 33

          2.   NHTSA considered the forbidden factors when
               carrying out §32902(f) ............................................ 35

               a.   NHTSA unlawfully considered the fuel
                    economy of electric vehicles in the baseline ....... 36

               b.   NHTSA unlawfully considered all three
                    forbidden factors outside the standard-setting
                    years ................................................................ 38

          3.   NHTSA's justifications fail ....................................... 39

          4.   NHTSA's errors were prejudicial ............................... 43

     B.   NHTSA unlawfully incorporated state electric-vehicle
          mandates into its baseline .............................................. 46

          1.   NHTSA erred by including state-mandated electric
               vehicles in the baseline because the state mandates
               are preempted ......................................................... 47

               a.   EPCA expressly preempts state electric-
                    vehicle mandates .............................................. 47

    b.  The RFS impliedly preempts state electric-vehicle mandates.................................51

    c.  NHTSA's reliance on preempted state laws was unlawful.......................................52

  2.  NHTSA erred by including state-mandated electric vehicles in the baseline without showing that compliance with the state mandates is feasible.........55

  3.  NHTSA's errors were prejudicial................................58

 C.  NHTSA unlawfully concluded that its standards are feasible by assuming that manufacturers will violate them.....................................................................59

II.  NHTSA'S Heavy-Duty Standards Are Unlawful ..........................63

 A.  NHTSA lacks authority to mandate heavy-duty electric vehicles ..................................................................63

  1.  NHTSA may set heavy-duty standards only for vehicles that consume "fuel." ........................................65

  2.  The major-questions doctrine confirms NHTSA lacks authority to mandate heavy-duty electric vehicles .........................................................................69

 B.  NHTSA cannot assign zero fuel consumption to heavy-duty electric vehicles...........................................................74

 C.  The standards do not provide "regulatory stability."...........76

CONCLUSION ...................................................................82

STATUTORY ADDENDUM

xxiv

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air All. Hous. v. EPA,*
906 F.3d 1049 (D.C. Cir. 2018) ........................................................ 25

*Alfred L. Snapp & Son, Inc. v. P.R. ex rel. Barez,*
458 U.S. 592 (1982) ........................................................................... 26

*Am. Fed'n of Gov't Emps., Loc. 2924 v. Fed. Lab. Rels. Auth.,*
470 F.3d 375 (D.C. Cir. 2006) .......................................................... 54

*Am. Hosp. Ass'n v. Becerra,*
596 U.S. 724 (2022) ........................................................................... 43

*Am. Textile Mfrs. Inst., Inc. v. Donovan,*
452 U.S. 490 (1981) ........................................................................... 60

*Ams. for Clean Energy v. EPA,*
864 F.3d 691 (D.C. Cir. 2017) .......................................................... 51

*Arizona v. United States,*
567 U.S. 387 (2012) ........................................................................... 51

*Biden v. Nebraska,*
143 S. Ct. 2355 (2023) ....................................................................... 34

*Ctr. for Biological Diversity v. NHTSA,*
538 F.3d 1172 (9th Cir. 2008) ..................................................... 60, 76

*Cent. Valley Chrysler-Jeep, Inc. v. Goldstene,*
529 F. Supp. 2d 1151 (E.D. Cal. 2007) ............................................ 50

*Collins v. Yellen,*
594 U.S. 220 (2021) ........................................................................... 23

*Competitive Enter. Inst. v. FCC,*
970 F.3d 372 (D.C. Cir. 2020) .......................................................... 25

*Competitive Enter. Inst. v. NHTSA,*
956 F.2d 321 (D.C. Cir. 1992) ...................................................... 24, 62

*Ctr. for Auto Safety v. NHTSA,*
793 F.2d 1322 (D.C. Cir. 1986) ........................................................ 62

*Delta Constr. Co., Inc. v. EPA,*
783 F.3d 1291 (D.C. Cir. 2015) .................................................... 48, 49

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz,*
601 U.S. 42 (2024) ............................................................................. 66

*DHS v. Regents of the Univ. of Cal.,*
591 U.S. 1 (2020) ................................................................................ 53

*FDA v. Brown & Williamson Tobacco Corp.,*
529 U.S. 120 (2000) ........................................................................... 68

*FMC Corp. v. Holliday,*
498 U.S. 52 (1990) .............................................................................. 47

*In re Ford Motor Co. F-150 & Ranger Truck
Fuel Econ. Mktg. & Sales Pracs. Litig.,*
2022 WL 551221 (E.D. Mich. Feb. 23, 2022) .................................... 78

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie,*
508 F. Supp. 2d 295 (D. Vt. 2007) ..................................................... 50

*Hallstrom v. Tillamook Cnty.,*
493 U.S. 20 (1989) .............................................................................. 29

*Hargett v. Comm'r of Soc. Sec.,*
964 F.3d 546 (6th Cir. 2020) ........................................................ 46, 59

*Hunt v. Wash. State Apple Advert. Comm'n,*
432 U.S. 333 (1977) ........................................................................... 24

*Kentucky v. Biden,*
23 F.4th 585 (6th Cir. 2022) .............................................................. 26

*King v. Burwell,*
576 U.S. 473 (2015) ........................................................................... 70

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657 (2020) ............................... 53, 55

*Lomax v. Ortiz-Marquez*,
140 S. Ct. 1721 (2020) ...................................... 40

*Loper Bright Enters. v. Raimondo*,
144 S. Ct. 2244 (2024) ........................... 35, 40, 79

*Marrama v. Citizens Bank of Mass.*,
549 U.S. 365 (2007) ......................................... 40

*Marx v. Gen. Revenue Corp.*,
568 U.S. 371 (2013) ......................................... 80

*Massachusetts v. EPA*,
549 U.S. 497 (2007) ......................................... 26

*Metro. Taxicab Bd. of Trade v. City of New York*,
615 F.3d 152 (2d Cir. 2010) ............................... 49

*Mexichem Fluor, Inc. v. EPA*,
866 F.3d 451 (D.C. Cir. 2017) ........................... 66

*Michigan v. EPA*,
576 U.S. 743 (2015) ................................... 53, 75

*Murray Energy Corp. v. EPA*,
936 F.3d 597 (D.C. Cir. 2019) ........................... 42

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
551 U.S. 644 (2007) ......................................... 29

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
583 U.S. 109 (2018) ......................................... 28

*Nat'l Fuel Gas Supply Corp. v. FERC*,
468 F.3d 831 (D.C. Cir. 2006) ........................... 46

*Nat'l Urb. League v. Ross*,
977 F.3d 770 (9th Cir. 2020) ............................. 54

*New Prime Inc. v. Oliveira,*
586 U.S. 105 (2019)............................................................ 28

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v.
Travelers Ins. Co.*, 514 U.S. 645 (1995) .............................. 50

*New York v. NHTSA,*
974 F.3d 87 (2d Cir. 2020) .................................................. 60

*Tennessee v. Dep't of Educ.,*
104 F.4th 577 (6th Cir. 2024) ............................................ 25

*United States v. Palomar-Santiago,*
593 U.S. 321 (2021).............................................................. 29

*Ohio v. EPA,*
98 F.4th 288 (D.C. Cir. 2024)............................................ 14

*Ophir v. City of Boston,*
647 F. Supp. 2d 86 (D. Mass. 2009).................................. 49

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation &
Dev. Comm'n*, 461 U.S. 190 (1983) .................................... 26

*Picur v. Kerry,*
128 F. Supp. 3d 302 (D.D.C. 2015) .................................. 54

*Pilot Life Ins. Co. v. Dedeaux,*
481 U.S. 41 (1987).............................................................. 47

*River City Fraternal Order of Police Lodge 614 v. Ky. Ret. Sys.,*
999 F.3d 1003 (6th Cir. 2021) ............................................ 42

*Rotkiske v. Klemm,*
589 U.S. 8 (2019)................................................................ 41

*Rowe v. N.H. Motor Transp. Ass'n,*
552 U.S. 364 (2008)............................................................ 47

*Russello v. United States,*
464 U.S. 16 (1983).............................................................. 29

*Taniguchi v. Kan Pac. Saipan, Ltd.*,
  566 U.S. 560 (2012)............................................................... 77

*Tanzin v. Tanvir*,
  592 U.S. 43 (2020)................................................................. 75

*Truck Trailer Mfrs. Ass'n, Inc v. EPA*,
  17 F.4th 1198 (D.C. Cir. 2021)............................................. 66

*United States v. Hynes*,
  467 F.3d 951 (6th Cir. 2006)................................................. 81

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014)................................................... 43, 72, 73

*West Virginia v. EPA*,
  597 U.S. 697 (2022)...................................33, 34, 35, 67, 70, 72, 73, 74

*Wyoming v. Oklahoma*,
  502 U.S. 437 (1992)............................................................... 26

## Statutes and Regulations

5 U.S.C. §706..........................................................................27

28 U.S.C. §2112(a)(3)............................................................. 3

42 U.S.C. §300gg-111(c)(5)(D)............................................ 42

42 U.S.C. §6201(5).................................................................. 3

42 U.S.C. §7507.....................................................................14

42 U.S.C. §7521(a)(3)(C)......................................................80

42 U.S.C. §7543(a)................................................................46

42 U.S.C. §7543(b)................................................................14

42 U.S.C. §7545(*o*)................................................................46

42 U.S.C. §17011(b)..............................................................68

49 U.S.C. §32901(a)(1)(J) ................................................................. 5

49 U.S.C. §32901(a)(6) ............................................................... 4, 78

49 U.S.C. §32901(a)(8) ................................................................. 5

49 U.S.C. §32901(a)(9) ................................................................. 5

49 U.S.C. §32901(a)(10) ........................................................... 8, 65

49 U.S.C. §32901(a)(11) ................................................................. 6

49 U.S.C. §32902(a) ......................................... 4, 21, 30, 59, 62

49 U.S.C. §32902(b) ...................................................................... 3

49 U.S.C. §32902(b)(1) ................................................................. 4

49 U.S.C. §32902(b)(2) ............................................................... 30

49 U.S.C. §32902(b)(2)(B) ...................................................... 4, 30

49 U.S.C. §32902(c) ...................................................................... 4

49 U.S.C. §32902(d)(1)(B) ......................................................... 30

49 U.S.C. §32902(f) ....................................... 5, 27, 31, 57, 59, 62

49 U.S.C. §32902(g) ...................................................................... 4

49 U.S.C. §32902(h) .......................................... 5, 20, 27, 30

49 U.S.C. §32902(h)(1) ................................................................. 5

49 U.S.C. §32902(h)(2) ................................................................. 5

49 U.S.C. §32902(h)(3) ................................................................. 5

49 U.S.C. §32902(k)(2) ............................. 7, 22, 23, 65, 67, 74

49 U.S.C. §32902(k)(3) ............................................... 8, 76, 79

49 U.S.C. §32902(k)(3)(B) ..................................................... 23, 63

49 U.S.C. §32904(a)-(c) .................................................................. 6

49 U.S.C. §32904(a)(2) .................................................................. 50

49 U.S.C. §32904(a)(2)(A) ............................................................ 65

49 U.S.C. §32904(a)(2)(B)................................................... 6, 68, 76

49 U.S.C. §32904(c) ....................................................................... 6

49 U.S.C. §32905(e) ....................................................................... 7

49 U.S.C. §32909(a)(1) ................................................................... 2

49 U.S.C. §32909(b) ....................................................................... 3

49 U.S.C. §32911 ........................................................................... 6

49 U.S.C. §32912 ........................................................................... 6

49 U.S.C. §32912(b) ..................................................................... 60

49 U.S.C. §32919(a) ............................................................... 15, 47

49 U.S.C. §41734(h) ..................................................................... 42

Pub. L. No. 94-163, 89 Stat. 871 (1975) .................................... 51

Pub. L. No. 96-185, 93 Stat. 1324 (1980) .................................. 68

Pub. L. No. 100-494, 102 Stat. 2441 ......................... 28, 29, 30

Pub. L. No. 101-549, 104 Stat. 2399 (1990) .............................. 80

Pub. L. No. 102-486, 106 Stat. 2776 ....................................... 28

Pub. L. No. 109-58, 119 Stat. 594 (2005) ................................. 46

Pub. L. No. 110-140, 121 Stat. 1492 (2007) ................. 4, 75, 81

Cal. Code Regs. tit. 13, §1962.2(a) ........................................ 48

Cal. Code Regs. tit. 13, §§1963-1963.5................................... 73

xxxi

10 C.F.R. §474.3(f) ................................................................ 76

49 C.F.R. §1.95(a) ................................................................. 4

49 C.F.R. §535.4 ............................................................. 65, 66

49 C.F.R. §535.6(a)(3)(iii) ................................................. 74

71 Fed. Reg. 17,566 (Apr. 6, 2006) ................................... 41

75 Fed. Reg. 25,324 (May 7, 2010) ................................... 48

81 Fed. Reg. 73,478 (Oct. 25, 2016) ............................ 63, 74

84 Fed. Reg. 51,310 (Sept. 27, 2019) .......................... 48, 54

86 Fed. Reg. 43,583 (Aug. 10, 2021) .............................. 8, 9

86 Fed. Reg. 49,602 (Sept. 3, 2021) ................................. 73

86 Fed. Reg. 74,236 (Dec. 29, 2021) ................................ 54

86 Fed. Reg. 74,434 (Dec. 30, 2021) .................................. 9

87 Fed. Reg. 25,710 (May 2, 2022) ................... 9, 32, 33, 51

89 Fed. Reg. 27,842 (Apr. 18, 2024) ............................. 9, 79

89 Fed. Reg. 29,440 (Apr. 22, 2024) ............................. 9, 73

## Legislative Materials

125 Cong. Rec. 37083 (1979) ............................................. 68

134 Cong. Rec. H8089 (1988) ...................................... 32, 36

H.R. Rep. No. 100-929 (1988) ........................................... 31

## Other Authorities

*American Heritage Dictionary* (2d ed. 1985) ....................... 28

Bureau of Transp. Stats., *Number of U.S. Truck
        Registrations by Type* ............................................. 72

DNC, *The Biden Plan for a Clean Energy Revolution and Environmental Justice* ................................................. 1, 33

EIA, *FAQs: How Much Electricity Does an American Home Use?* .......................................................... 72

*Merriam-Webster's Collegiate Dictionary* (11th ed. 2006) ............... 75, 77

Dave Vanderwerp, *Tested: How Towing Affects Electric Pickups, Car & Driver*, Car and Driver (Aug. 18, 2022) .................... 71

White House, *Fact Sheet: Biden-Harris Administration Proposes New Standards to Protect Public Health that Will Save Consumers Money, and Increase Energy Security* (Apr. 12, 2023) ................................................... 64

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

This case raises important questions about the National Highway Traffic Safety Administration's automobile fuel-economy and heavy-duty fuel-efficiency standards. Petitioners respectfully submit that oral argument would help the Court resolve the issues presented.

## **INTRODUCTION**

This case arises from the Biden administration's whole-of-government campaign to electrify the nation's vehicle fleet. To that end, President Biden vowed to wield the "full authority of the executive branch" to "ensur[e] 100% of new sales for light- and medium-duty vehicles will be electrified."[1] Petitioners challenge one front in that campaign: a National Highway Traffic Safety Administration (NHTSA) rule that sets fuel-economy standards so stringent that they can be met only by phasing out conventional internal-combustion-engine vehicles in favor of electric ones.

NHTSA's rule is unlawful several times over, but its core flaw is straightforward: Congress never authorized NHTSA (or any other agency) to effectively mandate electric vehicles. Just the opposite: Congress expressly *prohibited* NHTSA from considering electric vehicles when setting automobile fuel-economy standards, but allowed automakers to count any electric vehicles they voluntarily produce toward compliance with the standards. Congress took that approach because it wanted electric vehicles to be a compliance option, not a regulatory mandate. And

---

[1] DNC, *The Biden Plan for a Clean Energy Revolution and Environmental Justice*, tinyurl.com/4j5hz9s5 (last visited Nov. 11, 2024).

when Congress later charged the agency with developing a fuel-efficiency improvement program for heavy-duty vehicles, it left electric vehicles out of the program entirely.

NHTSA, however, is determined not to let these limits on its statutory authority stand in its way. So it reads exceptions into the statute that are not there, to seize a power that Congress did not grant it, in service of a policy agenda that Congress has never embraced. In so doing, NHTSA violates the first principle of administrative law: that agencies may not rewrite their governing statute to suit their own sense of how it should operate. Congress required NHTSA to set fuel-economy standards that are feasible for conventional vehicles alone, and NHTSA may not disregard that instruction because it thinks it has better ideas. This Court should set aside NHTSA's unlawful rule.

## JURISDICTIONAL STATEMENT

The agency acted under 49 U.S.C. §32902.[2] This Court has jurisdiction under §32909(a)(1). NHTSA published its final rule on June 24, 2024. JA__[89Fed.Reg.52,540]. Petitioners timely sought review on or before August 9, 2024, within "59 days after the regulation [was]

---

[2] Unless otherwise indicated, statutory citations are to Title 49.

2

prescribed." §32909(b). This Court was selected under 28 U.S.C. §2112(a)(3) to hear their challenges.

## STATEMENT OF ISSUES

1.    Whether NHTSA's automobile standards are unlawful because NHTSA (a) considered the fuel economy of electric vehicles, the fuel economy of plug-in hybrids when operated on electricity, and the availability of compliance credits when determining "maximum feasible" fuel economy; (b) improperly incorporated state electric-vehicle mandates into its baseline; and (c) relied on automakers' ability to pay penalties in finding that the standards were feasible.

2.    Whether NHTSA's heavy-duty standards are unlawful because NHTSA (a) effectively mandated that manufacturers produce electric vehicles; (b) treated those vehicles as though they consume no energy; and (c) failed to provide "3 full model years of regulatory stability."

## STATEMENT OF THE CASE

### I.    Statutory Background

"In the wake of the 1973-1974 Arab oil embargo," Congress enacted the Energy Policy and Conservation Act of 1975 (EPCA) to, among other things, "provide for improved energy efficiency of motor vehicles." 42 U.S.C. §6201(5). EPCA requires the Secretary of Transportation to

3

prescribe corporate average fuel-economy (CAFE) standards for "automobiles," a category that includes passenger cars and light trucks. §32902(b)(1)(A), (B); *see* 49 C.F.R. §1.95(a) (delegation to NHTSA). Under the Energy Independence and Security Act of 2007 (EISA), NHTSA also separately sets fuel-efficiency standards for "work trucks and commercial medium-duty or heavy-duty on highway vehicles." §32902(b)(1); *see* Pub. L. No. 110-140, §102(b), 121 Stat. 1492, 1499.

## A.   Automobile standards

NHTSA must set its CAFE standards—for passenger cars and light trucks—at least 18 months before the beginning of each model year. §32902(a). "Each standard shall be the maximum feasible average fuel economy level that [NHTSA] decides the manufacturers can achieve in that model year." *Id.*; *see also* §32902(b)(2)(B). NHTSA may amend a standard it has previously set, but the amended standards also must be set at the "maximum feasible average fuel economy level for that model year." §32902(c); *see also* §32902(g). The standards are fleetwide-average standards, so an automaker can produce some vehicles that do not meet the standard so long as it produces enough vehicles that exceed the standard such that its fleet, on average, complies. *See* §32901(a)(6).

4

The statute lists certain things that NHTSA "shall consider" and other things NHTSA "may not consider" when making the "maximum feasible" determination. NHTSA "shall consider" (i) "technological feasibility," (ii) "economic practicability," (iii) "the effect of other motor vehicle standards of the Government on fuel economy," and (iv) "the need of the United States to conserve energy." §32902(f). And NHTSA "may not consider" the three factors listed in §32902(h). First, NHTSA "may not consider the fuel economy of dedicated automobiles," §32902(h)(1), *i.e.*, automobiles that operate "only on alternative fuel," §32901(a)(8), such as "electricity," §32901(a)(1)(J).[3] Second, NHTSA may not consider the fuel economy of "dual fueled automobile[s]," such as plug-in hybrids, *see* §32901(a)(9), when operated on electricity; rather, it must consider them "to be operated only on gasoline or diesel fuel," §32902(h)(2). Third, NHTSA "may not consider" the "trading, transferring, or availability of credits" that automakers earn if they exceed the standards. §32902(h)(3).

---

[3] In discussing the automobile standards, we use the term "electric vehicle" to mean battery-electric vehicles. In discussing the heavy-duty standards, we use the term "electric vehicle" to also include plug-in hybrid electric vehicles when operated on electricity.

A different agency, the Environmental Protection Agency (EPA), determines the fuel economy of each model of automobile manufactured in a model year. §32904(c). A model's fuel economy is the "average number of miles traveled" for "each gallon of gasoline (or equivalent amount of other fuel)." §32901(a)(11). EPA must also calculate the average fuel economy of all the automobiles manufactured by each automaker in each model year. §32904(a)-(c). An automaker violates EPCA and is subject to civil penalties if the average fuel economy of its fleet, as adjusted by any credits, is lower than the standards for that model year. §§32911, 32912.

Unlike NHTSA, which "may not consider" the fuel economy of electric vehicles in setting fuel-economy standards, §32902(h)(1), EPA "shall include" their fuel economy when calculating the average fuel economy achieved by individual automakers for compliance purposes, §32904(a)(2)(B). EPA does so by giving electric vehicles "equivalent petroleum based fuel economy values determined by the Secretary of Energy." *Id.* Under that formula, electric vehicles are assigned a much higher fuel economy than conventional vehicles, so producing electric vehicles significantly increases the average fuel economy of an automaker's fleet, conferring a sizeable compliance boost. *See* JA__[TSD.3-89-3-90].

6

Plug-in hybrids also receive an enhanced fuel economy when operated on electricity. *See* §32905(e).

The upshot is that Congress forbade NHTSA to consider the enhanced fuel economy of vehicles that use electricity when setting standards, but allowed automakers to count any such vehicles they voluntarily produce toward compliance with the standards. In this way, Congress created an incentive for automakers to produce alternative-fuel vehicles, while preventing NHTSA from forcing them to do so by setting standards that are feasible only for a fleet that includes such vehicles.

## B.    Heavy-duty standards

NHTSA's regulation of the fuel economy of commercial medium- or heavy-duty vehicles and work trucks is governed by §32902(k), a provision enacted in EISA. That provision directs NHTSA, in consultation with the Department of Energy and EPA, to issue regulations implementing a "fuel efficiency improvement program" for these vehicles. §32902(k)(2). NHTSA's regulations must contain "appropriate test methods, measurement metrics, fuel economy standards, and compliance and enforcement protocols that are appropriate, cost-effective, and technologically feasible for commercial medium- and heavy-duty" vehicles. *Id.*

For purposes of both the automobile and heavy-duty standards, "fuel" means "gasoline," "diesel oil," or "other liquid or gaseous fuel that the Secretary [of Transportation] decides by regulation to include in this definition as consistent with the need of the United States to conserve energy." §32901(a)(10). NHTSA's heavy-duty standards "shall provide not less than (A) 4 full model years of regulatory lead-time; and (B) 3 full model years of regulatory stability." §32902(k)(3).

## II.    Regulatory Background

### A.    President Biden's Executive Order

In August 2021, President Biden issued an Executive Order declaring that "America must lead the world on clean and efficient cars and trucks." Executive Order 14037 §1, 86 Fed. Reg. 43,583 (Aug. 10, 2021). "That means," President Biden said, the country's "goal" should be "that 50 percent of all new passenger cars and light trucks sold in 2030 be zero-emission vehicles, including battery electric, plug-in hybrid electric, or fuel cell electric vehicles." *Id.*[4] To make that goal a reality, President

---

[4] "Zero-emission vehicle" is a misnomer. Emissions are created in generating the electricity that powers electric vehicles.

Biden directed (1) NHTSA to set new fuel-economy standards and (2) EPA to set new vehicle greenhouse-gas emission standards. *Id.* §§2, 3.

In December 2021, EPA issued a rule establishing more stringent greenhouse-gas emission standards for light-duty vehicles for model years 2023 and later. 86 Fed. Reg. 74,434 (Dec. 30, 2021). That rule is being challenged in *Texas v. EPA* (D.C. Cir. No. 22-1031). In April 2024, EPA followed up by issuing a pair of rules establishing even more stringent greenhouse-gas emission standards for (i) light- and medium-duty vehicles for model years 2027 and later, and for (ii) heavy-duty vehicles for model years 2032 and later (with phase-in starting in model year 2027 for certain vehicle categories). 89 Fed. Reg. 27,842 (Apr. 18, 2024); 89 Fed. Reg. 29,440 (Apr. 22, 2024). Those rules are being challenged in *Kentucky v. EPA* (D.C. Cir. No. 24-1087) and *Nebraska v. EPA* (D.C. Cir. No. 24-1129), respectively.

In May 2022, NHTSA followed suit, amending the fuel-economy standards for passenger cars and light trucks for model years 2024-2026. 87 Fed. Reg. 25,710 (May 2, 2022). Many of the petitioners here challenged that rule because (among other things) NHTSA improperly considered the fuel economy of electric vehicles. *See AFPM v. NHTSA* (D.C.

Cir. No. 22-1145). The D.C. Circuit heard argument in September 2023 but has not yet issued its decision.

## B. The automobile standards

This case involves a rule NHTSA issued in June 2024, which set fuel-economy standards for passenger cars and light trucks for model years 2027-2031 and for heavy-duty pickup trucks and vans for model years 2030-2035. In this rule, NHTSA followed the same basic approach it used in 2022 and further increased the stringency of its fuel-economy standards to advance President Biden's electrification policy.

For passenger cars, the rule increases the stringency of the model year 2026 standards by 2% per year in model years 2027-2031. JA__[89Fed.Reg.52,547]. For light trucks, there is no increase in model years 2027-2028, but the standards then increase by 2% per year in model years 2029-2031. *Id.* As a result, NHTSA predicts the standards will require an industry-average for model year 2031 of 65.1 miles per gallon for passenger cars and 45.2 miles per gallon for light trucks. JA__[89Fed.Reg.52,549] (Table 1-4).

These are substantial increases from model year 2022, the last year from which NHTSA had data when it issued the rule. In model year 2022,

the standards required an estimated fleetwide average of 44.1 miles per gallon for passenger cars and 32.1 miles per gallon for light trucks. *Id.* Yet NHTSA found that the rule's far more stringent standards are "the maximum feasible" for model years 2027-2031 based on modeling showing what NHTSA claims is a "cost-effective pathway" for automakers to comply. JA__[89Fed.Reg.52,834]; JA__[89Fed.Reg.52,550]. That pathway requires automakers either (i) to produce large numbers of electric vehicles or (ii) to pay civil monetary penalties or use compliance credits.

### 1.    NHTSA's consideration of the forbidden factors

NHTSA used the "CAFE Compliance and Effects Modeling System" to assess the technological feasibility and economic practicability of its proposed fuel-economy standards. JA__[89Fed.Reg.52,580]. The model estimates how automakers "might respond to a given regulatory scenario," and "what impact that response will have on fuel consumption, emissions, safety impacts, and economic externalities." *Id.*

NHTSA began by modeling a projected "baseline" scenario in which NHTSA made no change to the standards set in the prior rule. JA__[89Fed.Reg.52,698]. NHTSA started with information from manufacturers about the vehicles they predicted they would produce in model

11

year 2022. JA__[TSD.2-20], JA__[80Fed.Reg.52,599]. NHTSA included estimates for how many electric vehicles and plug-in hybrids automakers would produce in 2022 in the baseline, even as it recognized there was "a high probability" that "actual production volumes" would differ from the estimates. *See* JA__[FRIA.8-10-8-11] (Figures 8-7 & 8-8), JA__[TSD.2-20] n.103. NHTSA also compiled a list of technologies (including electrification) that could improve fuel economy. JA__[TSD.3-1]. Using these data, NHTSA projected how the fleet would change in subsequent model years as automakers added fuel-saving technologies in response to economic factors and other regulatory requirements that NHTSA assumed would exist even if it did not change the current standards. JA__[89Fed.Reg.52,635], JA__[TSD.1-27].

To project how automakers would respond to economic factors, NHTSA's model added technology that "pays for itself" in fuel savings within 30 months. JA__[89Fed.Reg.52,598], JA__[89Fed.Reg.52,708]. The model also considered ways automakers could lower the cost of electric vehicles by taking advantage of "recently-passed tax credits for battery-based vehicle technologies." JA__[89Fed.Reg.52,707]; JA__[89Fed. Reg.52,614-16]. And to project how manufacturers would respond to

12

regulatory requirements other than this rule, the model assumed automakers would add technology to their 2022 fleets in response to four factors. JA__[89Fed.Reg.52,698]; JA__[TSD.1-27].

First, the model assumed automakers would add technology to comply with NHTSA's prior fuel-economy standards, including the model year 2026 standards that NHTSA assumed would apply in future years absent this rulemaking. JA__[89Fed.Reg.52,698]; JA__[TSD.1-27].

Second, the model assumed automakers would add technology to comply with the greenhouse-gas standards set by EPA in 2021 and that EPA's model year 2026 standards would continue in perpetuity. JA__[89Fed.Reg.52,698].[5]

Third, the model assumed that automakers who had made voluntary commitments to California would fulfill their "contractual obligations" to produce more electric vehicles in model year 2022 than required by EPA's greenhouse-gas standards. *Id.*

Fourth, the model assumed automakers would produce electric vehicles in response to the "zero-emission vehicle" (ZEV) programs

---

[5] Although EPA published more stringent greenhouse-gas standards two months before NHTSA issued this rule, NHTSA used the prior EPA standards to model the baseline. JA__[89Fed.Reg.52,698] n.826.

California and other states have adopted or are in the process of adopting. *Id.*; *see also* JA__[89Fed.Reg.52,610-14]. These programs require increasing percentages of new vehicles be ZEVs—thereby creating an electric-vehicle mandate. For the newest program (called "Advanced Clean Cars II" or "ACC II"), 35% of automobiles sold in model year 2026 must be ZEVs, and the percentage "would ramp up to 100% in [model year] 2035 and subsequent years if it became legally enforceable." JA__[89Fed.Reg.52,613].

ACC II is not currently enforceable in California (or elsewhere) because it is preempted by the Clean Air Act. JA__[89Fed.Reg.52,610]. EPA may waive preemption for California under specified conditions. 42 U.S.C. §7543(b). If EPA grants California a waiver, other states may "adopt and enforce" California's standards. *Id.* §7507. But EPA has not yet ruled on California's request for a waiver for ACC II.

EPA has already granted waivers for California's Advanced Clean Cars I (ACC I) and Advanced Clean Trucks (ACT) programs. *See* JA__[89Fed.Reg.52,613]. But the legality of those waivers has been challenged. JA__[89Fed.Reg.52,704] & n.843; *see also Ohio v. EPA*, 98 F.4th 288 (D.C. Cir. 2024) (dismissing statutory challenge to ACC I waiver for

lack of standing), *petition for cert. filed sub. nom. Diamond Alternative Energy, LLC v. EPA* (U.S. July 8, 2024) (No. 24-7); *W. States Trucking Ass'n v. EPA* (D.C. Cir. No. 23-1143) (pending challenge to ACT waiver).

Commenters explained that California's ZEV programs are preempted by EPCA because they are "related to fuel economy standards," §32919(a); showed that automakers will not be able to comply with ACC II; and explained that California has a history of setting stringent requirements and then relaxing them or extending compliance deadlines, *see, e.g.*, JA__[89Fed.Reg.52,610] & n.258; JA__[Kia.4-5]; JA__[AutoAlliance.Attachment0.10-11]; JA__[Valero.10-11]. The model nevertheless assumed that automakers would produce electric vehicles at a "level [that] would result in full compliance with the ACC II program" in California and the other states that have adopted or may adopt it. JA__[89Fed.Reg.52,611-12].

Based on these (and other) assumptions, the model projected that the percentage of electric vehicles in the baseline passenger-car fleet will increase from 12.4% in 2022 to 31.4% in model year 2027 and 39.4% in model year 2031. JA__[89Fed.Reg.52,731] (Table V-9). For light trucks,

15

the percentage is projected to increase from 1.3% in model year 2022 to 14.8% in model year 2027 and 22.5% in model year 2031. *Id.*

Having generated these projected baseline fleets, NHTSA then modeled five alternative scenarios to estimate whether and how automakers could comply with stricter fuel-economy standards. *Id.* NHTSA prohibited the model from adding electric vehicles in response to the new fuel-economy standards during the model years for which NHTSA was setting standards (2027-2031). JA__[89Fed.Reg.52,832]. But NHTSA did not remove the electric vehicles it had already included in its baseline.[6] So those electric vehicles and their high imputed fuel economy were included in the compliance fleet that NHTSA modeled for each of the alternatives, including the one it selected as the final standards. JA__[89Fed.Reg.52,731] (Table V-9); *see also* JA__[89Fed.Reg.52,799].

Although NHTSA was setting standards only for model years 2027-2031, it considered the standards' impact until 2050. JA__[89Fed.Reg.52,552]. The model introduced *additional* electric

---

[6] NHTSA also did not remove plug-in hybrids from the baseline, but it treated them during the standard-setting years as if they operated only on gasoline, as §32902(h)(2) requires. JA__[89Fed.Reg.52,832].

vehicles (beyond those in the baseline) that automakers may produce in later years "as an indirect effect of more stringent standards" or in response to other factors. JA__[89Fed.Reg.52,828]; *see also* JA__[89Fed.Reg.52,635], JA__[89Fed.Reg.52,835]. The model also allowed plug-in hybrids to receive their enhanced fuel economy when operated on electricity, and considered that automakers could comply using credits, in years outside the standard-setting years. JA__[89Fed.Reg.52,731]; JA__[89Fed.Reg.52,833], JA__[FRIA.9-65], JA__[FRIA.6-4-6-12]. These compliance flexibilities were included in the cost-benefit analysis that NHTSA considered in assessing economic practicability. *See* JA__[89Fed.Reg.52,815], JA__[89Fed.Reg.52,887]; JA__[89 Fed.Reg.52,553].

## 2.  NHTSA's consideration of civil penalties

The model also considered that automakers would pay civil penalties when they cannot comply with the standards or when it is cheaper to pay penalties than to comply. JA__[89Fed.Reg.52,582-83]. The model projected that during model years 2027-2031, automakers would pay over $1.8 billion in penalties. JA__[89Fed.Reg.52,807-08] (Tables VI-7 & VI-8). NHTSA treated these penalties as "a component of per-vehicle cost

17

increases" resulting from the new standards because NHTSA "assumes that they (like technology costs) are passed forward to new vehicle buyers." JA__[89Fed.Reg.52,806]. Civil penalties are 10% of the "regulatory costs" for passenger-car manufacturers and 9% for light-truck manufacturers. JA__[89Fed.Reg.52,810-11] (Tables VI-11 & VI-12).

### C.    The heavy-duty standards

The rule's new standards for heavy-duty pickup trucks and vans ("HDPUVs," in NHTSA's shorthand) build on standards that were set in 2016 and apply to vehicles through model year 2029. JA__[89Fed.Reg.52,576]. The standards are based on a vehicle's fuel consumption and are expressed in terms of how many gallons of fuel the vehicle uses per 100 miles. JA__[89Fed.Reg.52,587-88] & n.155.

The rule increases the stringency of the existing 2029 standards by 10% per year in model years 2030-2032 and by 8% per year in model years 2033-2035. JA__[89Fed.Reg.52,547]. NHTSA estimates that the standards will require a fleetwide-average fuel-consumption rate of 2.851 gallons/100 miles in model year 2035—substantially stricter than the 5.023 gallons/100 miles required in model year 2029. JA__[89Fed.Reg.52,576]; JA__[89Fed.Reg.52,547] n.14.

18

NHTSA concluded that even though the standards increase in stringency year-over-year, they provide the "three full model years of regulatory stability" required by §32902(k)(3)(B). JA__[89Fed.Reg.52,780]. NHTSA asserted that "'stable' can reasonably be interpreted as 'known in advance' and 'remaining in effect for three years,'" and that its standards thus comply with §32902(k)(3)(B) because they "are known in advance and established in three-year tranches." *Id.*

NHTSA also found that the standards are "appropriate, cost-effective, and technologically feasible." JA__[89Fed.Reg.52,836]. As with the automobile standards, NHTSA's finding was based on modeling that assumes automakers will produce large numbers of electric vehicles. Although there were no electric vehicles in the heavy-duty fleet in 2022, NHTSA's new standards assume that battery-electric vehicles will make up 27% of the fleet in model year 2030 and 40% in model year 2038, and that plug-in hybrids will make up an additional 4% of the 2038 fleet. JA__[89Fed.Reg.52,905-06] (Table VI-51). NHTSA counted the fuel consumption of these vehicles "as 0 even though their energy consumption

19

is non-zero." JA__[89Fed.Reg.52,913].[7] NHTSA acknowledged that under "the mathematics of averaging," including "a '0' value in the calculation" has a significant impact on the fleetwide-average fuel consumption achievable by a manufacturer of heavy-duty vehicles. *Id.*

## SUMMARY OF ARGUMENT

**I.**    NHTSA's automobile standards are unlawful for three independent reasons, each of which warrants vacatur.

**A.**    First, NHTSA considered factors that Congress prohibited it from considering. When NHTSA determines the maximum-feasible standards under §32902(f), it "may not consider" the fuel economy of electric vehicles, the fuel economy of plug-in hybrids when operated on electricity, or the availability of compliance credits. §32902(h). This means the agency must set standards that a fleet of internal-combustion-engine vehicles can achieve, ensuring that electric vehicles, plug-in hybrids, and credits remain compliance *options*, not regulatory *mandates*.

---

[7] For plug-in hybrids, NHTSA deems the proportion of operation "derived from electricity that is generated from sources that are not onboard the vehicle to have a fuel efficiency value of 0 gallons/mile." JA__[89Fed.Reg.52,576].

NHTSA openly flouted that prohibition here. Instead of leaving the forbidden factors out of the equation, as Congress required, NHTSA baked them into its standards. That led the agency to set standards so stringent that they are not feasible for a conventional fleet and can be met only by using the compliance flexibilities that Congress prohibited the agency from considering. NHTSA's efforts to defend that choice fail. The agency may not create exceptions that Congress did not enact, and it may not substitute its policy judgment for Congress's.

**B.**    Second, NHTSA improperly incorporated state electric-vehicle mandates into its baseline. NHTSA tried to evade §32902(h) by claiming that its standards merely reflect the electric vehicles automakers would produce to comply with state electric-vehicle mandates. But those state mandates are preempted, making NHTSA's reliance on them unlawful. At a minimum, NHTSA acted arbitrarily and capriciously when it failed to address these issues or consider whether automakers could feasibly comply with the state mandates.

**C.**    Finally, NHTSA never showed that manufacturers could feasibly comply with its standards. Congress required NHTSA to set standards that are "feasible" for automakers to actually meet. §32902(a).

21

Instead, NHTSA set standards that it knows most automakers *cannot* meet—and then justified that choice by concluding that the automakers who inevitably fall short can afford to pay civil penalties. But paying civil penalties is a sanction for *violating* the standards, not a means of complying with them. NHTSA cannot rely on automakers' ability to pay penalties as a basis for finding the standards to be feasible.

**II.** NHTSA's heavy-duty standards are also unlawful and should be vacated for three independent reasons.

**A.** First, Congress never authorized the agency to effectively mandate heavy-duty electric vehicles. Congress told NHTSA to create a "fuel efficiency improvement program" for heavy-duty vehicles. §32902(k)(2). But electric vehicles do not use "fuel" as that term is employed in the statute. Electric vehicles therefore cannot be part of NHTSA's "fuel efficiency" program.

**B.** Second, even if NHTSA could include electric vehicles in its heavy-duty program, it cannot assume they use no energy. The agency exceeded its statutory authority by artificially assigning electric vehicles a fuel-consumption rate of zero—even though electric vehicles, like all other vehicles, use energy. Any metric that does not account for a

22

vehicle's energy usage is not "appropriate" in light of EISA's focus on energy conservation. §32902(k)(2).

**C.**     Finally, NHTSA failed to provide "3 full model years of regulatory stability." §32902(k)(3)(B). Properly read, that language means that NHTSA's standards must remain constant at the same stringency for at least three years. NHTSA turned that directive on its head by setting standards that increase year-over-year.

## STANDING

**1.**     Petitioners include entities and associations of entities that produce or sell liquid fuels and the raw materials used to produce them. NHTSA estimates that its automobile standards "will reduce gasoline consumption by 64 billion gallons" through 2050, and its heavy-duty standards will reduce fuel consumption by an additional "5.6 billion gallons" relative to reference baseline levels. JA__[89Fed.Reg.52,545].

As the accompanying declarations explain (and common sense confirms), depressing demand for liquid fuels financially injures entities that would otherwise sell those billions of gallons of fuel and corresponding raw materials. That constitutes Article III injury-in-fact directly traceable to NHTSA's rule. *See Collins v. Yellen*, 594 U.S. 220, 243 (2021). And

23

because vacating the rule would result in higher fuel consumption, that injury is redressable. *See* JA__[89 Fed. Reg. 52,545].

Petitioners also include or represent consumers who purchase, and automobile dealerships who sell, regulated vehicles. NHTSA's standards will injure those petitioners by "increas[ing] the average cost" and reducing the availability of those vehicles. JA__[89 Fed. Reg. 52,550]; *cf. Competitive Enter. Inst. v. NHTSA*, 956 F.2d 321, 324 (D.C. Cir. 1992). Those injuries are likewise redressable, as vacating the standards will eliminate the market distortion.

The membership-association petitioners have associational standing. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342-43 (1977). Their members have standing to sue in their own right, for the reasons described above; the interests they seek to protect are germane to their organizational purposes, which include safeguarding the viability of their members' businesses; and neither the claims asserted nor the relief requested requires the participation of individual members.

**2.** Petitioners also include West Virginia and 25 other states, which, as explained in the accompanying declarations, have standing for at least three reasons.

24

First, NHTSA's standards increase costs to state petitioners. This is a "'pocketbook' injury that is incurred by the state itself." *Air All. Hous. v. EPA*, 906 F.3d 1049, 1059-60 (D.C. Cir. 2018); *see also Tennessee v. Dep't of Educ.*, 104 F.4th 577, 587-88 (6th Cir. 2024). State petitioners own fleets of vehicles to perform state functions and must regularly replace them. NHTSA's standards will increase average vehicle cost by over $1,500. JA__[89Fed.Reg.52,734]. NHTSA's standards thus make replacement more expensive while depriving the states of the "opportunity to purchase vehicles of choice." *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 383 (D.C. Cir. 2020). Because the rule increases the market share of plug-in hybrids, JA__[89Fed.Reg.52,729-31], state petitioners will also need to retool maintenance and fueling systems to accommodate more hybrids—further increasing costs. Electric vehicles and hybrids are also much heavier than internal-combustion-engine vehicles, increasing road- and infrastructure-maintenance costs. And state petitioners will also pay—as regulators and ratepayers—billions of dollars for the electric-grid updates necessitated by the rule. JA__[89Fed.Reg.52,563].

Second, NHTSA's standards will reduce state petitioners' fuel-tax revenues. NHTSA projects the rule will reduce gasoline consumption by

some 69.6 billion gallons through 2050. JA__[89Fed.Reg.52,545]. That means lower fuel-tax revenues, harming state petitioners by decreasing funding. *See Wyoming v. Oklahoma*, 502 U.S. 437, 448-49 (1992).

Third, the rule undermines state petitioners' interest in protecting their electric grids. Although NHTSA ignored the "effects of its standards on future electricity prices," JA__[89Fed.Reg.52,678], it admits its standards "may end up causing increased electrification," JA__[89Fed.Reg.52,828]. Regulating, managing, and overseeing grid expansion is one of state petitioners' most important police powers. *See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 205 (1983). Increasing grid capacity is not costless. Displacing states as primary grid regulators undermines their sovereign and quasi-sovereign interests, *Alfred L. Snapp & Son, Inc. v. P.R. ex rel. Barez*, 458 U.S. 592, 607 (1982); *Kentucky v. Biden*, 23 F.4th 585, 598-601 (6th Cir. 2022), and entitles them to "special solicitude" in this standing analysis, *see Massachusetts v. EPA*, 549 U.S. 497, 520 (2007).

## **STANDARD OF REVIEW**

This Court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §706(A), (C).

## ARGUMENT

### I.    NHTSA's Automobile Standards Are Unlawful.

#### A.    NHTSA unlawfully considered the forbidden factors.

Congress prohibited NHTSA from considering the fuel economy of electric vehicles, the fuel economy of plug-in hybrids when operated on electricity, and the availability of compliance credits when determining maximum-feasible fuel economy. But that is exactly what the agency did here. None of NHTSA's justifications excuses these violations, and its errors cannot be dismissed as harmless.

##### 1.    NHTSA may not consider the forbidden factors when carrying out §32902(f).

###### a.    Section 32902(h) prohibits NHTSA from considering the forbidden factors when setting fuel-economy standards.

Congress could not have been clearer. In "carrying out" its duty to determine maximum-feasible fuel economy under §32902(f), NHTSA "may not consider" the fuel economy of electric vehicles, the fuel economy of plug-in hybrids when operated on electricity, or the availability of compliance credits. §32902(h). No exceptions; full stop. Congress forbade

NHTSA to consider these factors because it wanted them to remain compliance *options*, not regulatory *mandates*. As a result, NHTSA must set fuel-economy standards at a level that a conventional fleet can achieve—without a compliance boost from the forbidden factors.

    **i.**    Section 32902(h)'s language is unambiguous, so the "inquiry begins … and ends there as well." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 127 (2018). Because the statute does not define *consider*, that word "should be interpreted as taking [its] ordinary meaning at the time Congress enacted the statute." *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) (cleaned up). In 1988, as today, to *consider* meant to "take into account." *American Heritage Dictionary* 313 (2d ed. 1985).[8] By its plain terms, then, §32902(h) means that NHTSA's decisionmaking may not account for the forbidden factors.

    That prohibition includes no qualifications or carveouts. Instead, Congress used the "mandatory language" *may not. United States v.*

---

[8] The earliest version of §32902(h)(1) was enacted as part of the Alternative Motor Fuels Act of 1988 and prohibited NHTSA from considering the fuel economy of alcohol- or natural-gas-powered vehicles. Pub. L. No. 100-494, sec. 6(a), §513(g)(2)(B), 102 Stat. 2441, 2450 (1988). In the Energy Policy Act of 1992, Congress expanded the provision to cover electric vehicles. Pub. L. No. 102-486, §403(5)(G)(ii)(II), (H)(ii) 106 Stat. 2776, 2878.

*Palomar-Santiago*, 593 U.S. 321, 326 (2021). Such language "indicates a command that admits of no discretion on the part of the person instructed to carry out the directive." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 661 (2007). So when §32902(h) applies, NHTSA has no discretion to consider the fuel economy of *any* electric vehicles, the fuel economy of *any* plug-in hybrids when operated on electricity, or the availability of *any* credits—no exceptions. *See Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 27 (1989) ("[W]e are not at liberty to create an exception where Congress has declined to do so.").

Neighboring provisions contain express exceptions—strengthening the inference that Congress intentionally omitted any such exceptions in §32902(h). *See Russello v. United States*, 464 U.S. 16, 23 (1983). For example, the same legislation that created the first version of §32902(h) required that the "maximum number practicable" of government-owned vehicles run on "alternative fuels." Pub. L. No. 100-494, sec. 4(a), §400AA(a)(2), 102 Stat. at 2442, *codified at* 42 U.S.C. §6374(a)(2). Congress then explained how to assess practicability, providing that the "initial cost" of those vehicles "shall not be considered"—"*unless* the initial

cost … exceeds" a certain threshold. *Id.* (emphasis added). There is no comparable exception in §32902(h).

Likewise, Congress showed elsewhere in §32902 that it knows how to distinguish among model years. *See* §32902(b)(2) (different standards for "model years 2011 through 2020" versus "model years 2021 through 2030"). So if Congress had wanted NHTSA to consider the forbidden factors in certain model years but not others, it had ready examples at hand. But Congress did not limit NHTSA's obligation under §32902(h) to the model years for which it is setting standards.

**ii.**     Section 32902(h) applies whenever NHTSA is "carrying out subsections (c), (f), and (g) of this section." §32902(h). Congress listed those specific provisions to ensure that no part of the agency's decisionmaking considers the forbidden factors.

Start with subsection (f), which tells NHTSA how to determine "maximum feasible average fuel economy." NHTSA necessarily carries out subsection (f) when it sets new standards under subsections (a), (b), and (d). All three provisions require NHTSA to set standards at the "maximum feasible" level. §32902(a), (b)(2)(b), (d)(1)(B). By prohibiting NHTSA from considering the forbidden factors when "carrying out"

30

subsection (f), Congress stopped the agency from setting new standards based on those factors. Thus, when NHTSA is deciding whether a standard is "technological[ly] feasib[le]" and "economic[ally] practicab[le]," §32902(f), it may not consider the forbidden factors.

Section 32902(h) also applies when NHTSA is "carrying out" subsections (c) and (g), which permit the agency to amend existing fuel-economy standards. Whenever NHTSA sets amended standards under subsections (c) and (g) it necessarily carries out subsection (f), just as it does when it sets new standards under subsections (a), (b), and (d). That is because amended standards (like new standards) must be the "maximum feasible" and subsection (f) applies whenever the agency is "deciding maximum feasible average fuel economy under this section." §32902(f). And Congress's decision to list subsections (c) and (g) in §32902(h) also accomplished a further goal: it prohibited NHTSA from considering the forbidden factors even when making the discretionary decision whether to amend standards in the first place.

**iii.**    All of this makes sense in light of Congress's aims. Congress enacted the initial version of §32902(h) in a bill to "facilitate the development and use of alternative fuels." H.R. Rep. No. 100-929, at 15 (1988).

According to Chairman Dingell of the House Energy and Commerce Committee—one of the bill's managers—Congress worried that "the incentives provided by th[e] bill" would be "erased" if NHTSA "assume[d] a certain penetration of alternative fueled vehicles." 134 Cong. Rec. H8089, H8091 (1988). Congress understood that if automakers that had invested in alternative-fuel vehicles faced "commensurate increases in the [fuel-economy] standard," *id.*, it would discourage them from making those investments—the exact opposite of what Congress set out to do. Congress thus enacted §32902(h) to ensure that fuel-economy standards would be set "without regard to the penetration of alternative fuel vehicles in any manufacturer's fleet"—preventing NHTSA from "wip[ing] out" the bill's "benefits." *Id.* The upshot is that NHTSA must set standards that are within reach for a fleet of internal-combustion-engine vehicles.

NHTSA itself has acknowledged the force of this reasoning. The agency previously recognized that "compliance with higher standards would appear more cost effective and, potentially, more feasible" if the agency presumed manufacturers would use regulatory "flexibilities" to comply. 87 Fed. Reg. at 25,994. That would "effectively require manufacturers to use those flexibilities if NHTSA [made standards] more

32

stringent." *Id.* "By keeping NHTSA from including them in [the] stringency determination, [§32902(h)] ensures that those statutory credits remain true compliance flexibilities." *Id.*

### b. The major-questions doctrine confirms that Congress did not authorize NHTSA to mandate electric vehicles.

Besides protecting Congress's incentives, §32902(h) also bars NHTSA from seizing power over a major policy issue that Congress has not given it. NHTSA's rule stems from the Biden administration's effort to "ensur[e] 100% of new sales for light- and medium-duty vehicles will be electrified." DNC, *The Biden Plan for a Clean Energy Revolution and Environmental Justice*, tinyurl.com/4j5hz9s5 (last visited Nov. 11, 2024). The forced electrification of the nation's vehicle fleet is a major question if ever there was one—requiring "clear congressional authorization." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). Far from clearly authorizing NHTSA's strategy, however, Congress has forbidden it. The major-questions doctrine thus reinforces the plain statutory text, confirming the rule exceeds NHTSA's authority.

**i.** NHTSA's rule implicates a major question. To begin with, the economic significance of NHTSA's rule "is staggering by any measure."

33

*Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023). "For passenger cars and light trucks," NHTSA's rule will impose "$24.5 billion in monetized costs." JA__[89Fed.Reg.52,550]. It will also "reduce gasoline consumption by 64 billion gallons … through calendar year 2050," JA__[89Fed.Reg. 52,545], and "increase electricity consumption by about 333 terawatt-hours" over the same period, JA__[89Fed.Reg.52,580]. Forcing a shift to electric vehicles will send shockwaves through the national economy, affecting not only automakers and vehicle consumers, but also producers of liquid fuels and countless associated supply chains, as well as state electric grids. That is precisely the sort of "substantia[l] restructur[ing]" that made *West Virginia* "a major questions case." 597 U.S. at 724 (11% projected drop in coal market share).

NHTSA's rule also has "vast … political significance." *Id.* at 716 (citation omitted). Electrification—and the government's role in mandating it—is "the subject of an earnest and profound debate across the country." *Id.* at 732. That debate touches on the nation's infrastructure, supply chain, workforce, and national security—issues well beyond NHTSA's "comparative expertise." *Id.* at 729. Here, as in *West Virginia*, the "basic

34

and consequential tradeoffs" involved "are ones that Congress would likely have intended for itself." *Id.* at 730.

ii.    Given the stakes, NHTSA must "point to 'clear congressional authorization.'" *Id.* at 732 (citation omitted). Yet far from providing clear congressional authorization, the text, history, and purpose of §32902(h) reveal clear congressional intent to *prohibit* NHTSA from forcing electrification. As shown above, the "best reading" of §32902(h) is that it bars NHTSA from considering the fuel economy of *any* electric vehicles and the electric-drive operation of plug-in hybrids when setting fuel-economy standards. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024). But even if there were a "colorable textual basis" to hold otherwise, the major-questions doctrine would still foreclose NHTSA's attempted power-grab. *West Virginia*, 597 U.S. at 722.

## 2.    NHTSA considered the forbidden factors when carrying out §32902(f).

NHTSA violated §32902(h) in determining the "maximum feasible" fuel economy by considering (a) the fuel economy of electric vehicles in the "reference baseline" and (b) all three of the forbidden factors in years outside those for which this rule set standards.

### a.    NHTSA unlawfully considered the fuel economy of electric vehicles in the baseline.

Section 32902(h)(1) forbids NHTSA to "consider the fuel economy" of electric vehicles when "carrying out" §32902(f). But NHTSA "considered" the fuel economy of electric vehicles by including those vehicles—and their high imputed fuel economy—in its projected "baseline" fleet. As explained above, *see supra* at 11-16, the agency began by "assum[ing] a certain penetration" of electric vehicles, *contra* 134 Cong. Rec. at H8091. For model year 2027, NHTSA assumed that 31.4% of passenger cars and 14.8% of light trucks in the baseline fleet would be electric vehicles, with those figures rising to 39.4% and 22.5%, respectively, in model year 2031. JA__[89Fed.Reg.52,732] (Table V-9); *see also* JA__[89Fed.Reg.52,698].

NHTSA then used its tainted baseline—electric vehicles and all—when "carrying out" §32902(f). Subsection (f) requires NHTSA to determine "maximum feasible average fuel economy" by considering "economic practicability" and "technological feasibility," among other factors. NHTSA did so using its baseline. *E.g.*, JA__[89Fed.Reg.52,552] (baseline informs "decision as to what standards are maximum feasible"). As to economic practicability, NHTSA conceded that the "baseline against which we measure the costs and benefits of our standards includes an

36

appreciable number of [electric vehicles]." JA__[89Fed.Reg.52,659]. And as to technological feasibility, "the pre-existing fleet fuel economy level is crucial because it marks the starting point for determining what further efficiency gains will be feasible." JA__[89Fed.Reg.52,635]; *see also* JA__ [89Fed.Reg.52,834] (NHTSA "determine[s] maximum feasible [fuel-economy] standards on the foundation of" its baseline fleet).

Put simply, NHTSA considered the fuel economy of electric vehicles in carrying out §32902(f) because the fleet NHTSA modeled to determine whether the standards were feasible included the baseline electric vehicles. As a result, NHTSA's determination that the standards were feasible depended on the presence of those electric vehicles in the fleet and the significant compliance boost they gave to automakers' average fuel economy. NHTSA never modeled whether a fleet *without* electric vehicles could comply with the standards and, if so, at what cost. NHTSA therefore necessarily considered the fuel economy of electric vehicles in carrying out §32902(f), in clear and direct violation of §32902(h)(1).

37

### b.    NHTSA unlawfully considered all three for-bidden factors outside the standard-setting years.

NHTSA also violated §32902(h) by considering all three forbidden factors outside the standard-setting years. As to electric vehicles, NHTSA allowed the model to add those it projected automakers would produce "following the period of regulation as an indirect effect of more stringent standards" or in response to other factors. JA__[89Fed.Reg.52,828]. As to plug-in hybrids, NHTSA allowed the model to consider their enhanced fuel economy when operated on electricity in the non-standard-setting years. JA__[89Fed.Reg.52,731]. And as to compliance credits, NHTSA considered their "potential use" outside the standard-setting years. JA__[89Fed.Reg.52,583]; *see also* JA__[FRIA.9-65], JA__[FRIA.6-4-6-12].

NHTSA claimed this would "improve the accuracy and realism of [its cost-benefit] analysis." JA__[89Fed.Reg.52,635]. That is, consideration of the forbidden factors in the non-standard-setting years affected the cost of compliance and the rule's benefits in those years. *See* JA__[89Fed.Reg.52,815],    JA__[89Fed.Reg.52,887],    JA__[FRIA.9-10] (Figure 9-5). And NHTSA used this cost-benefit analysis when assessing

economic practicability under §32902(f). *See* JA__[89Fed.Reg.52,815]; JA__[89Fed.Reg.52,887]. That too is squarely barred by §32902(h).

### 3. NHTSA's justifications fail.

NHTSA defended its reliance on the forbidden factors in three ways. First, it read exceptions into the phrase "may not consider"—claiming that NHTSA *may* consider the forbidden factors at some times or for some reasons. Second, it suggested that §32902(h) does not govern its baseline. And finally, it invoked policy arguments. Each effort fails.

**a.** According to NHTSA, §32902(h) merely bars the agency from "consider[ing] the possibility that manufacturers would create new [electric vehicles] *to comply* with [NHTSA's] standards *in any model year for which standards are being set*." JA__[89Fed.Reg.52,832] (emphases added). That interpretation leaves the agency free to consider electric vehicles produced "independent of NHTSA's standards," JA__[89Fed.Reg.52,704] n.836, and to consider electric vehicles (and the other forbidden factors) "[o]utside of the standard-setting years," JA__[89Fed.Reg.52,635].

The problem, of course, is that §32902(h) does not say any of those things—and NHTSA "may not narrow [the] provision's reach by inserting

39

words Congress chose to omit." *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020). Section 32902(h) does not say that NHTSA "may not consider" the forbidden factors "*unless*," or that "NHTSA *may* consider" the forbidden factors "*if*." It says NHTSA "may not consider" them, period. The statutory text is plain, and it leaves no room for the exceptions NHTSA reads into it.

Nor is NHTSA's reading a "possible" one because it "give[s] meaningful effect" to §32902(h). JA__[89Fed.Reg.52,705]. If an agency's interpretation "is not the best, it is not permissible." *Loper Bright*, 144 S. Ct. at 2266. And the problem with NHTSA's interpretation is not that it gives §32902(h) *no* effect, but that it gives it only *partial* effect—not the "full effect" demanded by Congress's categorical prohibition. *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 372 (2007).

**b.**     NHTSA also briefly suggested that §32902(h) does not prevent it from baking electric vehicles into the baseline because the baseline is "simply the backdrop against which [the maximum-feasible] determination is made." JA__[89Fed.Reg.52,704] n.836. But the baseline is not some historical artifact divorced from NHTSA's standard-setting. It is an integral part of NHTSA's maximum-feasible determination.

40

Standards that are feasible using one baseline may not be feasible using a different baseline. NHTSA conceded that it used the baseline to "measure the costs and benefits of [its] standards," JA__[89Fed.Reg.52,659], and to "determin[e] what further efficiency gains will be feasible," JA__[89Fed.Reg.52,635]. Those are both subsection (f) questions. And when NHTSA used its baseline in "carrying out" subsection (f), it violated §32902(h)'s instruction that it "may not consider" the forbidden factors.

NHTSA used to know better. In 2006, the agency recognized that its "baseline projections *cannot reflect*" the "improve[d] … fuel economy performance" of "alternative fuel vehicles" because "[§]32902(h) prohibits us from taking such benefits into consideration." 71 Fed. Reg. 17,566, 17,582 (Apr. 6, 2006) (emphasis added). NHTSA had it right before, and its new reading is "bad wine of recent vintage." *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019) (cleaned up).

**c.**    NHTSA eventually dropped all pretense to statutory interpretation and simply declared that it had good reasons for ignoring Congress's instructions. It insisted it cannot "pretend" that electric vehicles "built for non-CAFE-compliance reasons do not exist" because that "would be unrealistic" and produce "inaccurat[e]" results. JA__[89Fed.

41

Reg.52,704] n.836. Instead, given the "reality" that "electric vehicles exist," JA__[89Fed.Reg.52,705], NHTSA declined to "blind itself" to them without a "clear indication" to do so, JA__[89Fed.Reg.52,834].

But Congress *did* provide a clear indication, and NHTSA is bound by it. *See River City Fraternal Order of Police Lodge 614 v. Ky. Ret. Sys.*, 999 F.3d 1003, 1009 (6th Cir. 2021) ("[T]he agency has no authority to promulgate a regulation that undoes the unambiguous language of the statute."). "[W]hen Congress directs an agency to consider only certain factors in reaching an administrative decision, the agency is not free to trespass beyond the bounds of its statutory authority by taking other factors into account." *Murray Energy Corp. v. EPA*, 936 F.3d 597, 623 (D.C. Cir. 2019) (citation omitted).

There is also nothing unusual about §32902(h). Congress often determines that "real" factors are not *relevant* to the task at hand and orders decisionmakers to proceed accordingly. *See*, *e.g.*, §41734(h); 42 U.S.C. §300gg-111(c)(5)(D). Here, it hardly defies "reality" for Congress to create incentives for alternative-fuel vehicles and then protect those incentives by requiring NHTSA to set fuel-economy standards based on what internal-combustion-engine vehicles can achieve. That some

42

automakers have previously chosen to produce electric vehicles does not lock in that choice for all time.

NHTSA may think §32902(h) is "bad policy" or that it is outdated and "is working in unintended ways"; if so, it "can ask Congress to change the law." *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 738 (2022). But "this Court is not the forum" for such arguments, *id.* at 739, and the agency may not "rewrite" §32902(h) "to suit its own sense of how the statute should operate," *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

### 4.    NHTSA's errors were prejudicial.

In a final attempt to defend its choices, NHTSA reran its model with some—but not all—electric vehicles removed from the baseline. According to NHTSA, using the revised baseline "would not change [its] conclusions regarding … technological feasibility," JA__[89Fed.Reg.52,799], or "alter [its] determination that the rule is economically feasible," JA__[89Fed.Reg.52,810]. That is misdirection. NHTSA never ran the numbers with *all* electric vehicles removed, nor did it even claim, let alone show, that a conventional fleet could meet the standards.

**a.**    Commenters warned NHTSA that its standards could not be met with a conventional fleet. As petitioners explained, the standards are

"not feasibly achievable by internal combustion engine vehicles" and "establis[h] a *de facto* electric vehicle … mandate." JA__[AFPM.1]; *see also* JA__[West.Virginia.6]. Automakers agreed. *See* JA__[Toyota.24] (the "standards are not achievable without the [baseline electric-vehicle] penetrations"); JA__[Stellantis.14] (the standards "cannot be met even with a dramatic increase in electrification"); JA__[AutoAlliance.Attachment0.8] ("Without [electric] vehicles," the standards "exceed technological feasibility.").

NHTSA cited no evidence that these commenters were wrong. Nor did it provide any modeling to show how a fleet of internal-combustion-engine vehicles could comply with its standards or at what cost. In other words, NHTSA never determined that its standards were technologically feasible and economically practicable without accounting for electric vehicles and their high imputed fuel economy, as §32902(h) requires.

**b.**    Instead, NHTSA responded by developing what it misleadingly called its "No ZEV alternative baseline." The "No ZEV" baseline removed two categories of electric vehicles from the baseline projection. First, it stripped out "electric vehicles that would be deployed to comply with" state ZEV mandates. JA__[89Fed.Reg.52,580]. And second, it

44

eliminated electric vehicles "that would be deployed consistent with man-
ufacturer commitments to deploy additional electric vehicles." *Id.*
NHTSA claimed that its alternative baseline showed the standards were
"consistent with the statutory factors regardless of the level of electrifi-
cation that occurs in the reference baseline." JA__[89Fed.Reg.52,611].

But that is simply not true, because NHTSA did not remove *all* elec-
tric vehicles from its alternative baseline. Elsewhere NHTSA acknowl-
edged that the "No ZEV" baseline "still include[d]" two categories of elec-
tric vehicles: (i) "those that were already observed in the [model year
2022] fleet" and (ii) those that NHTSA expected automakers to produce
"outside of standard setting years." JA__[89Fed.Reg.52,737]. That is like
removing the bacon from a bacon-and-ham omelet and calling it a "kosher
breakfast." In fact, NHTSA's own numbers show that 19% of the vehicles
in the "No ZEV" baseline were, well, ZEVs. *See* JA__[89Fed.Reg.52,795]
(Table VI-4) (showing 19% "[p]enetration [r]ate" for electric vehicles
throughout the standard-setting years). NHTSA's "No ZEV" baseline
should really have been called the "19% ZEV" baseline.

**c.**    That is more than enough to defeat any assertion that
NHTSA's errors were harmless. An error cannot be dismissed as

45

harmless when "it is not clear … that the end result would have been the same" absent the error. *Hargett v. Comm'r of Soc. Sec.*, 964 F.3d 546, 554 (6th Cir. 2020). Instead, courts "ordinarily vacate … unless [it is] *certain* that [the agency] would have adopted [the flawed rule] even absent the flawed rationale." *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006) (emphasis added). NHTSA cannot meet that high bar. It never even claimed, much less showed, that its standards were feasible for a conventional fleet.

### B.    NHTSA unlawfully incorporated state electric-vehicle mandates into its baseline.

NHTSA's automobile standards are unlawful for another reason: the agency unlawfully incorporated state electric-vehicle mandates into its baseline—in particular California's ZEV programs. These state laws are preempted by EPCA itself and by the Clean Air Act's Renewable Fuel Standard (RFS), Pub. L. No. 109-58, §1501, 119 Stat. 594, 1067-76 (2005), *codified as amended at* 42 U.S.C. §7545(*o*).[9] At the very least, it was arbitrary and capricious for NHTSA to assume automakers would produce

---

[9] They are also preempted by §209(a) of the Clean Air Act, 42 U.S.C. §7543(a), as petitioners have shown in cases challenging EPA's grant of a waiver for California's programs. *See supra* at 14-15.

electric vehicles to comply with state electric-vehicle laws without considering whether these electric-vehicle mandates are legally valid or whether compliance with those mandates was feasible.

### 1.   NHTSA erred by including state-mandated electric vehicles in the baseline because the state mandates are preempted.

#### a.   EPCA expressly preempts state electric-vehicle mandates.

Congress expressly barred states from enacting the laws that NHTSA relied on here. EPCA prohibits states from adopting or enforcing any "law or regulation *related to* fuel economy standards or average fuel economy standards for automobiles." §32919(a) (emphasis added). State electric-vehicle mandates clearly fit that bill.

EPCA preemption sweeps broadly. The Supreme Court has described comparable "related to" preemption provisions as "deliberately expansive," *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45-46 (1987), and "conspicuous" in their breadth, *FMC Corp. v. Holliday*, 498 U.S. 52, 58 (1990). As the Court has explained, a state requirement "relate[s] to" a federal law as long as it has a "connection with," or contains a "reference to," the regulated topic. *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370-71 (2008) (citation omitted).

47

State electric-vehicle mandates have a clear "connection with" fuel economy. Electric-vehicle mandates like California's require manufacturers to make a certain number of "vehicles that produce zero exhaust emissions." Cal. Code Regs. tit. 13, §1962.2(a); *see* JA__[WestVirginia.9]. Because carbon-dioxide emissions are "essentially constant per gallon combusted of a given type of fuel," a vehicle's fuel economy and its carbon-dioxide emissions are two sides of the same coin. 75 Fed. Reg. 25,324, 25,327 (May 7, 2010); *see* 84 Fed. Reg. 51,310, 51,313 (Sept. 27, 2019). Accordingly, "any rule that limits tailpipe [greenhouse-gas] emissions is effectively identical to a rule that limits fuel consumption." *Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1294 (D.C. Cir. 2015) (alteration in original) (quoting 76 Fed. Reg. 57,106, 57,124-25 (Sept. 15, 2011)).

An electric-vehicle mandate thus has more than a mere "connection with" fuel economy—it has a direct correlation. NHTSA itself has recognized this reality. It has previously found that state mandates requiring "a certain number or percentage of a manufacturer's fleet" to "produce no carbon dioxide tailpipe emissions necessarily affect the fuel economy achieved by the manufacturer's fleet," and are therefore preempted. 84 Fed. Reg. at 51,320. And, indeed, that direct correlation between fuel

48

economy and fuel consumption is why NHTSA previously issued its fuel-economy rules jointly with EPA, which regulates tailpipe emissions. *See Delta Constr. Co.*, 783 F.3d at 1294.

Courts applying EPCA have had little trouble finding federal preemption of similar state laws. For example, the Second Circuit has held that EPCA preempts local taxi-fleet rules merely *encouraging* hybrid taxis. *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 157 (2d Cir. 2010). The court explained that EPCA's broad preemption provision covers state laws that "make fuel economy standards essential to the operation of those rules," even if they do no more than "draw a distinction between vehicles with greater or lesser fuel-efficiency." *Id.* Likewise, the court in *Ophir v. City of Boston*, 647 F. Supp. 2d 86, 94 (D. Mass. 2009), found similar hybrid-taxi rules preempted.

The state electric-vehicle mandates on which NHTSA relied here "relat[e] to" fuel economy even more clearly than the taxi rules in *Metropolitan Taxicab* and *Ophir*. Electric-vehicle *mandates* plainly are not "neutral to the fuel economy of the vehicles to which they apply." *Metro. Taxicab*, 615 F.3d at 158. The mandates' very purpose is to force

49

automakers to produce electric vehicles, which have a higher imputed fuel economy than conventional vehicles. *See supra* at 6.

Electric-vehicle mandates also relate to "average fuel economy" because they restrict manufacturers' choices as to how to meet those standards. Manufacturers can meet NHTSA's standards by producing any combination of vehicles the market will bear, using whatever technologies they think best. *See* §32904(a)(2). State electric-vehicle mandates, by contrast, require automakers to comply in a specific way: by selling ZEVs or purchasing credits. JA__[CEA.11]; JA__[89Fed.Reg.52,611]. The state mandates thus "relate" to federal fuel-economy standards—and so are preempted—because they "force [a manufacturer] to adopt a certain scheme" and "restrict its choice" of compliance. *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 668 (1995); *accord Ophir*, 647 F. Supp. 2d at 93 ("Congress intended that passage of EPCA would not unnecessarily restrict purchase options.").

Two district courts have reached a different conclusion, but both decisions were wrong. *See Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295 (D. Vt. 2007); *Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d 1151 (E.D. Cal. 2007). Those

50

courts mistakenly concluded that when EPA grants a preemption waiver, *state* standards are transformed into *federal* standards. In so doing, they relied on a provision of EPCA that from 1978 to 1980 authorized NHTSA to grant automakers a variance from federal fuel-economy standards to comply with other standards—including California's emission standards. *See* Pub. L. No. 94-163 §502(d)(1)-(3), 89 Stat. 871, 904-05 (1975). But that provision is no longer in effect and thus has no bearing on the issue here. Notably, NHTSA has previously disclaimed reliance on the argument that a waiver federalizes state standards, *see* 87 Fed. Reg. at 25,899, and does not endorse it here, *see* JA__[89Fed.Reg.52,825].

> **b.    The RFS impliedly preempts state electric-vehicle mandates.**

The state electric-vehicle mandates are also preempted by the RFS, because they "stan[d] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 406 (2012); *see* JA__[Valero.13].

The RFS reflects Congress's decision to "move the United States toward greater energy independence and security" in a specific way: by "increas[ing] the production of clean renewable fuels" to be blended with fossil fuels. *Ams. for Clean Energy v. EPA*, 864 F.3d 691, 697 (D.C. Cir.

51

2017) (citation omitted). Mandating electrification—eliminating vehicles that use liquid renewable fuels—puts severe pressure on regulated entities' ability to comply with the RFS by reducing the percentage of vehicles that use those renewable fuels. After all, automakers cannot simultaneously both produce fewer cars that use liquid fuel and produce cars that consume an increasing total number of gallons of liquid fuel.

### c. NHTSA's reliance on preempted state laws was unlawful.

**i.** It was unlawful for NHTSA to rely on—and incorporate into its baseline—state electric-vehicle mandates that are preempted. Congress forbade NHTSA from considering the fuel economy of electric vehicles, thereby preventing NHTSA from setting standards that can be met only by producing electric vehicles. *See* §I.A. NHTSA therefore tried to slip in through the back door what it was barred from bringing through the front. It reasoned that *someone else* was requiring the electric vehicles and it was merely acknowledging the effects of those requirements. *See, e.g.*, JA__[89Fed.Reg.52,825]. But this maneuver fails because if the state mandates are invalid, it is NHTSA itself that is effectively mandating more electric vehicles. Indeed, NHTSA recognized as much, touting that

its standards "ensure continued improvements … even if … other regulatory pushes change in unexpected ways." JA__[89Fed.Reg.52,895].

**ii.**     At the very least, NHTSA's failure to confront the illegality of the state electric-vehicle mandates was arbitrary and capricious. "[A]gency action is lawful only if it rests 'on a consideration of the relevant factors.'" *Michigan v. EPA*, 576 U.S. 743, 750 (2015). Agency action that fails to grapple with an "important aspect of the problem" is thus arbitrary and capricious. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). Significant legal issues with a chosen regulatory action are generally an "important aspect" of the problem. *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 682 (2020).

The legality of state electric-vehicle mandates was highly relevant to NHTSA's rulemaking. In response to comments raising the preemption issue, NHTSA asserted that it "is not taking any action regarding preemption" and disclaimed any obligation to "make a determination or pronouncement on preemption." JA__[89Fed.Reg.52,943]. But by insisting that these mandates apply as a matter of "clear reality" and are "legally-binding," NHTSA *has* taken a position on their legal validity. JA__[89Fed.Reg.52,705]. NHTSA cannot simultaneously declare the

53

mandates legally binding and disavow any view on the preemption question. *See Am. Fed'n of Gov't Emps., Loc. 2924 v. Fed. Lab. Rels. Auth.*, 470 F.3d 375, 380 (D.C. Cir. 2006) ("[I]f the result reached is 'illogical on its own terms,' the [agency's] order is arbitrary and capricious.").

NHTSA has attempted to avoid considering the legality of those state mandates on the ground that it "does not have authority to make such determinations with the force of law." JA__[89Fed.Reg.25,826]. But agencies must consider relevant legal questions, including the constitutionality of their own rulemaking, even when those decisions may lack the force of law. *See Nat'l Urb. League v. Ross*, 977 F.3d 770, 777 (9th Cir. 2020); *Picur v. Kerry*, 128 F. Supp. 3d 302, 310 (D.D.C. 2015) (K.B. Jackson, J.). The APA does not require binding legal determinations, only reasoned consideration of the relevant issues.

Requiring that reasoned consideration is particularly appropriate here because the legal issue involves the very statute the agency administers—and when the agency last substantively considered the issue, it concluded that state electric-vehicle mandates *are* preempted. 84 Fed. Reg. at 51,320. *See* JA__[Valero.13]. While NHTSA has since backtracked, it pledged at that time it would "deliberate further." 86 Fed. Reg.

54

74,236, 74,264 (Dec. 29, 2021). But it has yet to offer any further analysis of the preemption issue, in this rulemaking or elsewhere. In this context, EPCA preemption was undoubtedly an "important aspect" of the problem NHTSA had to consider. *Little Sisters of the Poor*, 591 U.S. at 682.

> **2.    NHTSA erred by including state-mandated electric vehicles in the baseline without showing that compliance with the state mandates is feasible.**

Finally, NHTSA's reliance on state mandates is arbitrary and capricious because NHTSA failed to show that it is feasible for automakers to produce the vast number of electric vehicles it assumes they will produce in response to the state ZEV programs.

    **a.**    Automakers told NHTSA that their ability to meet state mandates is far from a foregone conclusion—and depends on numerous factors beyond their control. As the Alliance for Automotive Innovation explained, there is "great uncertainty" about automakers' capacity to meet state mandates, given "market conditions (e.g., affordability)," the "nascent state of EV supply chains," and the need for "development of the requisite charging infrastructure and supporting distribution grid upgrades." JA__[AutoAlliance.Attachment0.10]; *see also, e.g.*, JA__[Kia.4] (Kia);    JA__[Nissan.4]    (Nissan);    JA__[Valero.AttachmentD.7-11]

(collecting statements from automakers qualifying their plans to meet state electrification targets).

In response, NHTSA claimed it had no "obligation" to prove that its baseline is "feasible." JA__[89Fed.Reg.52,786]. According to NHTSA, "[n]othing in EPCA/EISA compels [it] to be responsible for proving the feasibility of things which are beyond [its] authority, like State regulations or development of charging infrastructure or permitting of critical minerals production sites." *Id.* On the agency's view, the feasibility of the state mandates is "a matter for the State(s) and vehicle manufacturers," and "it is not NHTSA's authority or responsibility to determine whether State programs *are*" or "*are not*" feasible. JA__[89Fed.Reg.52,787].

**b.**    NHTSA is mistaken. Congress required NHTSA to ensure that its standards are "feasible" for automakers to meet. §32902(a). The baseline that NHTSA adopts is "crucial" to that determination, since "it marks the starting point for determining what further efficiency gains will be feasible." JA__[89Fed.Reg.52,635]. When NHTSA sets standards that require fuel economy at or above the baseline level, automakers must achieve the baseline fuel economy, *plus* any additional improvements required by NHTSA's higher standards. If it is not feasible for

56

automakers to meet the baseline fuel economy, then necessarily it is not feasible for them to achieve standards above that baseline. Because compliance with the baseline fuel economy is necessarily required to comply with stricter standards, NHTSA has not shown that its standards are feasible unless it has shown that the baseline is feasible.

NHTSA did not show that its baseline was feasible here. It cannot assume that California's standards are feasible just because manufacturers have said they "will at least plan to meet legally binding State regulations." JA__[89Fed.Reg.52,787]. For one thing, ACC II—which requires electrification of 100% of the light-duty fleet by 2035—is not legally binding. JA__[89Fed.Reg.52,610]. And even if it were, the fact that a state has imposed ZEV mandates does not establish that those mandates are "technologically feasib[le]" and "economic[ally] practicab[le]." §32902(f). That is especially true here, where automakers have explicitly questioned whether they can meet those mandates, and where the state has a history of setting aspirational standards only to later relax those standards when the industry struggles to comply. *See, e.g.*, JA__[AutoAlliance.Attachment0.10], JA__[Valero.AttachmentD.1-4].

NHTSA's standards impose independent (and independently enforceable) federal requirements. NHTSA thus cannot blind itself to evidence that it is infeasible for automakers to produce the electric vehicles that NHTSA's own analysis shows will be needed to comply not only with state ZEV programs but with NHTSA's own standards as well.

### 3. NHTSA's errors were prejudicial.

NHTSA's errors were not harmless. Apparently anticipating challenges to its consideration of the state-mandated electric vehicles, NHTSA created its "No ZEV" baseline that removed those electric vehicles from the baseline. JA__[89Fed.Reg.52,795-96], JA__[FRIA_p.9-2]. NHTSA said its conclusions would remain the same using the alternative baseline because the results "are generally quite similar." JA__[89Fed.Reg.52,799], JA__[89Fed.Reg.52,810]. But that blithe assertion ignores substantial differences in costs between the two baselines. For example, the estimated cost of NHTSA's regulations is eight times higher under the No ZEV model than under the reference baseline for a model year 2031 Mazda passenger vehicle. JA__[89 Fed.Reg.52,802-03].

NHTSA's assertion that its standards would still be feasible even without the state-mandated electric vehicles in the baseline also ignores

that automakers cannot meet NHTSA's standards without those electric vehicles and would have to pay approximately $1.5 billion more in penalties. *Compare* JA__[89Fed.Reg.52,807-08] (Tables VI-7 & VI-8), *with* JA__[89Fed.Reg.52,809-10] (Tables VI-9 & VI-10). At a minimum, that makes it "not clear" how NHTSA could justify the standards if it excluded those electric vehicles from the baseline. *Hargett*, 964 F.3d at 554.

## C.   NHTSA unlawfully concluded that its standards are feasible by assuming that manufacturers will violate them.

NHTSA's determination that its automobile standards are feasible is unlawful for yet another reason: the agency did not actually analyze whether manufacturers could feasibly *comply* with its standards at all. Instead, it assumed manufacturers would *violate* those standards, and asked whether they could feasibly pay the resulting civil penalties. That approach cannot be reconciled with the statutory text or requirements of reasoned decisionmaking. The question is whether compliance is feasible, not whether noncompliance is financially ruinous.

1.    EPCA requires NHTSA to set its standards at "the maximum feasible average fuel economy level," taking into account "technological feasibility" and "economic practicability." §32902(a), (f). To be "feasible,"

59

NHTSA's standards must be "capable of being done, executed, or effected." *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 508-09 (1981). Likewise, "technological feasibility" and "economic practicability" require that the "particular methods of improving fuel economy" be "available for commercial application," and that meeting the standards be "within the economic capability of the industry." *Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1196 (9th Cir. 2008).

The statute then imposes civil monetary penalties on any manufacturer that "violates a standard." §32912(b); *see New York v. NHTSA*, 974 F.3d 87, 91 (2d Cir. 2020). As the statutory language makes clear (and as NHTSA has acknowledged), those penalties are not an alternative form of compliance; they are a consequence imposed on any manufacturer that "violates" the standards by failing to achieve fuel-economy levels that NHTSA has determined are feasible. §32912(b); *see* JA__[89Fed.Reg. 52,810] ("penalties are not compliance").

**2.**    But rather than follow the statute—by setting "feasible" standards—NHTSA set standards it knew manufacturers cannot meet. In fact, NHTSA recognized that noncompliance was "almost inevitable" for multiple manufacturers. JA__[89Fed.Reg.52,862]; *see also*

60

JA__[89Fed.Reg.52,793]; JA__[89Fed.Reg.52,864]. NHTSA predicted that five of the eight passenger-car manufacturers making up 80% of all sales would fail to meet its standards for at least one model year, and that manufacturers collectively would have to pay a total of *$774 million* in penalties. JA__[89Fed.Reg.52,794], JA__[89Fed.Reg.52,807]. Likewise, NHTSA predicted that three of the seven light-truck manufacturers making up 80% of sales would fail to meet its standards for at least one model year, resulting in a total of *over $1 billion* in penalties. JA__[89Fed.Reg.52,793], JA__[89Fed.Reg.52,808]. Those predictions show that compliance is *not* technologically feasible and economically practicable—the opposite of what §32902(f) requires.

Instead of recognizing that the impossibility of complying with its standards made them infeasible, however, NHTSA ducked the feasibility question altogether. The agency never showed how manufacturers could actually comply with its standards and what that compliance would cost. Instead, NHTSA concluded that its standards were feasible because manufacturers would simply *violate* them and could afford the resulting penalties. *See* JA__[89Fed.Reg.52,793-95]; JA__[89Fed.Reg.52,806-11].

61

That analysis cannot be squared with the statutory text, which requires standards that can feasibly be achieved—not standards that can be violated at an acceptable cost. A fuel-economy standard of 500 miles per gallon does not suddenly become technologically feasible or economically practicable if manufacturers can shoulder the penalty for failing to meet it. Finding that manufacturers who inevitably fall short of NHTSA's standards can afford to pay penalties is not the same as finding that those standards themselves are "feasible." §32902(a), (f). And because NHTSA never made the latter, statutorily required finding, its standards are unlawful.

NHTSA's analysis also runs contrary to EPCA's basic purpose. EPCA requires the maximum-feasible standards to force manufacturers to adopt feasible improvements in fuel economy, and provides for civil penalties to punish manufacturers that are unwilling to take feasible steps to comply. *See, e.g.*, *Competitive Enter. Inst. v. NHTSA*, 956 F.2d 321, 324 (D.C. Cir. 1992); *Ctr. for Auto Safety v. NHTSA*, 793 F.2d 1322, 1341 (D.C. Cir. 1986). But setting standards at unattainable levels, and then charging manufacturers penalties for failing to meet those standards, "do[es] not reduce fuel use or emissions, and thus do[es] not serve

62

the overarching purpose of EPCA." JA__[89Fed.Reg.52,815]. These charges amount to an unavoidable exaction, rather than a penalty for failing to take feasible steps, and "merely consume resources that could otherwise be better spent elsewhere." *Id.*

Because NHTSA's analysis cannot be squared with the statute—and because NHTSA never even analyzed whether actual compliance with its standards is feasible—the rule is unlawful and must be vacated.

## II.    NHTSA's Heavy-Duty Standards Are Unlawful.

NHTSA also lacks authority to mandate electrification of the nation's heavy-duty fleet. NHTSA's heavy-duty standards are governed by different statutory provisions and are independently unlawful, for three reasons. First, NHTSA lacks authority to set "fuel efficiency" standards premised upon manufacturing electric vehicles, which do not use "fuel." Second, NHTSA cannot assign zero fuel consumption to electric vehicles, which do consume energy. Third, NHTSA's annually increasing standards do not provide "regulatory stability." §32902(k)(3)(B).

### A.    NHTSA lacks authority to mandate heavy-duty electric vehicles.

Previously, NHTSA set heavy-duty standards that could be met by improving the efficiency of conventional vehicles. *See* 81 Fed. Reg. 73,478,

73,754-55, 73,776 (Oct. 25, 2016). But improving conventional vehicles cannot achieve the Biden Administration's goal "that 100 percent of all new medium- and heavy-duty vehicles sold in 2040 be zero-emission vehicles." White House, *Fact Sheet: Biden-Harris Administration Proposes New Standards to Protect Public Health that Will Save Consumers Money, and Increase Energy Security* (Apr. 12, 2023), tinyurl.com/wjvu3975. So NHTSA charted a novel course, setting standards that compel manufacturers to phase out conventional heavy-duty vehicles in favor of electric vehicles.

NHTSA's scheme to electrify the nation's heavy-duty fleet works in two steps. First, NHTSA's standards require manufacturers to cut fuel-consumption rates in half over the next decade, JA__[89Fed.Reg.52,723-24], JA__[89Fed.Reg.52,737]—which they cannot realistically do with a conventional-vehicle fleet. *See* JA__[TSD.3-31], JA__[TSD.3-64], JA__[TSD.3-91], JA__[TSD.3-151], JA__[TSD.3-166], JA__[TSD.3-175] (modeling technology "effectiveness"); DA-113-15, ¶¶29-30 (summarizing NHTSA's modeling results). Second, NHTSA assigns heavy-duty electric vehicles an artificial fuel-consumption "value of 0 gallons/mile," JA__[89Fed.Reg.52,737], equivalent to declaring they have infinite fuel

64

economy, JA__[89Fed.Reg.52,896] (Figure VI-29). Because producing electric vehicles that are treated as having no fuel consumption is the only practical means to meet NHTSA's standards, NHTSA is effectively forcing manufacturers to phase out conventional heavy-duty vehicles in favor of electric ones. That exceeds NHTSA's authority.

### 1. NHTSA may set heavy-duty standards only for vehicles that consume "fuel."

**a.** EISA directs NHTSA to create a "fuel efficiency improvement program" for heavy-duty vehicles. §32902(k)(2). What NHTSA must "improv[e]" is vehicle "fuel efficiency"—*i.e.*, "the amount of work performed for each gallon of fuel consumed." 49 C.F.R. §535.4. Electric vehicles do not fit within EISA's "fuel efficiency improvement program."

For starters, electric vehicles have no "fuel efficiency" because they do not use "fuel." Under the statute, "fuel" means "(A) gasoline; (B) diesel oil; or (C) other *liquid or gaseous* fuel." §32901(a)(10) (emphasis added). Electric vehicles draw electrical current from a portable battery; they do not use liquid or gaseous fuel. *See* §32904(a)(2)(A). "When Congress takes the trouble to define the terms it uses, a court must respect its definitions as 'virtually conclusive.'" *Dep't of Agric. Rural Dev. Rural Hous. Serv. v.*

*Kirtz*, 601 U.S. 42, 59 (2024). Congress's omission of "electricity" from the definition of "fuel" is therefore determinative.

NHTSA recognizes that electric vehicles "have no fuel usage." JA__[89Fed.Reg.52,931]. But it mistakenly concludes this means it can "assume [they have] zero fuel consumption for compliance." *Id*. This ignores that using "fuel" is "a required trait of the vehicles subject to the fuel-efficiency improvement program." *Truck Trailer Mfrs. Ass'n, Inc v. EPA*, 17 F.4th 1198, 1205-06 (D.C. Cir. 2021). Relying on this requirement, the D.C. Circuit recently rejected NHTSA's claim that a trailer without a fuel economy is a "vehicle" subject to regulation as part of NHTSA's fuel-efficiency program under §32902(k). *Id*. "[B]y requiring NHTSA to set fuel economy standards when establishing its fuel efficiency program and then constantly referring us to fuel economy," the court explained, "Congress put the term 'vehicle' in a context limited to machines that *use* fuel." *Id*. at 1205. Because electric vehicles do not use fuel, they do not belong in the program.

That makes sense: the energy that electric vehicles consume is measured in watt-hours, not "gallon[s] of fuel." 49 C.F.R. §535.4. And the fuel efficiency of a vehicle that uses no fuel cannot be improved. An

electric vehicle thus does not fit within a "fuel efficiency improvement program" any more than a trailer or a horse-drawn carriage does. And regulations designed to phase out vehicles that run on fuel are not a "fuel efficiency improvement program"; they make such a program unnecessary by *eliminating* vehicles that use fuel. *Cf. West Virginia*, 597 U.S. at 735.

In short, "Congress has not yet enacted" mandates that align with the Biden administration's policy wishes, so NHTSA "jam[med] a square peg" (vehicles that do not use fuel) "into a round hole" (EISA's fuel-efficiency-improvement program). *Mexichem Fluor, Inc. v. EPA*, 866 F.3d 451, 460 (D.C. Cir. 2017) (Kavanaugh, J.). That move is incompatible with the statutory text. Because electric vehicles do not use "fuel," they cannot fall within EISA's "fuel efficiency improvement program." §32902(k)(2).

**b.** "[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *West Virginia*, 597 U.S. at 721. Context, as well as "common sense," *id.*, confirm that Congress never delegated to NHTSA a fleet-electrification mission.

67

The suggestion that Congress silently authorized NHTSA to mandate production of heavy-duty electric vehicles is at odds with the careful approach Congress took to incorporating electric vehicles in other statutes. Start with the CAFE program. When Congress amended EPCA to let automakers count electric vehicles toward compliance with automobile fuel-economy standards, it also ordered the Secretary of Energy to "determine" "*equivalent* petroleum based fuel economy values" for those vehicles. §32904(a)(2)(B) (emphasis added); *see* Chrysler Corporation Loan Guarantee Act of 1979, Pub. L. No. 96-185, §18, 93 Stat. 1324, 1336 (1980); 125 Cong. Rec. 37083 (1979) (statement of Sen. McClure) (adding amendment). The equivalency values filled an important gap: electric vehicles lacked a "fuel economy" because they do not use "fuel" as defined in the statute. Had Congress meant to include heavy-duty electric vehicles in the fuel-efficiency program, it surely would have enacted a similar mechanism for estimating their fuel usage.

Moreover, when Congress separately addressed electric vehicles in EISA it chose grants, not mandates—casting further doubt on NHTSA's view. 42 U.S.C. §17011(b). *Cf. FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 156 (2000) (no authority to regulate where Congress

68

"created a distinct scheme to regulate" a product). And, as mentioned, allowing NHTSA to electrify heavy-duty vehicles would conflict with Congress's carefully negotiated biofuel targets in the RFS. It defies common sense to conclude that Congress departed from its prior judgments by authorizing NHTSA to mandate a shift to electricity.

### 2. The major-questions doctrine confirms NHTSA lacks authority to mandate heavy-duty electric vehicles.

As with NHTSA's automobile standards, the major-questions doctrine confirms the plain reading of the statutory text and forecloses NHTSA's attempt to force electrification. Indeed, the major-questions doctrine applies with even greater force here, where NHTSA is claiming not just the authority to bake into its standards the electric vehicles it thinks will be produced in response to other factors, but the authority to unilaterally force the electrification of the fleet.

NHTSA aims to radically transform the heavy-duty market in less than a decade. Under its standards, NHTSA projects that heavy-duty electric vehicles will increase from 0% in model year 2022 to 38% battery-electric vehicles and 4% plug-in hybrids in model year 2033. JA__[89Fed.Reg.52,906], JA__[FRIA.8-84]. The share of gas-powered

69

vehicles will fall significantly. JA__[FRIA.8-85]. And diesel-powered vehicles, which account for roughly 40% of heavy-duty sales in 2022, will disappear by 2031. DA-110-11, ¶25; *see also* JA__[89Fed.Reg.52,899] (commenter explaining that rule "effectively kills diesel engines").

If this seems familiar, it should. Like EPA in *West Virginia*, NHTSA has "announc[ed] what the market share" of its favored technologies must be "and then requir[ed]" producers to meet those targets "or subsidize their competitors to get there." 597 U.S. at 731 n.4. And as in *West Virginia*, NHTSA is claiming "unprecedented power over American industry," *id.* at 728, with vast "economic and political significance" *id.* at 721.

a.   NHTSA estimates that manufacturers will need to invest approximately $10.7 billion through model year 2038 to comply with the heavy-duty standards. *See* JA__[89Fed.Reg.52,740] (Table V-18). That cost alone shows the economic significance of the rule. *See, e.g., West Virginia*, 597 U.S. at 714 (EPA's "rule would entail billions of dollars in compliance costs"); *King v. Burwell*, 576 U.S. 473, 485-86 (2015) (tax subsidy "involving billions of dollars in spending each year" is "a question of deep 'economic and political significance'").

70

But the economic effects go well beyond compliance costs. Heavy-duty electric vehicles have virtually no market share for a reason: they perform worse than their conventional counterparts, with lower and unpredictable ranges, particularly at high loads. *See* Dave Vanderwerp, *Tested: How Towing Affects Electric Pickups,* Car & Driver, (Aug. 18, 2022) tinyurl.com/yau5bsb3. They have uncertain durability, long recharging times, limited public recharging infrastructure, higher insurance premiums, lower payload capacities, and lower resale values. Forcing electrification of the nation's heavy-duty vehicles will reverberate through the entire economy, raising the cost of everything from groceries to shared transport. *See* JA__[AFPM.75-76].

It will also reshape energy markets. *See* JA__[FEIS.3-3-3-4]. Under NHTSA's standards, heavy-duty "diesel consumption is expected to fall significantly from 46.9 percent [of fuel consumption] in 2022 to 4.7 percent in 2050," while "electricity consumption [by heavy-duty vehicles] is expected to increase from less than 0.1 percent in 2022 to 19.1 percent in 2050." JA__[FEIS.3-4]. NHTSA projects that electricity used by heavy-duty vehicles will increase from nothing in 2022 to more than 75 terawatt-hours annually by 2050, JA__[FRIA.1-5] (Figure 1-2); JA__

[FRIA.8-119] (Figure 8-88)—equivalent to the annual electricity use of about 7 million American homes. EIA, *FAQs: How Much Electricity Does an American Home Use?,* tinyurl.com/uykbxhwz (updated Jan. 8, 2024).

These standards, moreover, are only the beginning of NHTSA's "voyage of discovery." *Util. Air*, 573 U.S. at 328. What matters under the major-questions doctrine is the full scope of authority the agency claims. *See West Virginia*, 597 U.S. at 728-29. Here, the standards cover about a million new heavy-duty vehicles each year, JA__[89Fed.Reg.52,741], but NHTSA's claimed authority would allow it to phase out conventional heavy-duty vehicles entirely. There are over 14 million of these vehicles today. Bureau of Transp. Stats., *Number of U.S. Truck Registrations by Type*, tinyurl.com/33c28pya (last visited Nov. 8, 2024). As in *West Virginia*, the "breadth of the authority that [NHTSA] has asserted" provides "reason to hesitate before concluding that Congress meant to confer such authority." 597 U.S. at 721 (cleaned up).

**b.**    NHTSA's rule is also politically significant. Whether to require heavy-duty-vehicle electrification is "the subject of an earnest and profound debate across the country." *Id*. at 732. Some states have moved aggressively to mandate electrification of medium- and heavy-duty

72

vehicles, *see, e.g.*, Cal. Code Regs. tit. 13, §§1963-1963.5 (ACT); others have opposed those efforts, *see, e.g., Iowa v. EPA* (D.C. Cir. No. 23-1144) (challenging ACT waiver). That makes NHTSA's "claimed delegation" "all the more suspect," and shows the "basic and consequential tradeoffs" involved in reshaping the commercial transportation system "are ones that Congress would likely have intended for itself." *West Virginia*, 597 U.S. at 730, 732.

Electrification also raises national-security issues outside NHTSA's expertise. The United States "has very little capacity in mining and re-fining any of the key raw materials" needed for electric vehicles. 86 Fed. Reg. 49,602, 49,797 (Sept. 3, 2021). The standards will accordingly make American fleets more dependent on supply chains in China and other "countries with which the U.S. has fragile trade relations or significant policy differences." 89 Fed. Reg. at 29,509.

**c.**    The "transformative expansion in … regulatory authority" claimed by NHTSA further confirms this is a major question. *West Virginia*, 597 U.S. at 724. When an agency relies upon old statutory text to assert newfound authority, courts "typically greet its announcement with a measure of skepticism." *Util. Air*, 573 U.S. at 324. That skepticism is

as warranted here as it was in *West Virginia*: "Prior to [2024], [NHTSA] had always set [fuel-efficiency standards] under [EISA] based on the application of measures that would reduce [fuel consumption] by causing the regulated [vehicles] to operate more [efficiently]." 597 U.S. at 725. In the decade following EISA's enactment, NHTSA consistently treated electric vehicles only as an optional "incentive" or flexibility, not a necessary technology. *See, e.g.*, 81 Fed. Reg. at 73,818. Now, however, NHTSA claims authority to set fuel-efficiency standards that effectively mandate the replacement of conventional vehicles with electric vehicles.

For all these reasons, NHTSA needs "clear congressional authorization" to force electrification. *West Virginia*, 597 U.S. at 723. As already explained, it has nothing of the sort. *See supra* §II.A.1.

## B.    NHTSA cannot assign zero fuel consumption to heavy-duty electric vehicles.

Even if NHTSA did have authority to include electric vehicles in its heavy-duty standards, the standards would still be unlawful. NHTSA's artificial assignment of "zero gallons per 100 miles" for those vehicles, 49 C.F.R. §535.6(a)(3)(iii), is not an "appropriate … measurement metri[c]" in light of EISA's focus on *energy* conservation, and so exceeds NHTSA's statutory authority. §32902(k)(2).

74

"Appropriate" means "especially suitable or compatible"; "fitting." *Merriam-Webster's Collegiate Dictionary* 61 (11th ed. 2006). Whether a metric is "'appropriate' is 'inherently context dependent.'" *Tanzin v. Tanvir*, 592 U.S. 43, 49 (2020). In a regulatory scheme, an "appropriate" measurement metric must "includ[e] consideration of all the relevant factors." *Michigan*, 576 U.S. at 752. The heavy-duty fuel-efficiency program is part of EISA's effort to "move the United States toward greater energy independence and security" through energy conservation. 121 Stat. at 1492. Thus, to be suited to EISA's energy-focused aims, an efficiency metric must reasonably reflect the amount of energy used to power the vehicle, including from upstream sources.

But NHTSA's metric unreasonably pretends that electric vehicles use no energy. Electric vehicles are not perpetual-motion machines. They use energy—albeit from power plants (that often combust nonrenewable fuels like natural gas and coal), rather than from fuel combusted onboard the vehicle. But where generation occurs is irrelevant to Congress's goal of conserving energy, as Congress recognized when including electric automobiles as a flexibility in the CAFE program. There, Congress provided for an "equivalent petroleum based fuel economy" for electric vehicles

75

based on four factors, including the "national average electrical genera-
tion and transmission efficiencies" and "the relative scarcity and value to
the United States of all fuel used to generate electricity."
§32904(a)(2)(B)(ii)-(iii). Although there may be "a range of values," the
energy used by electric vehicles "is certainly not zero." *Ctr. for Biological
Diversity*, 538 F.3d at 1200; *see* 10 C.F.R. §474.3(f) ("28,996 Watt-hours
per gallon").

### C.    The standards do not provide "regulatory stability."

NHTSA's rule also runs afoul of EISA's requirement that NHTSA's
heavy-duty standards "shall provide not less than … 3 full model years
of regulatory stability." §32902(k)(3). Instead of providing the required
"regulatory stability," the rule increases the stringency of the heavy-duty
standards by "10 percent *per year* … for MYs 2030-2032, and 8 percent
*per year* for MYs 2033-2035." JA__[89Fed.Reg.52,547] (emphases added).
NHTSA argues that its standards may increase year-over-year, so long
as those standards are not amended for three years.
JA__[89Fed.Reg.52,780]. But the "regulatory stability" the statute re-
quires means that the standards may *not* increase year-over-year—not

76

that NHTSA must tell manufacturers three years in advance how much the standards will increase year-over-year.

1.    The ordinary meaning of "regulatory stability" is that NHTSA's standards may not become stricter year-over-year: they must remain constant. "When a term goes undefined in a statute, [the court] give[s] the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). And the ordinary meaning of "stability" is "the quality, state, or degree of being stable." *Merriam-Webster's Collegiate Dictionary* 1213 (11th ed. 2006). "Stable," in turn, means "firmly established: fixed, steadfast," or "not changing or fluctuating: unvarying." *Id.*

Because the relevant phrase is "regulatory stability," it is the "regulat[ion]" that must be unvarying for three years. That refers to three years of consistency in the specific fuel-economy standard imposed through regulation, not, as NHTSA contends, a requirement to conduct rulemakings at least three years apart to impose "standards that contain predetermined stringency increases." JA__[89Fed.Reg.52,780].

The rest of §32902(k)(3)(B) makes that clear. NHTSA must provide "3 full model years of regulatory stability" for the heavy-duty "fuel

economy standard." A "fuel economy standard," in turn, is a "performance standard specifying a minimum level of average fuel economy applicable to a manufacturer in *a model year*." §32901(a)(6) (definition of "average fuel economy standard") (emphasis added); *see In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*, 2022 WL 551221, at *9 (E.D. Mich. Feb. 23, 2022) (noting that "[c]ourts have used" the phrase "average fuel economy standard" "interchangeably with the term 'fuel economy standard,' which is not separately defined"), *aff'd*, 65 F.4th 851 (6th Cir. 2023). Because "fuel economy standard" refers to the standard for a particular year, the statute's command to set that standard with "3 full model years of regulatory stability" requires that a standard be set at the same level for each year of a three-year period.

Standards that increase each year plainly are not "unvarying" and therefore do not grant "regulatory stability." In NHTSA's own words, they represent "year-over-year percent *changes*." JA__[89Fed.Reg.52, 547] n.14 (emphasis added). "One wouldn't say that 'interest rates have stabilized' if the Fed said they'd increase year over year." JA__[CEA.31]. And other agencies, such as EPA, sensibly distinguish "stability"—

keeping standards at a consistent level—from "year-over-year incremental reductions in the standards levels." 89 Fed. Reg. at 27,928.

Even NHTSA does not argue that its interpretation is the best reading. Instead, invoking *Chevron* deference just days before the Supreme Court overturned it, the agency described its interpretation as "reasonabl[e]." JA__[89Fed.Reg.52,780]. But NHTSA now must show it has the best reading, not a merely reasonable one. *See Loper Bright*, 144 S. Ct. at 2273. The best understanding of "3 full model years of regulatory stability" is three years where the standards do not increase year-over-year.

**2.**    Other statutory provisions confirm that "regulatory stability" requires three years of fixed standards. Most critical is the neighboring provision within §32902(k)(3). Titled "Lead-time; regulatory stability," §32902(k)(3) imposes two distinct temporal restrictions. It requires both (A) "4 full models of regulatory lead-time," and (B) "3 full model years of regulatory stability." §32902(k)(3). Subparagraphs (A) and (B) do independent work: the standards must be announced with 4 model years of notice and must remain constant for 3 model years.

By contrast, NHTSA's interpretation of "regulatory stability" renders subparagraph (B) superfluous. NHTSA's view of subparagraph (B)

79

boils down to a three-year lead-time requirement—which is impossible to square with subparagraph (A)'s independent imposition of a four-year lead-time requirement. If NHTSA must always give four years' lead-time, then a three-year "regulatory stability" requirement that only ensures three years' advance notice of the standards would be meaningless. And the "canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013).

A related statute confirms the distinction between lead-time and stability requirements. The Clean Air Act Amendments of 1990 included a provision titled "Lead Time and stability" that is remarkably similar to §32902(k)(3). It requires certain standards applicable to "heavy-duty vehicles" to "apply for a period of no less than 3 model years beginning no earlier than the model year commencing 4 years after such revised standard is promulgated." Pub. L. No. 101-549, §201, 104 Stat. 2399, 2472, *codified at* 42 U.S.C. §7521(a)(3)(C). Like EISA, that provision establishes a minimum duration for standards ("no less than 3 model years") and separately requires those standards to be announced with four years of lead time.

80

Congress was surely aware of the 1990 Clean Air Act Amendments when it enacted EISA seventeen years later. Indeed, EISA itself explicitly amended parts of the Clean Air Act. *See, e.g.*, 121 Stat. at 1519-21. Thus, when Congress incorporated similar language into §32902(k)(3)(B), it presumably knew of the existing requirement and intended to replicate it. *See United States v. Hynes*, 467 F.3d 951, 967 (6th Cir. 2006) ("The Supreme Court has held that statutes containing similar language and having a similar underlying purpose should be interpreted consistently."). That both provisions apply to heavy-duty vehicles reinforces this conclusion: as discussed next, stability requirements accommodate the longer redesign cycles of heavy-duty vehicles.

**3.**    Requiring that heavy-duty standards remain constant for three years also comports with Congress's objective. In enacting EISA, Congress sought to ensure that new fuel-economy standards were feasible. *See, e.g.*, 121 Stat. at 1505 (calling for a study to evaluate how the technologies forced by fuel-economy standards can "practically" be "integrated"). The "regulatory stability" requirement advances that goal. Most notably, it applies to "heavy-duty vehicles," which "have longer redesign cycles" than other vehicles. JA__[CEA.31]; *see* JA__[89Fed.Reg.52,780].

81

Given the less-frequent redesign cycles, manufacturers would have more "difficulty meeting standards that ratchet up every year," so Congress provided them with a minimum time at a given stringency. JA__[CEA.31].

NHTSA waves away these practicality concerns by pointing to manufacturers' ability to use credit banking. JA__[89Fed.Reg.52,781]. But Congress did not accommodate feasibility concerns just by allowing manufacturers to average their compliance over time. Congress required the agency to set the same standard for at least three years. NHTSA failed to do so here, and its standards are unlawful.

## <u>CONCLUSION</u>

For these reasons, the rule should be vacated.

Dated: November 20, 2024

Respectfully submitted,

/s/ *Paul D. Clement*

Paul D. Clement
C. Harker Rhodes IV
Nicholas A. Aquart*
Niccolo A. Beltramo*
CLEMENT & MURPHY PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@
  clementmurphy.com

*Counsel for Petitioners
in No. 24-3664*

*Supervised by principals of the
firm who are members of the Vir-
ginia bar

/s/ *Eric D. McArthur*

Eric D. McArthur
Kathleen M. Mueller
Peter A. Bruland
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000
emcarthur@sidley.com

*Counsel for Petitioners
in No. 24-3728*

/s/ *Jeffrey B. Wall*

Jeffrey B. Wall
Morgan L. Ratner
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500
wallj@sullcrom.com

*Counsel for Petitioners in
No. 24-3658*

/s/ *Michael B. Buschbacher*

Michael B. Buschbacher
James R. Conde
BOYDEN GRAY PLLC
800 Connecticut Ave. NW,
Suite 900
Washington, DC 20006
(202) 955-0620
mbuschbacher@boydengray.com

*Counsel for Petitioners in
Nos. 24-3539, 24-3572, 24-3606,
24-3658, and 24-3698*

PATRICK MORRISEY
  ATTORNEY GENERAL

/s/ *Michael R. Williams*
Michael R. Williams
  *Solicitor General*
Frankie A. Dame
  *Assistant Solicitor General*
Office of the Attorney General
  of West Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov
frankie.a.dame@wvago.gov

*Counsel for Petitioner*
*State of West Virginia in*
*No. 24-3560*

RUSSELL COLEMAN
  ATTORNEY GENERAL

/s/ *Matthew F. Kuhn*
Matthew F. Kuhn
  *Solicitor General*
Jacob M. Abrahamson
  *Assistant Solicitor General*
Office of the Kentucky
  Attorney General
700 Capital Avenue, Suite 118
Frankfort, KY 40601
(502) 696-5300
matt.kuhn@ky.gov
jacob.abrahamson@ky.gov

*Counsel for Petitioner*
*Commonwealth of Kentucky in*
*No. 24-3560*

STEVE MARSHALL
  ATTORNEY GENERAL

/s/ *Edmund G. LaCour Jr.*
Edmund G. LaCour Jr.
 *Solicitor General*
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130
 (334) 242-7300
edmund.lacour@
  alabamaag.gov

*Counsel for Petitioner*
*State of Alabama in*
*No. 24-3560*

TIM GRIFFIN
  ATTORNEY GENERAL

/s/ *Nicholas J. Bronni*
Nicholas J. Bronni
 *Solicitor General*
Office of the Arkansas
  Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
nicholas.bronni@
  arkansasag.gov

*Counsel for Petitioner*
*State of Arkansas in*
*No. 24-3560*

TREG TAYLOR
  ATTORNEY GENERAL

/s/ *Thomas Mooney-Myers*
Thomas Mooney-Myers
 *Assistant Attorney General*
Alaska Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, AK 99501
(907) 269-5100
thomas.mooney-myers@alaska.gov

*Counsel for Petitioner*
*State of Alaska in*
*No. 24-3560*

ASHLEY MOODY
  ATTORNEY GENERAL

/s/ *Henry C. Whitaker*
Henry C. Whitaker (FBN 1031175)
 *Solicitor General*
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, FL 32399
(850) 414-3300
henry.whitaker@
  myfloridalegal.com

*Counsel for Petitioner*
*State of Florida in*
*No. 24-3560*

85

CHRISTOPHER M. CARR
  ATTORNEY GENERAL

/s/ *Stephen J. Petrany*
Stephen J. Petrany
  *Solicitor General*
Office of the Attorney General
  of Georgia
40 Capitol Square, SW
Atlanta, GA 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Petitioner*
*State of Georgia in*
*No. 24-3560*

BRENNA BIRD
  ATTORNEY GENERAL

/s/ *Eric H. Wessan*
Eric H. Wessan
  *Solicitor General*
Office of the
  Attorney General of Iowa
1305 East Walnut Street
Des Moines, IA 50319
(515) 823-9117
eric.wessan@ag.iowa.gov

*Counsel for Petitioner*
*State of Iowa in*
*No. 24-3560*

RAÚL R. LABRADOR
  ATTORNEY GENERAL

/s/ *Alan M. Hurst*
Alan M. Hurst
  *Solicitor General*
Office of the Idaho
  Attorney General
P.O. Box 83720
Boise, ID 83720
(208) 334-2400
alan.hurst@ag.idaho.gov

*Counsel for Petitioner*
*State of Idaho in*
*No. 24-3560*

THEODORE E. ROKITA
  ATTORNEY GENERAL

/s/ *James A. Barta*
James A. Barta
  *Solicitor General*
Indiana Attorney General's Office
ICGS—5th Floor
302 West Washington Street
Indianapolis, IN 46204
(317) 232-0709
james.barta@atg.in.gov

*Counsel for Petitioner*
*State of Indiana in*
*No. 24-3560*

86

KRIS W. KOBACH
   ATTORNEY GENERAL

/s/ *Abhishek S. Kambli*
Abhishek S. Kambli
  *Deputy Attorney General*
Anthony J. Powell
  *Solicitor General*
Office of the Kansas
  Attorney General
120 SW 10th Avenue
Topeka, KS 66612
(785) 296-2215
abhishek.kambli@ag.ks.gov
anthony.powell@ag.ks.gov

*Counsel for Petitioner*
*State of Kansas in*
*No. 24-3560*

LYNN FITCH
   ATTORNEY GENERAL

/s/ *Justin L. Matheny*
Justin L. Matheny
  *Deputy Solicitor General*
Office of the Mississippi
  Attorney General
P.O. Box 220
Jackson, MS 39205
(601) 359-3825
justin.matheny@ago.ms.gov

*Counsel for Petitioner*
*State of Mississippi in*
*No. 24-3560*

LIZ MURRILL
   ATTORNEY GENERAL

/s/ *J. Benjamin Aguiñaga*
J. Benjamin Aguiñaga
  *Solicitor General*
Tracy Short
  *Assistant Attorney General*
Louisiana Department of Justice
1885 North Third Street
Baton Rouge, LA 70804
(225) 326-6766
aguinagaj@ag.louisiana.gov
shortt@ag.louisiana.gov

*Counsel for Petitioner*
*State of Louisiana in*
*No. 24-3560*

ANDREW BAILEY
   ATTORNEY GENERAL

/s/ *Joshua M. Divine*
Joshua M. Divine
  *Solicitor General*
Missouri Attorney General's Office
P.O. Box 899
Jefferson City, MO 65102
(573) 751-1800
josh.divine@ago.mo.gov

*Counsel for Petitioner*
*State of Missouri in*
*No. 24-3560*

87

AUSTIN KNUDSEN
  ATTORNEY GENERAL

/s/ *Christian B. Corrigan*
Christian B. Corrigan
  *Solicitor General*
Peter M. Torstensen, Jr.
  *Deputy Solicitor General*
Montana Department of Justice
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
(406) 444-2026
christian.corrigan@mt.gov
peter.torstensen@mt.gov

*Counsel for Petitioner*
*State of Montana in*
*No. 24-3560*

MICHAEL T. HILGERS
  ATTORNEY GENERAL

/s/ *Lincoln J. Korell*
Lincoln J. Korell
  *Assistant Solicitor General*
Office of the Attorney General
  of Nebraska
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
lincoln.korell@nebraska.gov

*Counsel for Petitioner*
*State of Nebraska in*
*No. 24-3560*

JOHN FORMELLA
  ATTORNEY GENERAL

/s/ *Brandon F. Chase*
Brandon F. Chase
  *Assistant Attorney General*
New Hampshire
  Department of Justice
1 Granite Place South
Concord, NH 03301
(603) 271-1210
brandon.f.chase@doj.nh.gov

*Counsel for Petitioner*
*State of New Hampshire in*
*No. 24-3560*

DREW H. WRIGLEY
  ATTORNEY GENERAL

/s/ *Philip Axt*
Philip Axt
  *Solicitor General*
Office of Attorney General of
  North Dakota
600 East Boulevard Avenue
Dept. 125
Bismarck, ND 58505
(701) 328-2210
pjaxt@nd.gov

*Counsel for Petitioner*
*State of North Dakota in*
*No. 24-3560*

DAVE YOST
  ATTORNEY GENERAL

/s/ *T. Elliot Gaiser*
T. Elliot Gaiser
  *Solicitor General*
Mathura J. Sridharan
  *Deputy Solicitor General*
Office of the Ohio
  Attorney General
365 East Broad Street
Columbus, OH 43215
(614) 466-8980
thomas.gaiser@ohioago.gov
mathura.sridharan@ohioago.gov

*Counsel for Petitioner*
*State of Ohio in*
*No. 24-3560*

ALAN WILSON
  ATTORNEY GENERAL

/s/ *Joseph D. Spate*
Joseph D. Spate
  *Assistant Deputy*
  *Solicitor General*
Office of the Attorney General of
South Carolina
1000 Assembly Street
Columbia, SC 29201
(803) 734-3371
josephspate@scag.gov

*Counsel for Petitioner*
*State of South Carolina in*
*No. 24-3560*

GENTNER DRUMMOND
  ATTORNEY GENERAL

/s/ *Garry M. Gaskins, II*
Garry M. Gaskins, II
  *Solicitor General*
Jennifer L. Lewis
  *Deputy Attorney General*
Office of the Attorney General
  of Oklahoma
313 NE Twenty-First Street
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov
jennifer.lewis@oag.ok.gov

*Counsel for Petitioner*
*State of Oklahoma in*
*No. 24-3560*

MARTY J. JACKLEY
  ATTORNEY GENERAL

/s/ *Charles D. McGuigan*
Charles D. McGuigan
  *Deputy Attorney General*
South Dakota
  Attorney General's Office
1302 East Highway 14, Suite 1
Pierre, SD 57501
(605) 773-3215
atgservice@state.sd.us

*Counsel for Petitioner*
*State of South Dakota in*
*No. 24-3560*

89

KEN PAXTON
  ATTORNEY GENERAL

Brent Webster
  *First Assistant*
  *Attorney General*
Aaron L. Neilson
  *Solicitor General*

/s/ *Lanora C. Pettit*
Lanora C. Pettit
  *Principal Deputy*
  *Solicitor General*
Office of the Attorney General
  of Texas
P.O. Box 12548, MC-066
Austin, TX 78711
(512) 463-2012
lanora.pettit@oag.texas.gov

*Counsel for Petitioner*
*State of Texas in*
*No. 24-3560*

SEAN REYES
  ATTORNEY GENERAL

/s/ *Stanford E. Purser*
Stanford E. Purser
  *Solicitor General*

Office of the Utah
  Attorney General
160 E. 300 S., 5th Floor
Salt Lake City, UT 84111
(385) 382-4334
spurser@agutah.gov

*Counsel for Petitioner*
*State of Utah in*
*No. 24-3560*

90

JASON MIYARES
   ATTORNEY GENERAL

/s/ *Kevin M. Gallagher*
Kevin M. Gallagher
   *Principal Deputy*
   *Solicitor General*
Brendan T. Chestnut
   *Deputy Solicitor General*
Virginia Attorney General's
   Office
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
emaley@oag.state.va.us
kgallagher@oag.state.va.us
bchestnut@oag.state.va.us

*Counsel for Petitioner*
*Commonwealth of Virginia in*
*No. 24-3560*

BRIDGET HILL
   ATTORNEY GENERAL

/s/ *D. David DeWald*
D. David DeWald
   *Deputy Attorney General*
Office of the Attorney General
   of Wyoming
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895
david.dewald@wyo.gov

*Counsel for Petitioner*
*State of Wyoming in*
*No. 24-3560*

91

## CERTIFICATE OF COMPLIANCE

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

This brief complies with the type-volume requirements of the Court's October 29, 2024 briefing order because it contains 14,991 words, not counting the parts excluded by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(b)(1).

Dated: November 20, 2024          /s/ *Eric D. McArthur*
                                  Eric D. McArthur

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 20, 2024, I electronically filed the foregoing brief and following addendum with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

<u>/s/ *Eric D. McArthur*</u>
Eric D. McArthur

# STATUTORY ADDENDUM

# <u>TABLE OF CONTENTS</u>

49 U.S.C §32901(a)(6), (a)(8-11).........................................................SA-1

49 U.S.C §32902 ...............................................................................SA-3

# 49 U.S.C. §32901 Definitions

**(a) General.**—In this chapter—

\*\*\*

**(6)** "average fuel economy standard" means a performance standard specifying a minimum level of average fuel economy applicable to a manufacturer in a model year.

\*\*\*

**(8)** "dedicated automobile" means an automobile that operates only on alternative fuel.

**(9)** "dual fueled automobile" means an automobile that—

**(A)** is capable of operating on alternative fuel or a mixture of biodiesel and diesel fuel meeting the standard established by the American Society for Testing and Materials or under section 211(u) of the Clean Air Act (42 U.S.C. 7545(u)) for fuel containing 20 percent biodiesel (commonly known as "B20") and on gasoline or diesel fuel;

**(B)** provides equal or superior energy efficiency, as calculated for the applicable model year during fuel economy testing for the United States Government, when operating on alternative fuel as when operating on gasoline or diesel fuel;

**(C)** for model years 1993-1995 for an automobile capable of operating on a mixture of an alternative fuel and gasoline or diesel fuel and if the Administrator of the Environmental Protection Agency decides to extend the application of this subclause, for an additional period ending not later than the end of the last model year to which section 32905(b) and (d) of this title applies, provides equal or superior energy efficiency, as calculated for the applicable model year during fuel economy testing for the Government, when operating on a mixture of

SA-1

alternative fuel and gasoline or diesel fuel containing exactly 50 percent gasoline or diesel fuel as when operating on gasoline or diesel fuel; and

**(D)** for a passenger automobile, meets or exceeds the minimum driving range prescribed under subsection (c) of this section.

**(10)** "fuel" means—

**(A)** gasoline;

**(B)** diesel oil; or

**(C)** other liquid or gaseous fuel that the Secretary decides by regulation to include in this definition as consistent with the need of the United States to conserve energy.

**(11)** "fuel economy" means the average number of miles traveled by an automobile for each gallon of gasoline (or equivalent amount of other fuel) used, as determined by the Administrator under section 32904(c) of this title.

**\*\*\***

SA-2

### 49 U.S.C. §32902 Average fuel economy standards

**(a) Prescription of standards by regulation.—**At least 18 months before the beginning of each model year, the Secretary of Transportation shall prescribe by regulation average fuel economy standards for automobiles manufactured by a manufacturer in that model year. Each standard shall be the maximum feasible average fuel economy level that the Secretary decides the manufacturers can achieve in that model year.

**(b) Standards for automobiles and certain other vehicles.—**

**(1) In general.—**The Secretary of Transportation, after consultation with the Secretary of Energy and the Administrator of the Environmental Protection Agency, shall prescribe separate average fuel economy standards for—

**(A)** passenger automobiles manufactured by manufacturers in each model year beginning with model year 2011 in accordance with this subsection;

**(B)** non-passenger automobiles manufactured by manufacturers in each model year beginning with model year 2011 in accordance with this subsection; and

**(C)** work trucks and commercial medium-duty or heavy-duty on-highway vehicles in accordance with subsection (k).

**(2) Fuel economy standards for automobiles.—**

**(A)** Automobile fuel economy average for model years 2011 through 2020.—The Secretary shall prescribe a separate average fuel economy standard for passenger automobiles and a separate average fuel economy standard for non-passenger automobiles for each model year beginning with model year 2011 to achieve a combined fuel economy

SA-3

average for model year 2020 of at least 35 miles per gallon for the total fleet of passenger and non-passenger automobiles manufactured for sale in the United States for that model year.

**(B)** Automobile fuel economy average for model years 2021 through 2030.—For model years 2021 through 2030, the average fuel economy required to be attained by each fleet of passenger and non-passenger automobiles manufactured for sale in the United States shall be the maximum feasible average fuel economy standard for each fleet for that model year.

**(C)** Progress toward standard required.—In prescribing average fuel economy standards under subparagraph (A), the Secretary shall prescribe annual fuel economy standard increases that increase the applicable average fuel economy standard ratably beginning with model year 2011 and ending with model year 2020.

**(3) Authority of the Secretary.**—The Secretary shall—

**(A)** prescribe by regulation separate average fuel economy standards for passenger and non-passenger automobiles based on 1 or more vehicle attributes related to fuel economy and express each standard in the form of a mathematical function; and

**(B)** issue regulations under this title prescribing average fuel economy standards for at least 1, but not more than 5, model years.

**(4) Minimum standard.**—In addition to any standard prescribed pursuant to paragraph (3), each manufacturer shall also meet the minimum standard for domestically manufactured passenger automobiles, which shall be the greater of—

**(A)** 27.5 miles per gallon; or

**(B)** 92 percent of the average fuel economy projected by the Secretary for the combined domestic and non-domestic passenger automobile fleets manufactured for sale in the United States by all manufacturers in the model year, which projection shall be published in the Federal Register when the standard for that model year is promulgated in accordance with this section.

**(c) Amending passenger automobile standards.**—The Secretary of Transportation may prescribe regulations amending the standard under subsection (b) of this section for a model year to a level that the Secretary decides is the maximum feasible average fuel economy level for that model year. Section 553 of title 5 applies to a proceeding to amend the standard. However, any interested person may make an oral presentation and a transcript shall be taken of that presentation.

**(d) Exemptions.**—

**(1)** Except as provided in paragraph (3) of this subsection, on application of a manufacturer that manufactured (whether in the United States or not) fewer than 10,000 passenger automobiles in the model year 2 years before the model year for which the application is made, the Secretary of Transportation may exempt by regulation the manufacturer from a standard under subsection (b) or (c) of this section. An exemption for a model year applies only if the manufacturer manufactures (whether in the United States or not) fewer than 10,000 passenger automobiles in the model year. The Secretary may exempt a manufacturer only if the Secretary—

**(A)** finds that the applicable standard under those subsections is more stringent than the maximum feasible average fuel economy level that the manufacturer can achieve; and

**(B)** prescribes by regulation an alternative average fuel economy standard for the passenger automobiles manufactured by the exempted manufacturer that the Secretary decides is the maximum

feasible average fuel economy level for the manufacturers to which the alternative standard applies.

**(2)** An alternative average fuel economy standard the Secretary of Transportation prescribes under paragraph (1)(B) of this subsection may apply to an individually exempted manufacturer, to all automobiles to which this subsection applies, or to classes of passenger automobiles, as defined under regulations of the Secretary, manufactured by exempted manufacturers.

**(3)** Notwithstanding paragraph (1) of this subsection, an importer registered under section 30141(c) of this title may not be exempted as a manufacturer under paragraph (1) for a motor vehicle that the importer—

**(A)** imports; or

**(B)** brings into compliance with applicable motor vehicle safety standards prescribed under chapter 301 of this title for an individual under section 30142 of this title.

**(4)** The Secretary of Transportation may prescribe the contents of an application for an exemption.

**(e) Emergency vehicles.—**

**(1)** In this subsection, "emergency vehicle" means an automobile manufactured primarily for use—

**(A)** as an ambulance or combination ambulance-hearse;

Case: 24-7001    Document: 102-1    Filed: 11/20/2024    Page: 137    (137 of 140)

**(B)** by the United States Government or a State or local government for law enforcement; or

**(C)** for other emergency uses prescribed by regulation by the Secretary of Transportation.

**(2)** A manufacturer may elect to have the fuel economy of an emergency vehicle excluded in applying a fuel economy standard under subsection (a), (b), (c), or (d) of this section. The election is made by providing written notice to the Secretary of Transportation and to the Administrator of the Environmental Protection Agency.

**(f) Considerations on decisions on maximum feasible average fuel economy.**—When deciding maximum feasible average fuel economy under this section, the Secretary of Transportation shall consider technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on fuel economy, and the need of the United States to conserve energy.

**(g) Requirements for other amendments.—**

**(1)** The Secretary of Transportation may prescribe regulations amending an average fuel economy standard prescribed under subsection (a) or (d) of this section if the amended standard meets the requirements of subsection (a) or (d), as appropriate.

**(2)** When the Secretary of Transportation prescribes an amendment under this section that makes an average fuel economy standard more stringent, the Secretary shall prescribe the amendment (and submit the amendment to Congress when required under subsection (c)(2) of this section) at least 18 months before the beginning of the model year to which the amendment applies.

SA-7

**(h) Limitations.**—In carrying out subsections (c), (f), and (g) of this section, the Secretary of Transportation—

**(1)** may not consider the fuel economy of dedicated automobiles;

**(2)** shall consider dual fueled automobiles to be operated only on gasoline or diesel fuel; and

**(3)** may not consider, when prescribing a fuel economy standard, the trading, transferring, or availability of credits under section 32903.

**(i) Consultation.**—The Secretary of Transportation shall consult with the Secretary of Energy in carrying out this section and section 32903 of this title.

**(j) Secretary of Energy comments.**—

**(1)** Before issuing a notice proposing to prescribe or amend an average fuel economy standard under subsection (a), (c), or (g) of this section, the Secretary of Transportation shall give the Secretary of Energy at least 10 days from the receipt of the notice during which the Secretary of Energy may, if the Secretary of Energy concludes that the proposed standard would adversely affect the conservation goals of the Secretary of Energy, provide written comments to the Secretary of Transportation about the impact of the standard on those goals. To the extent the Secretary of Transportation does not revise a proposed standard to take into account comments of the Secretary of Energy on any adverse impact of the standard, the Secretary of Transportation shall include those comments in the notice.

**(2)** Before taking final action on a standard or an exemption from a standard under this section, the Secretary of Transportation shall notify the Secretary of Energy and provide the Secretary of Energy a reasonable time to comment.

SA-8

**(k) Commercial medium- and heavy-duty on-highway vehicles and work trucks.—**

**(1) Study.—**Not later than 1 year after the National Academy of Sciences publishes the results of its study under section 108 of the Ten-in-Ten Fuel Economy Act, the Secretary of Transportation, in consultation with the Secretary of Energy and the Administrator of the Environmental Protection Agency, shall examine the fuel efficiency of commercial medium- and heavy-duty on-highway vehicles and work trucks and determine—

**(A)** the appropriate test procedures and methodologies for measuring the fuel efficiency of such vehicles and work trucks;

**(B)** the appropriate metric for measuring and expressing commercial medium- and heavy-duty on-highway vehicle and work truck fuel efficiency performance, taking into consideration, among other things, the work performed by such on-highway vehicles and work trucks and types of operations in which they are used;

**(C)** the range of factors, including, without limitation, design, functionality, use, duty cycle, infrastructure, and total overall energy consumption and operating costs that affect commercial medium- and heavy-duty on-highway vehicle and work truck fuel efficiency; and

**(D)** such other factors and conditions that could have an impact on a program to improve commercial medium- and heavy-duty on-highway vehicle and work truck fuel efficiency.

**(2) Rulemaking.—**Not later than 24 months after completion of the study required under paragraph (1), the Secretary, in consultation with the Secretary of Energy and the Administrator of the Environmental Protection Agency, by regulation, shall determine in a rulemaking

proceeding how to implement a commercial medium- and heavy-duty on-highway vehicle and work truck fuel efficiency improvement program designed to achieve the maximum feasible improvement, and shall adopt and implement appropriate test methods, measurement metrics, fuel economy standards, and compliance and enforcement protocols that are appropriate, cost-effective, and technologically feasible for commercial medium- and heavy-duty on-highway vehicles and work trucks. The Secretary may prescribe separate standards for different classes of vehicles under this subsection.

**(3) Lead-time; regulatory stability.**—The commercial medium- and heavy-duty on-highway vehicle and work truck fuel economy standard adopted pursuant to this subsection shall provide not less than—

**(A)** 4 full model years of regulatory lead-time; and

**(B)** 3 full model years of regulatory stability.