**No. 24-7001 (and consolidated cases 24-3539, 24-3560, 24-3572, 24-3601, 24-3603, 24-3605, 24-3606, 24-3658, 24-3664, 24-3698, and 24-3728)**

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

---

IN RE: NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION, DEPARTMENT OF TRANSPORTATION, CORPORATE AVERAGE FUEL ECONOMY STANDARDS FOR PASSENGER CARS AND LIGHT TRUCKS FOR MODEL YEARS 2027 AND BEYOND AND FUEL EFFICIENCY STANDARDS FOR HEAVY-DUTY PICKUP TRUCKS AND VANS FOR MODEL YEARS 2030 AND BEYOND, 89 FED. REG. 52540, PUBLISHED ON JUNE 24, 2024.

---

On Petitions for Review of a Final Rule
of the Department of Transportation,
National Highway Traffic Safety Administration

---

**INITIAL BRIEF FOR FEDERAL GOVERNMENT RESPONDENTS**

---


BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

MARK B. STERN
JOSHUA M. KOPPEL
KEVIN J. KENNEDY
*Attorneys, Appellate Staff*
*Civil Division, Room 7212*
*U.S. Department of Justice*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*
*(202) 514-4820*

*Of Counsel:*

SUBASH IYER
*Acting General Counsel*

CHARLES E. ENLOE
*Assistant General Counsel*

HUNTER OLIVER
*Attorney, National Highway Traffic Safety Administration*

*Department of Transportation*

**TABLE OF CONTENTS**

**Page**


TABLE OF AUTHORITIES ........ iv

STATEMENT REGARDING ORAL ARGUMENT ........ x

INTRODUCTION........ 1

STATEMENT OF JURISDICTION ........ 4

STATEMENT OF THE ISSUES ........ 5

STATEMENT OF THE CASE ........ 6

A. Statutory Background ........ 6

B. Regulatory Background ........ 11

1. Fuel-economy standards for the light-duty fleet........ 11

2. Standards for the heavy-duty fleet ........ 18

SUMMARY OF ARGUMENT ........ 20

STANDARD OF REVIEW........ 25

ARGUMENT ........ 26

I. NHTSA LAWFULLY ESTABLISHED THE LIGHT-DUTY FUEL-ECONOMY STANDARDS ON THE BASIS OF THE PRESCRIBED STATUTORY CRITERIA........ 26

A. NHTSA Properly Considered The Entire Existing Fleet In Calculating The Starting Fuel-Economy Level........ 26

B. NHTSA Properly Considered Certain New Battery-Electric Vehicle Models That Automakers Are Expected To Produce After The Model Year 2022 Fleet ........ 40

1. NHTSA properly accounted for battery-electric vehicles that automakers will independently produce in response to state regulatory requirements........ 41

2. NHTSA properly accounted for battery-electric vehicles that automakers will produce, and compliance credits they will use, outside of the rulemaking timeframe .......... 51

C. The Maximum Feasible Fuel-Economy Level Is Determined By The Capacity Of The Industry As A Whole .......... 54

D. Even If There Were Any Prejudicial Error, The Proper Remedy Would Be Remand Without Vacatur .......... 60

II. NHTSA's Heavy-Duty Standards Are Lawful .......... 63

A. NHTSA Properly Accounted For Electric Vehicles In The Heavy-Duty Fuel-Efficiency Program .......... 64

B. NHTSA Properly Treats Electric Vehicles As Having A Fuel-Consumption Value Of Zero Gallons Per 100 Miles .......... 74

C. The Final Rule Complies With The Statute's Regulatory-Stability Requirement Because It Establishes Fuel-Efficiency Standards For Six Years .......... 77

III. The Environmental Petitioners' Challenges Are Without Merit .......... 82

A. NHTSA Reasonably Explained That It Is Not Feasible To Model "Production Shifting" As An Available Compliance Pathway .......... 82

B. NHTSA Properly Determined That Its Light-Truck Standards Are Set At The Maximum Feasible Fuel-Economy Level That Manufacturers Can Achieve .......... 90

1. NHTSA determined that automakers could not feasibly comply with more stringent fuel-economy standards .......... 90

2. Petitioners misunderstand the final rule's reasoning on economic practicability .......... 94

3. The final rule appropriately established different standards for passenger cars and light trucks .......... 97

CONCLUSION .......... 102

CERTIFICATE OF COMPLIANCE

ADDENDUM

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Allied-Signal, Inc. v. U.S. NRC*,
988 F.2d 146 (D.C. Cir. 1993) .................... 61, 62

*American Bird Conservancy, Inc. v. FCC*,
516 F.3d 1027 (D.C. Cir. 2008) .................... 77

*American Great Lakes Ports Ass'n v. Schultz*,
962 F.3d 510 (D.C. Cir. 2020) .................... 97

*Appalachian Power Co. v. EPA*,
135 F.3d 791 (D.C. Cir. 1998) .................... 50, 53

*Cellnet Commc'ns, Inc. v. FCC*,
149 F.3d 429 (6th Cir. 1998) .................... 61

*Center for Auto Safety v. NHTSA*,
793 F.2d 1322 (D.C. Cir. 1986) .................... 7, 27

*Center for Biological Diversity v. NHTSA*,
538 F.3d 1172 (9th Cir. 2008) .................... 34, 96

*Chamber of Commerce of the U.S. v. SEC*,
115 F.4th 740 (6th Cir. 2024) .................... 26

*Clean Wis. v. EPA*,
964 F.3d 1145 (D.C. Cir. 2020) .................... 61

*Coalition for Gov't Procurement v. Federal Prison Indus., Inc.*,
365 F.3d 435 (6th Cir. 2004) .................... 48

*Competitive Enter. Inst. v. NHTSA*,
45 F.3d 481 (D.C. Cir. 1995) .................... 25

*Davis Cty. Solid Waste Mgmt. v. U.S. EPA*,
108 F.3d 1454 (D.C. Cir. 1997) .................... 62

*Garcia v. United States*,
469 U.S. 70 (1984) .................... 39

*Hargett v. Commissioner of Soc. Sec.*,
964 F.3d 546 (6th Cir. 2020) .................... 53

*HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*,
594 U.S. 382 (2021) .................... 65

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .................... 74

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) .................... 60

*Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*,
498 U.S. 211 (1991) .................... 77

*National Ass'n of Regulatory Util. Comm'rs v. FCC*,
737 F.2d 1095 (D.C. Cir. 1984 .................... 97

*Pulsifer v. United States*,
601 U.S. 124 (2024) .................... 56

*Rudisill v. McDonough*,
601 U.S. 294 (2024) .................... 81

*Shinseki v. Sanders*,
556 U.S. 396 (2009) .................... 48

*Sierra Club v. Slater*,
120 F.3d 623 (6th Cir. 1997) .................... 48

*Sierra Club v. U.S. EPA*,
60 F.4th 1008 (6th Cir. 2023) .................... 61

*Troy Corp. v. Browner*,
120 F.3d 277 (D.C. Cir. 1997) .................... 88

*Truck Trailer Manufacturers Ass'n v. EPA*,
17 F.4th 1198 (D.C. Cir. 2021) .................... 67, 68

*West Virginia v. EPA*,
597 U.S. 697 (2022) .................... 35, 69, 73

**Statutes:**

Administrative Procedure Act (APA):
5 U.S.C. § 706 .................... 48
5 U.S.C. § 706(2)(A) .................... 26

Energy Independence and Security Act of 2007 (EISA),
Pub. L. No. 110-140, 121 Stat. 1492 (2007):
§ 102, 121 Stat. at 1498-1501 .......... 10, 60
§ 102(b), 121 Stat. at 1500 (codified at 49 U.S.C. § 32902(k)(2)) .......... 10
§ 103, 121 Stat. at 1501 (codified at 49 U.S.C. § 32901(a)(7), (19)) .......... 10
§ 131(a)(5), 121 Stat. at 1509 .......... 65
§ 133, 121 Stat. at 1512 .......... 65

Energy Policy and Conservation Act (EPCA),
Pub. L. No. 94-163, 89 Stat. 871 (1975) .......... 6
§ 2, 89 Stat. at 874 .......... 7
Sec. 301, § 501(1), 89 Stat. at 901 .......... 7

28 U.S.C. § 2112(a)(3) .......... 5

42 U.S.C. § 4332(2)(C) .......... 34

42 U.S.C. § 7507 .......... 41

42 U.S.C. § 7521(a)(3)(C) .......... 81

42 U.S.C. § 7543(a) .......... 41

42 U.S.C. § 7543(b) .......... 41

42 U.S.C. § 17011(a)(5)(C) .......... 69

42 U.S.C. § 17011(b)(1) .......... 68

49 U.S.C. § 103 .......... 10

49 U.S.C. § 32901(a)(1) .......... 8

49 U.S.C. § 32901(a)(1)(J) .......... 65, 68

49 U.S.C. § 32901(a)(3) .......... 7, 65

49 U.S.C. § 32901(a)(6) .......... 7

49 U.S.C. § 32901(a)(7) .......... 10, 64

49 U.S.C. § 32901(a)(8) .......... 8

49 U.S.C. § 32901(a)(9) .......... 8

49 U.S.C. § 32901(a)(10) .......... 3, 20, 24, 66, 75

49 U.S.C. § 32901(a)(11) .......... 9, 18, 75

49 U.S.C. § 32901(a)(19) .......... 10, 65

49 U.S.C. § 32902(a) .......... 1, 7, 27, 30, 31, 37, 55, 62, 63, 90

49 U.S.C. § 32902(b)(1) .......... 7, 64, 66, 97

49 U.S.C. § 32902(b)(2)(B) .......... 7

49 U.S.C. § 32902(b)(3)(B) .......... 30

49 U.S.C. § 32902(b)(4) .......... 58

49 U.S.C. § 32902(d)(1) .......... 56

49 U.S.C. § 32902(f) .......... 8, 16, 27, 30, 83, 90

49 U.S.C. § 32902(g)(1) .......... 56

49 U.S.C. § 32902(g)(2) .......... 63

49 U.S.C. § 32902(h) .......... 14, 31, 37

49 U.S.C. § 32902(h)(1) .......... 8

49 U.S.C. § 32902(h)(1)-(2) .......... 27

49 U.S.C. § 32902(h)(2) .......... 8

49 U.S.C. § 32902(h)(3) .......... 8, 27

49 U.S.C. § 32902(k) .......... 23

49 U.S.C. § 32902(k)(1)(B) .......... 68

49 U.S.C. § 32902(k)(2) .......... 10, 11, 23, 64, 66, 68, 69, 74, 75, 76

49 U.S.C. § 32902(k)(3) .......... 11, 77, 79, 80

49 U.S.C. § 32903 .......... 8

49 U.S.C. § 32904 .......... 7

49 U.S.C. § 32904(a) .......... 9

49 U.S.C. § 32904(a)(2) .......... 9

49 U.S.C. § 32904(a)(2)(B) .......... 76

49 U.S.C. § 32904(c) .......... 9

49 U.S.C. § 32905(e) .......... 9

49 U.S.C. § 32909(a) .......... 5

49 U.S.C. § 32913 .......... 59

**Regulations:**

49 C.F.R. § 1.95(a) .......... 11

49 C.F.R. pt. 533, app. A .......... 32

49 C.F.R. § 535.6(a)(3)(iii) .......... 19, 73, 74, 75

**Legislative Material:**

134 Cong. Rec. 25,124 (1988) .......... 38

H.R. Rep. No. 94-340 (1975) .......... 6

H.R. Rep. No. 100-476 (1987) .......... 33

S. Rep. No. 94-516 (1975) (Conf. Rep.) .......... 7, 59

**Other Authorities:**

Annual Societal Effects Summary Worksheet – HDPUV, (found in HDPUV_ref/reports-csv/annual_societal_effects_summary_report.csv within the HDPUV_ref.zip file located at https://www.nhtsa.gov/file-downloads?p=nhtsa/downloads/CAFE/2024-FRM-LD-2b3-2027-2035/Central-Analysis/) (last updated June 7, 2024) .......... 71, 72

42 Fed. Reg. 33,534 (June 30, 1977) .......... 35, 60

50 Fed. Reg. 40,528 (Oct. 4, 1985) .......... 59

68 Fed. Reg. 16,868 (Apr. 7, 2003) .......... 59

76 Fed. Reg. 57,106 (Sept. 15, 2011) .......... 73, 74, 77, 80, 81

77 Fed. Reg. 62,624 (Oct. 15, 2012) .......... 85, 86

81 Fed. Reg. 73,478 (Oct. 25, 2016) .......... 73, 77

87 Fed. Reg. 25,710 (May 2, 2022) .......... 39, 92

88 Fed. Reg. 56,128 (Aug. 17, 2023) .......... 11, 12, 18, 19

89 Fed. Reg. 52,540 (June 24, 2024) .......... 4, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 27, 28, 29, 33, 34, 36, 39, 40, 41, 42, 43, 44, 44-45, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 57, 58, 59, 62, 70, 71, 75, 76, 77, 78, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 98, 101

90 Fed. Reg. 643 (Jan. 6, 2025) .......... 42

NHTSA, *Market Data Input File (Light-Duty)*, vehicles tab, (found in Central_Analysis_Inputs/market_data_LD_ref.xlsx located within the Central_Analysis_Inputs.zip file located at https://www.nhtsa.gov/file-downloads?p=nhtsa/downloads/CAFE/2024-FRM-LD-2b3-2027-2035/Central-Analysis/) (last updated June 7, 2024) .......... 9-10

Peter Slowik et al., Int'l Council on Clean Transp., *Analyzing the Impact of the Inflation Reduction Act on Electric Vehicle Uptake in the United States* (Jan. 2023), https://perma.cc/78QC-UYKC .......... 32

*Stability*, American Heritage Dictionary (4th ed. 2006) .......... 79

*Stable*, American Heritage Dictionary (4th ed. 2006) .......... 79

*Vehicle*, American Heritage Dictionary (4th ed. 2006) .......... 65

## STATEMENT REGARDING ORAL ARGUMENT

This case concerns a National Highway Traffic Safety Administration rule establishing fuel-economy standards for the light-duty vehicle fleet and fuel-efficiency standards for a portion of the heavy-duty vehicle fleet. Because of the technical aspects of the rule, respondents respectfully submit that oral argument would help the Court resolve the issues presented.

## INTRODUCTION

Congress enacted the Energy Policy and Conservation Act of 1975 (EPCA) to promote the conservation of energy supplies and to improve the energy efficiency of motor vehicles. The Act requires the Secretary of Transportation to establish mandatory average fuel-economy standards for passenger cars and light trucks (the "light-duty" fleet) for each model year. Those standards are to be set at "the maximum feasible average fuel economy level that the Secretary decides [automobile] manufacturers can achieve." 49 U.S.C. § 32902(a).

Congress enacted the Energy Independence and Security Act of 2007 (EISA) to promote similar goals. In addition to increasing the stringency of the light-duty fuel-economy standards, EISA directs the Secretary to implement a fuel-efficiency improvement program for commercial medium- and heavy-duty vehicles and work trucks (the "heavy-duty" fleet).

The Secretary has delegated authority to set fuel-economy standards under both programs to the National Highway Traffic Safety Administration (NHTSA). In the final rule at issue here, NHTSA established fuel-economy standards for the light-duty fleet for model years 2027 to 2031 and fuel-efficiency standards for heavy-duty pickup trucks and vans—a subset of vehicles within the heavy-duty fleet—for model years 2030 to 2035.

Several fuel manufacturers, States, and automobile dealerships (referred to here as the state and industry petitioners) petitioned for review of the final rule, arguing

that the light-duty and heavy-duty standards will result in undue fuel-economy gains and that they will thus be injured by reduced revenues from gasoline sales or increased vehicle prices. Environmental groups also petitioned for review, arguing that the light-duty standards are too lenient and do not represent the maximum feasible fuel-economy level that manufacturers can achieve. Notably, the automobile manufacturers themselves—the parties directly regulated by the final rule—have not petitioned for review of the final rule or supported either group of petitioners as intervenors or amici.

**1.** Congress has recognized the important and growing role of dedicated alternative-fuel vehicles, such as battery-electric vehicles, in furthering the nation's energy-conservation goals. To that end, EPCA contains various measures to encourage production of those vehicles in the light-duty fleet. In particular, light-duty electric vehicles have a higher fuel-economy value so that automakers that produce those vehicles get a boost in achieving compliance with the fuel-economy standards. Congress did not want NHTSA to set fuel-economy standards at a level that would require automakers to produce new alternative-fuel vehicles, however. Accordingly, in determining what fuel-economy gains are practicable and feasible in the light-duty fleet during the period covered by new standards, NHTSA considers only the gains that can be achieved without producing new alternative-fuel vehicles.

The state and industry petitioners urge that NHTSA erred in setting the light-duty standards by accounting for electric vehicles that automakers are already

producing or are expected to produce even in the absence of new standards. Petitioners misunderstand the statutory framework. The statute ensures that new standards are set at a level that can be achieved solely by improvements to the efficiency of gasoline-powered vehicles. But the statute does not require NHTSA to pretend that the pre-existing fuel-economy level is less than it actually is by imagining the non-existence of electric vehicles already in production or that would be produced even in the absence of NHTSA's standards. Rather, NHTSA must accurately assess the fuel-economy level already attained by the actual fleet, and then exclude consideration of battery-electric vehicles in determining the fuel-efficiency improvements that can be achieved in the next regulatory period.

**2.** In contrast with the statute's treatment of the light-duty fuel-economy standards, the statute does not address NHTSA's consideration of electric vehicles in establishing fuel-efficiency standards for the heavy-duty fleet. NHTSA thus considers heavy-duty electric vehicles in establishing those standards and accounts for the energy-conservation benefit that such vehicles provide in determining automakers' compliance with the standards.

The state and industry petitioners nonetheless contend that NHTSA may not include electric vehicles in the heavy-duty fuel-efficiency improvement program because such vehicles do not burn "fuel" as that term is defined by statute ("gasoline," "diesel oil," and "other liquid or gaseous fuel" as determined by the Secretary, 49 U.S.C. § 32901(a)(10)). That argument finds no basis in the statute or

common sense. The statute is concerned with improving fuel efficiency. A vehicle technology that reduces the use of fuel plainly improves the fleet's fuel efficiency. NHTSA thus properly included electric vehicles in the heavy-duty fuel-efficiency program and treated them as consuming zero gallons of fuel, while also accounting for their electricity use in considering the standards' effect on energy conservation.

**3.** The environmental petitioners, for their part, contend that the light-duty fuel-economy standards are set at an improperly low level. They argue that in setting new standards NHTSA should have considered ways in which manufacturers could improve their fuel economy by increasing sales of existing fuel-efficient vehicle models. NHTSA explained, however, that it cannot model such production shifting as an available response to comply with the standards because it lacks reliable models to predict how profit-maximizing automakers may choose to adjust their pricing and how consumers would respond to such adjustments.

NHTSA also explained that more stringent light-truck standards suggested by petitioners would have led to widespread noncompliance due to insufficient opportunities to apply efficiency-improving technology in the relevant timeframe, and petitioners fail to grapple with these concerns.

The petitions for review should be denied.

## STATEMENT OF JURISDICTION

NHTSA issued the final rule under review on June 24, 2024. 89 Fed. Reg. 52,540 (June 24, 2024) (JA___). The petitions for review were timely filed by August

9, 2024. The petitions were consolidated in this Court pursuant to 28 U.S.C. § 2112(a)(3). This Court has jurisdiction pursuant to 49 U.S.C. § 32909(a).

## STATEMENT OF THE ISSUES

**I.** The state and industry petitioners raise the following issues regarding the fuel-economy standards for the light-duty fleet:

**A**. Whether NHTSA acted lawfully when it accounted for alternative-fuel vehicles already being produced and sold in model year 2022 in determining the maximum feasible fuel-economy level for model years 2027 to 2031.

**B.** Whether NHTSA acted lawfully when it accounted for the battery-electric vehicles manufacturers are expected to produce for reasons other than the fuel-economy standards themselves.

**C.** Whether NHTSA properly set the standards at a level that the automotive industry can achieve, even though a few automakers may not practicably be able to achieve compliance in all years.

**II.** The state and industry petitioners raise the following issues regarding the fuel-efficiency standards for heavy-duty pickups and vans:

**A.** Whether NHTSA properly includes electric heavy-duty vehicles in the heavy-duty fuel-efficiency program because those vehicles fit within the statute's definition of heavy-duty vehicles.

**B.** Whether NHTSA properly treats electric vehicles as using zero gallons of fuel per 100 miles because electric vehicles consume no fuel, as that term is defined by statute.

**C.** Whether the final rule properly provides automakers at least three years of regulatory stability because it establishes fuel-efficiency standards for six model years at a time.

**III.** The environmental petitioners raise the following issues regarding the fuel-economy standards for the light-duty fleet:

**A.** Whether NHTSA reasonably explained that it is not feasible to model "production shifting" as an available compliance pathway.

**B.** Whether NHTSA properly determined that its light-truck standards are set at the maximum feasible level.

## STATEMENT OF THE CASE

### A. Statutory Background

**1.** In the aftermath of the 1973 oil crisis, Congress enacted the Energy Policy and Conservation Act, Pub. L. No. 94-163, 89 Stat. 871 (1975). *See* H.R. Rep. No. 94-340, at 1-3 (1975). Congress observed that "[t]he fundamental reality is that this nation has entered a new era in which energy resources previously abundant, will remain in short supply, retarding our economic growth and necessitating an alteration in our life's habits and expectations." *Id.* at 1. The goals of EPCA are therefore to "decrease dependence upon foreign imports, enhance national security, achieve the

efficient utilization of scarce resources, and guarantee the availability of domestic energy supplies at prices consumers can afford." S. Rep. No. 94-516, at 117 (1975) (Conf. Rep.); *see also* EPCA § 2, 89 Stat. at 874.

In order to promote the conservation of fuel, Title III of EPCA established average fuel-economy standards for automobiles, which are statutorily defined to include vehicles rated at less than 10,000 pounds gross vehicle weight. EPCA sec. 301, § 501(1), 89 Stat. at 901; 49 U.S.C. § 32901(a)(3). These standards "set a minimum performance requirement in terms of an average number of miles a vehicle travels per gallon of gasoline or diesel fuel." *Center for Auto Safety v. NHTSA*, 793 F.2d 1322, 1324 (D.C. Cir. 1986). "Individual vehicles and models are not required to meet the mileage standard; rather, each manufacturer must achieve *an average* level of fuel economy for all specified vehicles manufactured in a given model year." *Id.*; *see also* 49 U.S.C. §§ 32901(a)(6), 32904.

In its current form, the statute directs the Secretary of Transportation to prescribe, for each model year, separate average fuel-economy standards for passenger automobiles and light trucks ("non-passenger automobiles," in the parlance of the statute), collectively referred to here as the "light-duty" fleet. 49 U.S.C. § 32902(b)(1). The statute requires that each fuel-economy standard prescribed by the Secretary "shall be the maximum feasible average fuel economy level that the Secretary decides the manufacturers can achieve in that model year." *Id.* § 32902(a); *see also id.* § 32902(b)(2)(B). Congress identified four factors to guide the Secretary's decision-

making: (1) "technological feasibility," (2) "economic practicability," (3) "the effect of other motor vehicle standards of the Government on fuel economy," and (4) "the need of the United States to conserve energy." *Id.* § 32902(f).

Congress also placed three constraints on the Secretary's determination of the maximum feasible average fuel-economy level. The first two constraints concern automobiles that operate wholly or partially on an "alternative fuel" such as electricity. *See* 49 U.S.C. § 32901(a)(1). First, the Secretary "may not consider the fuel economy of dedicated automobiles." *Id.* § 32902(h)(1). A dedicated automobile is a vehicle (such as a battery-electric vehicle) that operates only on an alternative fuel. *Id.* § 32901(a)(8). Second, the Secretary "shall consider dual fueled automobiles"—that is, automobiles capable of operating on alternative fuel *and* on gasoline or diesel (such as plug-in hybrid vehicles)—as if they were "operated only on gasoline or diesel fuel." *Id.* § 32902(h)(2); *see also id.* § 32901(a)(9).

The third constraint provides that the Secretary "may not consider … the trading, transferring, or availability of [compliance] credits" in determining the maximum feasible fuel-economy level. 49 U.S.C. § 32902(h)(3). Manufacturers earn such credits when the average fuel economy of their fleet exceeds the applicable fuel-economy standard. Those compliance credits can then be applied to achieve compliance with the fuel-economy standards in any of the three prior model years or five subsequent model years. *Id.* § 32903.

The Environmental Protection Agency (EPA) is charged with calculating the fuel economy of each model of vehicle and the average fuel economy of all vehicles produced by a manufacturer in a given model year. 49 U.S.C. § 32904(a), (c). These calculations are used to determine a fleet's compliance with the fuel-economy standards. A vehicle's fuel economy is generally the number of miles traveled by the automobile for each gallon of gasoline (or equivalent amount of other fuel) consumed. *Id.* § 32901(a)(11). Although NHTSA may not consider dedicated automobiles in determining the maximum feasible fuel-economy level that manufacturers can achieve (the inquiry required when NHTSA establishes the standards), those vehicles are accounted for in determining automakers' compliance with the standards. The EPA determines the compliance fuel-economy value of battery-electric vehicles—which use no gasoline—using a petroleum-equivalency factor determined by the Secretary of Energy. *Id.* § 32904(a)(2). EPA calculates the fuel economy of electric dual-fueled automobiles (*i.e.*, plug-in hybrid electric vehicles) based on a formula that accounts for how much of the time the vehicle is expected to use each source of fuel. *Id.* § 32905(e). As a general matter, battery-electric vehicles and plug-in hybrids obtain substantially higher compliance fuel-economy values than internal-combustion-engine vehicles.[1]

[1] *Compare, e.g.*, NHTSA, *Market Data Input File (Light-Duty)*, vehicles tab, row 1182, col. M (battery-electric model of the Hyundai Kona has a fuel-economy compliance value of approximately 175.5 miles per gallon), *with id.* rows 1175-1181,

*Continued on next page.*

**2.** The Energy Independence and Security Act of 2007 increased the fuel-economy standards for the light-duty fleet and made various other amendments to the fuel-economy program for those vehicles. Pub. L. No. 110-140, § 102, 121 Stat. 1492, 1498-1500 (2007). The statute also directed the Secretary to "determine in a rulemaking proceeding how to implement a commercial medium- and heavy-duty on-highway vehicle and work truck fuel efficiency improvement program designed to achieve the maximum feasible improvement." *Id.* § 102(b), 121 Stat. at 1500 (codified at 49 U.S.C. § 32902(k)(2)). The Secretary was instructed to "adopt and implement appropriate test methods, measurement metrics, fuel economy standards, and compliance and enforcement protocols that are appropriate, cost-effective, and technologically feasible for commercial medium- and heavy-duty on-highway vehicles and work trucks." *Id.* EISA defines "commercial medium- and heavy-duty on-highway vehicle[s]" and "work truck[s]"—collectively referred to here as the "heavy-duty" fleet—to include on-highway vehicles with a gross vehicle weight rating of 10,000 pounds or more and non-passenger vehicles with a gross vehicle weight rating between 8,500 and 10,000 pounds. *Id.* § 103, 121 Stat. at 1501 (codified at 49 U.S.C. § 32901(a)(7), (19)).

---

col. K (gasoline models of the Hyundai Kona have a fuel-economy compliance value of approximately 28.3 to 44.4 miles per gallon). The Market Data Input File (Light Duty) is located at Central_Analysis_Inputs/market_data_LD_ref.xlsx within the Central_Analysis_Inputs.zip file located at https://www.nhtsa.gov/file-downloads?p=nhtsa/downloads/CAFE/2024-FRM-LD-2b3-2027-2035/Central-Analysis/ (last updated June 7, 2024).

Rather than prescribing one fuel-efficiency standard for all heavy-duty vehicles, the Secretary "may prescribe separate standards for different classes of [heavy-duty] vehicles." 49 U.S.C. § 32902(k)(2). The restrictions applicable to the Secretary's consideration of standards for the light-duty fleet—related to dedicated automobiles, dual-fueled automobiles, and compliance credits—do not apply to the Secretary's consideration of standards for the heavy-duty fleet. When adopting standards for heavy-duty vehicles, however, the Secretary must provide automakers "4 full model years of regulatory lead-time" and "3 full model years of regulatory stability." *Id.* § 32902(k)(3).

## B. Regulatory Background

The Secretary of Transportation has delegated authority to establish fuel-economy standards to the National Highway Traffic Safety Administrator. 49 C.F.R. § 1.95(a). In 2023, NHTSA issued a notice of proposed rulemaking to establish fuel-economy standards for passenger cars and light trucks for model years 2027 to 2031. 88 Fed. Reg. 56,128, 56,132 (Aug. 17, 2023) (JA___). NHTSA also proposed fuel-efficiency standards for heavy-duty pickup trucks and vans—two categories of vehicles within the heavy-duty fleet—for model years 2030 to 2035. *Id.* NHTSA finalized standards for these vehicles in June 2024. 89 Fed. Reg. at 52,545 (JA___).

### 1. Fuel-economy standards for the light-duty fleet

In the notice of proposed rulemaking, NHTSA proposed to increase the fuel-economy standards for passenger cars by two percent each year, and for light trucks

by four percent each year, from model year 2027 to 2031. 88 Fed. Reg. at 56,133 (JA___). The proposed standards would have required an average fuel-economy level of approximately 55.7 miles per gallon for the combined light-duty fleet in model year 2031. *Id.* at 56,137 (JA___).[2]

After considering comments, NHTSA decided to finalize the proposed fuel-economy standard for passenger cars. 89 Fed. Reg. at 52,547 (JA___). But the agency reconsidered the proposed standards for light trucks and decided to maintain the fuel-economy standard from 2026 without change through model year 2028, and then to increase the standard by two percent each year in model years 2029 through 2031. *Id.* The final standards would require an estimated average fuel-economy level of 50.4 miles per gallon for the combined light-duty fleet. NHTSA estimated, however, that many manufacturers would exceed that standard and that the overall fleet would achieve an average fuel-economy level of 52.5 miles per gallon. *Id.* at 52,549 (JA___). NHTSA found that the final light-duty standards will "achieve significant fuel economy, improve energy security, … reduce harmful pollution by a

---

[2] The actual fuel-economy standards for light-duty vehicles are calculated based on the footprint of the vehicles a manufacturer sells in a given year. *See* 88 Fed. Reg. at 56,134 (JA___). Accordingly, the fuel-economy requirements for a given manufacturer depend on the size of the vehicles that manufacturer ultimately sells, and NHTSA's estimate of the overall fuel-economy level of the fleet in a future model year necessarily depends on its estimate of the size of future vehicles and manufacturers' projected sales. *See id.* at 56,137 (JA___).

large amount," and "save consumers money and fuel over the lifetime of their vehicles." *Id.* at 52,550 (JA___).

### a. ***The CAFE Model***

As NHTSA has done since 2001, the agency used the Corporate Average Fuel Economy Compliance and Effects Modeling System (CAFE Model) to assess the effects of different possible fuel-economy standards. 89 Fed. Reg. at 52,580 (JA___). The CAFE Model is a comprehensive computational model that "estimates how vehicle manufacturers might respond to a given regulatory scenario," as well as "what impact that response will have on fuel consumption, emissions, safety impacts, and economic externalities." *Id.*; *see also id.* at 52,592 (JA___).

The CAFE Model begins with a large spreadsheet file—the market data input file—that describes the existing vehicle fleet. 89 Fed. Reg. at 52,592 (JA___); JA___[TSD.2-9]. That file identifies each vehicle model in nearly every configuration that each manufacturer produced in the most recent year for which data is available—in this case, 2022—along with their production volumes, technologies, and existing fuel-economy levels. 89 Fed. Reg. at 52,595-52,599 (JA___-___); JA___-___[TSD.2-9to2-10]; JA___-___[TSD.2-16to2-17]. The CAFE Model then simulates the application of more than 70 potential "technologies to different vehicle models in each manufacturer's product line" to assess possible ways that vehicles in a fleet could be changed to improve their fuel economy. JA___[TSD.2-1]. To do this, the model "applies technologies based on their relative cost-effectiveness" until the

manufacturer achieves compliance with a given regulatory scenario. *Id.* The changes simulated by the model account for a variety of constraints recognizing, for example, that certain technologies can feasibly be applied only during a year in which a vehicle is scheduled to undergo a refresh or redesign. *See* 89 Fed. Reg. at 52,548 n.18 (JA___ n.18). The CAFE Model then produces a representation of the full simulated fleet for each model year and uses this fleet to generate estimates of the energy-consumption, economic, public-health, and environmental consequences of each of the regulatory scenarios. JA___[TSD.2-1]. Of course, "the CAFE Model does not dictate or predict the technologies manufacturers must use to comply; rather, the CAFE Model outlines a technology pathway that manufacturers could use to meet the standards cost-effectively." 89 Fed. Reg. at 52,594 (JA___).

As required by the constraints in 49 U.S.C. § 32902(h), NHTSA ran the CAFE Model with settings that excluded any consideration of the possibility that manufacturers will comply with the light-duty fuel-economy standards by using compliance credits, by creating new battery-electric vehicles (or other dedicated alternative-fuel vehicles), or by relying on the alternative-fuel advantage of dual-fueled vehicles. This is how it did that: As explained above, the CAFE Model began with empirical data describing the entire model year 2022 vehicle fleet, and then built from there. That fleet included internal-combustion-engine vehicles, hybrid-electric vehicles, and battery-electric vehicles, and the CAFE Model accounted for all of them in the 2022 reference fleet. *See* 89 Fed. Reg. at 52,832 (JA___). The model also

accounted for the battery-electric vehicles that manufacturers will produce in subsequent years pursuant to their independent commitments to produce such vehicles at the levels that would be required by zero-emission vehicle programs adopted by California and 17 other States, as described further below. *Id.*; *see infra* pp. 41-42. But NHTSA did not otherwise allow the CAFE Model to simulate the production of any new battery-electric vehicles during the rulemaking timeframe (model year 2027 to 2031). 89 Fed. Reg. at 52,832 (JA___) (noting that "the model is restricted … from applying [battery-electric vehicles] during model years 2027–2032").[3] For model years other than those that were the subject of NHTSA's rulemaking, the agency considered whether manufacturers were expected to introduce new battery-electric vehicles for certain reasons other than compliance with the fuel-economy standards (*e.g.*, due to consumer demand or to take advantage of tax credits). *See id.* at 52,698 (JA___). Furthermore, the CAFE Model did not simulate manufacturers' potential use of compliance credits during the years for which NHTSA was establishing standards, and it treated dual-fueled automobiles (*i.e.*, plug-in hybrids) as running only on gasoline during those years. JA___[TSD.1-13] (explaining that NHTSA ran the CAFE Model "in a manner that excludes the

[3] Although NHTSA only established fuel-economy standards for the light-duty fleet for model years 2027 to 2031, it promulgated non-binding "augural" standards for model year 2032, reflecting NHTSA's "best estimate of what the agency would propose" if it were to establish standards for that year. 89 Fed. Reg. at 52,547 (JA___). Accordingly, NHTSA operated the CAFE Model as if 2032 were within the regulatory timeframe of the final rule.

additional application of dedicated [alternative-fuel-vehicle] technologies in model years for which maximum feasible standards are under consideration" and "limit[s] the consideration of dual-fueled [vehicles'] fuel economy to only their gasoline or diesel operation"); JA___[TSD.1-14 ] (explaining that NHTSA ran the CAFE Model "in a manner that excludes the application of [compliance] credits" in the model years for which NHTSA was establishing fuel-economy standards for light-duty vehicles).

Using the CAFE Model, NHTSA considered five alternative regulatory options for the light-duty fuel-economy standards as well as a "[n]o-[a]ction" or "baseline" alternative in which NHTSA would have retained the standards applicable in model year 2026 (which were established pursuant to a 2022 rulemaking). *See* 89 Fed. Reg. at 52,546 (JA___).

#### b. ***NHTSA's determination that the final light-duty standards are the maximum feasible fuel-economy standards that manufacturers can achieve in model years 2027 to 2031***

Informed by the projections generated by the CAFE Model, NHTSA considered each of the four factors set out at 49 U.S.C. § 32902(f).

First, NHTSA determined that the final rule is technologically feasible because "sufficient technology and timely opportunities to apply that technology exist to meet the final standards." 89 Fed. Reg. at 52,795 (JA___). The CAFE Model demonstrated a technology path that manufacturers could use to meet the standards that does not involve the creation of additional battery-electric vehicles. *Id.* In

particular, "manufacturers might modestly increase strong hybrid-based technologies" beyond the levels they would produce in the absence of the final rule. *Id.* at 52,787 (JA___); *see also id.* at 52,786 (JA___) (table showing that manufacturers could achieve compliance in model year 2031 using hybrid-vehicle technology on an additional five percent of the combined light-duty fleet). And compliance would not require the production of any battery-electric vehicles that would not be produced even in the absence of the final standards. *See id.* at 52,785-52,786 (JA___-___). NHTSA recognized that some manufacturers might not comply with the standards and might end up paying civil penalties as a result of the final rule, but it explained that "this appears to be an economic decision by a relatively small number of companies." *Id.* at 52,549 (JA___). That is, some manufacturers might choose to "stop adding fuel-saving technologies" to their fleet "once continuing to do so would effectively be more 'expensive' … than paying civil penalties." *Id.* at 52,583 (JA___).

Second, with respect to economic practicability, NHTSA concluded that although the final standards will increase the cost of passenger cars and light trucks, the cost increase will be more than offset by fuel-cost savings over the life of the vehicles. *See* 89 Fed. Reg. at 52,818-52,819 (JA___-___) (showing average net savings in model year 2031 of $191 per passenger car and $281 per light truck). NHTSA also projected that the standards will have relatively small effects on vehicle sales and will actually increase employment by more than 5,800 jobs in 2031. *Id.* at 52,813 (JA____); JA___[FRIA.9-14]. The agency conducted a cost-benefit analysis

considering, *inter alia*, reduced fuel costs, reduced climate damages, and technology costs to increase fuel economy, and concluded that the final rule will result in net benefits of $35.2 billion over the lifetime of the fleet produced through model year 2031. 89 Fed. Reg. at 52,816 (JA___).

Third, NHTSA determined that the final rule will promote the goal of energy conservation by reducing gasoline consumption by 63.6 billion gallons over calendar years 2022 to 2050. 89 Fed. Reg. at 52,572 (JA___). The standards are also expected to reduce greenhouse gas emissions by approximately 659 million metric tons of carbon dioxide, 825,000 metric tons of methane, and 24,000 tons of nitrous oxide. *Id.* at 52,573 (JA___).

Finally, NHTSA determined that the standards are "complementary to other motor vehicle standards of the Government," 89 Fed. Reg. at 52,579 (JA___), and that they will not "alter[] or inhibit[]" compliance with the Federal Motor Vehicle Safety Standards, *id.* at 52,822 (JA___).

**2. Standards for the heavy-duty fleet**

NHTSA also proposed and finalized standards for heavy-duty pickup trucks and vans. 89 Fed. Reg. at 52,546 (JA___). In contrast with the fuel-economy standards for the light-duty fleet, which must be expressed in miles per gallon, *see* 49 U.S.C. § 32901(a)(11), the fuel-efficiency standards for heavy-duty vehicles are expressed in units of gallons consumed per 100 miles, 88 Fed. Reg. at 56,313, 56,321 n.564 (JA___, JA___ n.564). And while the fuel-economy standards for light-duty

vehicles are calculated based on the vehicles' footprint, *see supra* p. 12 n.2, the standards for heavy-duty vehicles are determined based on the vehicles' work factor—a unit established to measure payload, towing capability, and whether a vehicle has four-wheel drive. 88 Fed. Reg. at 56,134 (JA___).

NHTSA proposed to increase the stringency of the fuel-efficiency standards for heavy-duty pickup trucks and vans by 10% per year from model year 2030 through 2035. 88 Fed. Reg. at 56,133 (JA___). After assessing comments on the proposal, however, NHTSA finalized stringency increases of 10% per year for model years 2030 through 2032 and eight percent per year for model years 2033 through 2035. 89 Fed. Reg. at 52,547 (JA___). NHTSA estimated that, under the final rule, the standards will require the overall fleet to achieve a fuel-efficiency level of 2.851 gallons per 100 miles by model year 2035, and that some manufacturers will in fact exceed that standard (due to consumer demand, for example) so that the industry-wide fleet achieves an average of 2.565 gallons per 100 miles. *Id.* at 52,576 (JA___).

As with the light-duty standards, NHTSA used the CAFE Model to analyze the effects of potential regulatory alternatives for the heavy-duty standards. Because the restrictions of Section 32902(h) do not apply to NHTSA's consideration of the heavy-duty standards, however, NHTSA did not artificially constrain the model's consideration of battery-electric vehicles or compliance credits. Pursuant to longstanding regulations, heavy-duty battery-electric vehicles have a compliance value of "zero gallons [of fuel] per 100 miles," 49 C.F.R. § 535.6(a)(3)(iii), because the

statutory definition of "fuel" does not include electricity, *see* 49 U.S.C. § 32901(a)(10) (defining "fuel" as "gasoline," "diesel oil," or "other liquid of gaseous fuel" as determined by the Secretary). Nonetheless, the CAFE Model showed that automakers can achieve compliance with the heavy-duty fuel-efficiency standards by producing additional plug-in hybrid vehicles, and without increasing the production of battery-electric vehicles compared to what they would produce in the absence of the standards. *See* 89 Fed. Reg. at 52,739, 52,906 (JA___, JA___) (charts showing no incremental application of battery-electric-vehicle technology under the final standards (the "HDPUV108" alternative) compared to the no-action alternative).

## SUMMARY OF ARGUMENT

The state and industry petitioners contend that NHTSA erred in establishing both the light-duty fuel-economy standards and the heavy-duty fuel-efficiency standards. The environmental petitioners challenge only the light-duty standards. None of their challenges have merit.

### I. State and industry petitioners' challenges to the light-duty fuel-economy standards

**A.** EPCA requires NHTSA to establish fuel-economy standards for automobiles at the maximum feasible level that the agency determines manufacturers can achieve without accounting for the fuel economy of dedicated automobiles, the alternative-fuel component of dual-fueled vehicles, or the availability of compliance credits. NHTSA did so. The agency first conducted an inventory of the model year

2022 fleet to assess existing fuel-economy levels. It then projected how the fleet could develop in the subsequent years in the case of various regulatory alternatives. In particular, the agency determined what fuel-economy gains automakers could feasibly be required to achieve during the 2027 to 2031 model years even if they introduced no additional alternative-fuel vehicles to comply with EPCA's fuel-economy standards.

The state and industry petitioners mistakenly urge, however, that NHTSA was also required to exclude all alternative-fuel automobiles in determining the average fuel economy of the reference fleet in model year 2022. That is, they contend that instead of using the actual vehicle fleet in the real world as a starting point for its analysis, NHTSA instead needed to create a fictional reference fleet that ignored the existence of alternative-fuel vehicles.

Petitioners' position lacks any foundation in the statute. EPCA requires the agency to establish fuel-economy standards based on a forward-looking determination of the fuel-saving improvements that manufacturers can make to their fleets. The statute specifies factors that NHTSA shall consider in making that determination and factors that NHTSA may not consider. Those prohibitions constrain NHTSA's consideration of what fuel-saving improvements automakers can implement. Accordingly, in determining the gains that could be achieved during the 2027 to 2031 model years, NHTSA looked to feasible efficiency improvements that could be made without introducing additional alternative-fuel vehicle models. But nothing in the

statute requires NHTSA to pretend away electric vehicles that automakers are already producing or to predict the maximum feasible average fuel-economy level in 2027 to 2031 without regard to the actual fleet fuel economy in the present.

Petitioners' contrary position would require NHTSA to systematically understate the fuel economy of the actual existing fleet from which future feasible gains would be measured. As alternative-fuel vehicles become increasingly prevalent, the gap between petitioners' fictional fleet and the actual fleet will continue to widen. And at some point, the actual fleet will already have achieved any fuel-economy standard that NHTSA could set on the basis of feasible improvements to the fictional fleet. Petitioners' attempt to render the fuel-economy standards meaningless should be rejected.

**B.** NHTSA properly included in its analysis battery-electric vehicles that manufacturers are expected to produce even in the absence of NHTSA's standards or in model years outside of the regulatory timeframe. NHTSA explained that because manufacturers are expected to produce those dedicated automobiles without regard to EPCA's fuel-economy standards, accounting for the vehicles does not result in standards that are so stringent that automakers would be required to introduce new dedicated automobiles that they would not have otherwise produced.

**C.** NHTSA properly established fuel-economy standards at a level that the automobile-manufacturing industry can achieve. The agency recognized that some individual manufacturers may choose not to comply with the standards, and that

others may not be able to comply in certain years. But NHTSA reasonably explained that it need not set the standards at a level achievable by even the least capable manufacturer. That approach is consistent with the statutory text, structure, purpose, and history.

**II. State and industry petitioners' challenges to the heavy-duty fuel-efficiency standards**

**A.** The restrictions of Section 32902(h) do not apply to NHTSA's consideration of fuel-efficiency standards for heavy-duty pickup trucks and vans. The statute directs NHTSA to establish a fuel-efficiency improvement program for "commercial medium- and heavy-duty on-highway vehicles and work trucks," 49 U.S.C. § 32902(k)(2), and electric vehicles plainly fit within the statutory definition of such vehicles. Contrary to petitioners' arguments, nothing in the statute limits the fuel-efficiency program to vehicles that consume fuel, and such a limitation would run contrary to the purpose of the statute by excluding vehicles that have achieved maximal fuel efficiency by eliminating their consumption of fuel. Accordingly, NHTSA appropriately considered the potential use of electric vehicles in calculating the standards for these vehicles.

**B.** Longstanding regulations have treated electric vehicles as having a fuel consumption value of zero gallons per 100 miles, and NHTSA did not err in retaining those regulations. The statute requires NHTSA to establish "fuel economy" or "fuel efficiency" standards for heavy-duty vehicles, 49 U.S.C. § 32902(k), and defines "fuel"

to include gasoline, diesel, and other liquid or gaseous fuel, *id.* § 32901(a)(10)—a definition that plainly excludes electricity. NHTSA's regulation is thus consistent with the statute in recognizing that heavy-duty electric vehicles consume zero gallons of fuel. Although NHTSA has discretion under the statute to assign heavy-duty electric vehicles a non-zero fuel-economy value, it reasonably deferred its consideration of that issue to a future rulemaking in which it would have a more thorough opportunity to consider the advantages and disadvantages of such an approach.

**C.** NHTSA also complied with the statute's requirement that the agency provide three model years of regulatory stability. By establishing heavy-duty fuel-efficiency standards for six model years, the final rule provides stability in the regulations and allows automakers to conduct multi-year planning to achieve compliance with those standards. Petitioners' contention that the fuel-efficiency standards themselves must remain flat for at least three years at a time misconstrues the statutory language.

**III. Environmental petitioners' challenges to the light-duty fuel-economy standards**

**A.** NHTSA reasonably determined that it was not feasible to model that, in order to comply with the light-duty fuel-economy standards, automakers might produce more of their preexisting fuel-efficient vehicle models and fewer of their less-efficient models. As it has done in prior rulemakings, NHTSA explained that it cannot model such production shifting as an available response to comply with the

standards because it lacks reliable models to predict how automakers may choose to adjust their pricing and how consumers would respond to such adjustments. That technical judgment was reasonable and falls squarely within NHTSA's domain of expertise.

**B.** NHTSA properly established light-truck fuel-economy standards at the maximum feasible level that automakers can achieve. In selecting the final standards, NHTSA determined that the more stringent alternatives considered fell beyond the realm of economic practicability. In the modeling of each of those alternatives, automakers broadly fell short of the standards due to limited opportunities to apply fuel-efficient technology to their light-truck fleet during the rulemaking timeframe, resulting in extensive payment of civil penalties. The rule properly concluded that the widespread use of automakers' funds to pay penalties—rather than to improve the fuel economy of their fleets—runs counter to the aims of the statute. Thus, contrary to petitioners' claims, NHTSA acted properly in adopting light-truck standards that increase more slowly than the passenger-car standards. Each standard was set at the maximum feasible level that manufacturers can achieve in the respective fleet.

## STANDARD OF REVIEW

Judicial review of fuel-economy standards proceeds under the standards established by the Administrative Procedure Act (APA). *See Competitive Enter. Inst. v. NHTSA*, 45 F.3d 481, 484 (D.C. Cir. 1995). The Court's review under the APA is limited to determining whether the final rule is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Under this standard, the agency is required to 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Chamber of Commerce of the U.S. v. SEC*, 115 F.4th 740, 750 (6th Cir. 2024). The Court "may not 'substitute its judgment for that of the agency,' and it should vacate a challenged regulation only if it 'had no rational basis or it involved a clear and prejudicial violation of applicable statutes or regulations.'" *Id.* (alteration and citation omitted).

## ARGUMENT

### I. NHTSA LAWFULLY ESTABLISHED THE LIGHT-DUTY FUEL-ECONOMY STANDARDS ON THE BASIS OF THE PRESCRIBED STATUTORY CRITERIA

The state and industry petitioners demonstrate no error in the light-duty fuel-economy standards.

#### A. NHTSA Properly Considered The Entire Existing Fleet In Calculating The Starting Fuel-Economy Level

The state and industry petitioners fundamentally misunderstand the nature of the constraints placed on NHTSA's consideration of electric vehicles in establishing light-duty fuel-economy standards. NHTSA may not consider the introduction of new electric vehicles as a means to achieve the prospective standards. But the statute does not require the agency to pretend that the fleet already in existence contains no

electric vehicles and thereby significantly downgrade the starting point for achieving future fuel-economy gains.

**1.** Congress directed the Secretary of Transportation to establish fuel-economy standards for each model year at "the maximum feasible average fuel economy level that the Secretary decides the manufacturers can achieve in that model year." 49 U.S.C. § 32902(a). In making that determination, the Secretary considers four factors: "technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on fuel economy, and the need of the United States to conserve energy." *Id.* § 32902(f). The Secretary must therefore consider what fuel-saving technology is (or will be) available and within the financial capacity of automakers to implement in their fleets in furtherance of Congress's energy-conservation goal.

EPCA is "intended to be technology forcing," *Center for Auto Safety v. NHTSA*, 793 F.2d 1322, 1339 (D.C. Cir. 1986), and the Secretary is directed to set standards that require automakers to implement additional technology, to the extent feasible, to improve the fleet's fuel economy. To determine the maximum feasible fuel-economy level that "manufacturers can achieve" in a future "model year," 49 U.S.C. § 32902(a), NHTSA must first ascertain the fuel-economy level that manufacturers have already achieved in previous model years. The pre-existing fuel-economy level "is crucial because it marks the starting point for determining what further efficiency gains will be feasible during the rulemaking timeframe." 89 Fed. Reg. at 52,635 (JA___). The

agency explained that the "analysis fleet provides a reference point to project how manufacturers could apply additional technologies to vehicles to cost-effectively improve vehicle fuel economy, in response to regulatory action and market conditions." JA___[TSD.2-16]. To determine this starting point, NHTSA calculates the average fuel economy of all vehicles sold in a given year. In the current rulemaking, NHTSA used the model year 2022 light-duty fleet as the analysis fleet because that was the most recent model year for which it had complete data. 89 Fed. Reg. at 52,599 & n.212 (JA___ & n.212); JA___[TSD.2-16].

Although other provisions of the statute encourage the production of alternative-fuel and dual-fueled vehicles, Congress did not wish the Secretary to set fuel-economy standards at a level that would require those technologies to be added to new vehicles. The statute thus precludes the Secretary from "consider[ing] the fuel economy of dedicated automobiles" and requires the Secretary to "consider dual fueled automobiles to be operated only on gasoline or diesel fuel" when determining what increases in the fuel-economy standards automakers can feasibly and practicably achieve. 49 U.S.C. § 32902(h)(1)-(2). Similarly, Congress did not want NHTSA's regulations to diminish the benefit of automakers' compliance credits by establishing fuel-economy standards at a level that would require automakers to use those credits. It therefore directed the Secretary not to consider the availability of credits in setting the standards. *Id.* § 32902(h)(3).

Accordingly, in setting the prospective standards, NHTSA did not consider manufacturers' ability to meet those standards by producing new battery-electric vehicles. 89 Fed. Reg. at 52,834 (JA___). Similarly, it "count[ed] [plug-in hybrid electric vehicles] in charge-sustaining mode only, avoiding consideration of their electric-only-operation fuel economy." *Id.* And, as required by statute, the agency did not consider the possibility that manufacturers might respond to fuel-economy standards in model years 2027 to 2031 by applying compliance credits. *Id.* at 52,728 (JA___); *see also id.* at 52,583 (JA___) (explaining that NHTSA runs the CAFE Model with a constraint "that excludes the application of [compliance] credits" during the years for which NHTSA is establishing new standards). The agency thus determined the maximum feasible fuel-economy level based solely on the gains that manufacturers could practicably achieve without adding new alternative-fuel vehicle models or using compliance credits.

**2.** Petitioners urge that NHTSA could not properly consider the fuel economy of the full existing fleet and was, instead, required to exclude from that fleet all dedicated automobiles (in particular, battery-electric vehicles) already being sold. That argument misconstrues Section 32902(h), which limits NHTSA's considerations in determining how much automakers can improve fuel economy, not NHTSA's determination of the pre-existing fuel-economy level.

**a.** EPCA requires the agency to establish fuel-economy standards based on a forward-looking determination of the fuel-saving improvements that manufacturers

can make to their vehicles, and it directs the agency to set new standards for no more than five model years at a time. 49 U.S.C. § 32902(b)(3)(B). The technology-forcing scheme is thus iterative. With each iteration, NHTSA is directed to set the standards at the "maximum feasible" level that NHTSA determines manufacturers "*can* achieve" based on an evaluation of what additional improvements could be made to the nation's fleet, *id.* § 32902(a) (emphasis added)—not at a level that has already been achieved.

The four factors set out in Section 32902(f) underscore the agency's forward-looking focus. That subsection identifies the factors that NHTSA must consider in determining how much automakers can improve existing fuel economy. The factors do not bear on NHTSA's observation of the fuel-economy level already achieved. For example, NHTSA must consider technological feasibility and economic practicability. 49 U.S.C. § 32902(f). The fuel-economy levels of fleets that currently exist are necessarily technologically feasible and almost certainly economically practicable. Using the existing fuel-economy level as a starting point, NHTSA must consider what improvements in fuel economy manufacturers can feasibly and practicably make going forward.

Section 32902(h)—which cross-references subsection (f) and identifies the factors that NHTSA may not consider—similarly forms part of the set of requirements and prohibitions that govern the prospective determination of

manufacturers' ability to meet new fuel-economy standards. NHTSA must therefore determine how much (if any) of an increase in the fuel-economy standards manufacturers "can achieve" in response to more stringent fuel-economy standards, 49 U.S.C. § 32902(a), without considering the possibility that automakers would use compliance credits or introduce additional alternative-fuel automobiles, *see id.* § 32902(h).

**b.** None of these factors is relevant to determining the average fuel economy already achieved. Petitioners' contrary approach would have NHTSA intentionally disregard the fuel economy already achieved and thus systematically understate pre-existing fuel-economy levels. The result would significantly underestimate the standards that manufacturers could meet by making additional improvements to gasoline- and diesel-powered vehicles. Indeed, as the percentage of battery-electric vehicles in a fleet rises, petitioners' methodology would increasingly cripple NHTSA's ability to issue meaningful standards that would accurately reflect maximum feasible fuel-economy levels. At some point, the result would be that manufacturers will already have achieved any fuel-economy standard that NHTSA could set on the basis of the fictional fleet that would form its starting point.

The problems created by petitioners' proposal are not hypothetical or distant. Electric vehicles are projected to comprise approximately 50% of vehicles sold in the

United States by model year 2030.[4] For purposes of illustration, it may be assumed that, at that time, gasoline-powered vehicles will have an average fuel-economy rating of 40 miles per gallon, and battery-electric vehicles will have a rating of 160 miles per gallon. The compliance fuel economy of such a real-world fleet would be 64 miles per gallon.[5] Under petitioners' proposed methodology, however, NHTSA would assume that manufacturers were achieving only 40 miles per gallon. If NHTSA then concluded that manufacturers could achieve an additional 5 miles per gallon in fuel-economy gain through improvements to their gasoline-powered vehicles, it would set the fuel-economy standard for the following regulatory period at 45 miles per gallon. Because manufacturers would already have achieved average fleet fuel economy well above that level, it would be unnecessary for them to make any improvements at all to achieve compliance, thus nullifying Congress's fuel-economy program. Indeed, the fuel-economy standards at that point would not even be effective in preventing automakers from downgrading their gasoline-powered vehicles to less expensive and less efficient technology.

Congress did not dictate a course that would first reduce and then eliminate NHTSA's obligation to set technology-forcing standards. On the contrary, when

---

[4] *See* Peter Slowik et al., Int'l Council on Clean Transp., *Analyzing the Impact of the Inflation Reduction Act on Electric Vehicle Uptake in the United States* 12 (Jan. 2023), https://perma.cc/78QC-UYKC.

[5] The average fuel economy is calculated as a harmonic mean. Thus, the calculation in the example provided would be: 2 vehicles/((1 vehicle/40 mpg)+ (1 vehicle/160 mpg)) = 64. *See* 49 C.F.R. pt. 533, app. A.

Congress created incentives for the production of alternative-fuel vehicles, it explained that those incentives were "not intended to allow manufacturers to relax their efforts to achieve better mileage in the remainder of their fleets that are still fueled with gasoline." H.R. Rep. No. 100-476, at 12 (1987). That would be the consequence of petitioners' construction of the statute: As fleet composition tilts increasingly toward battery-electric vehicles, automakers would never again need to improve the fuel economy of their gasoline-powered vehicles in response to EPCA's standards.

**c.** In contrast, in setting standards in the present rulemaking, NHTSA began with an accurate representation of the model year 2022 fleet. NHTSA then adhered to the statutory scheme of setting fuel-economy standards at a level that will require automakers to improve their fuel economy commensurate with their ability to improve their gasoline-powered vehicles and without requiring them to produce new dedicated vehicle models.

Because NHTSA excluded the ability to produce new battery-electric vehicles from this calculation, the resulting fuel-economy standards understate feasible efficiency gains. "Without the restriction on considering electrification, the[ fuel-economy] standards would be significantly more stringent and achieve significantly greater fuel economy benefits." 89 Fed. Reg. at 52,834 (JA___); *see also id.* at 52,832 (JA___) ("NHTSA cannot set standards as stringent as NHTSA would if NHTSA *could* account for the availability" of dedicated and dual-fueled vehicles and

compliance credits.). Furthermore, because automakers have the option of complying with the new fuel-economy standards by producing electric vehicles—which in some cases will be more cost-effective than improving the fuel efficiency of gasoline-powered vehicles—compliance will in reality be significantly less costly than the amount NHTSA determined was economically practicable. In particular, NHTSA estimated that in light of manufacturers' ability to voluntarily produce new battery-electric models, the actual total regulatory cost of compliance in the rulemaking timeframe is likely to be $11.5 billion less than the regulatory cost NHTSA projected for purposes of setting the fuel-economy standards (a difference of nearly 10%). *Compare* JA___[FRIA.App.II.at.II-763] (estimated total regulatory costs of $118 billion over model years 2027 to 2031 under the unconstrained real-world analysis), *with* JA___[FRIA.App.I.at.I-764] (estimated total regulatory costs of $106.5 billion over model years 2027 to 2031 under NHTSA's standard-setting analysis).[6]

As Congress intended, the fuel-economy standards thus create an incentive for the voluntary production of additional dedicated vehicles rather than compel their

[6] NHTSA performed a real-world analysis of the impact of its regulations in order to prepare an environmental impact statement in accordance with the National Environmental Policy Act. *See* 42 U.S.C. § 4332(2)(C); *Center for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1212-1215 (9th Cir. 2008). In preparing that statement, NHTSA permitted the CAFE Model to run an analysis unconstrained by the limitations of Section 32902(h), *i.e.*, it allowed the model to simulate the unlimited production of new battery-electric vehicles in model years 2027 to 2031. 89 Fed. Reg. at 52,839 (JA___). NHTSA did not rely on that unconstrained analysis in making its decision about what levels of standards would be maximum feasible.

production. Although manufacturers can comply with the revised standards without introducing new alternative-fuel vehicle models, some manufacturers will likely choose to produce new models of battery-electric vehicles for a variety of reasons, and some may find that such production is a less costly means of complying with the standards than applying fuel-saving technology to gasoline-powered vehicles. In this way, manufacturers can realize significant cost savings. And if manufacturers exceed the fuel-economy standards (which, again, were calculated without regard to automakers' ability to produce additional battery-electric vehicles), they will also receive the benefit of compliance credits.

**d.** Petitioners' invocation of the major-questions doctrine does not advance their argument. The statute provides "clear congressional authorization," *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quotation marks omitted), for NHTSA to establish fuel-economy standards, and NHTSA has repeatedly exercised the authority to do so for more than four decades, *see, e.g.*, 42 Fed. Reg. 33,534 (June 30, 1977) (establishing fuel-economy standards for model years 1981 to 1984). Rather than exercising a "newfound power," *West Virginia*, 597 U.S. at 724, the final rule incrementally increases the stringency of longstanding standards by a relatively small amount—two percent per year in the case of passenger cars, and zero to two percent per year in the case of light trucks. *Cf. id.* (the major-questions doctrine applied where an agency had "located [a] newfound power in the vague language of an ancillary

provision … that was designed to function as a gap filler and had rarely been used in the preceding decades" (alteration, citation, and quotation marks omitted)).

Furthermore, contrary to petitioners' assertion (Indus. Br. 33-35), NHTSA's understanding of the statute does not enable it to "force[] electrification of the nation's vehicle fleet," nor does the final rule have that effect. The final rule explains that the fuel-economy standards "in no way push[] manufacturers toward electrification." 89 Fed. Reg. at 52,834 (JA___). If Section 32902(h) did not prohibit NHTSA from considering the fuel economy of battery-electric vehicles in determining the maximum feasible average fuel-economy level that manufacturers can achieve, "NHTSA would almost certainly include [in the CAFE Model] pathways involving increased electrification," which would result in NHTSA adopting "standards [that] would be significantly more stringent and achieve significantly greater fuel economy benefits." *Id.* But NHTSA gives effect to Section 32902(h) by "model[ing] a cost-effective pathway to compliance with potential new [fuel-economy] standards that includes no new [battery-electric vehicles] in response to the standards, and that counts [plug-in hybrid electric vehicles] in charge-sustaining mode only, avoiding consideration of their electric-only-operation fuel economy." *Id.* NHTSA thus ensures that manufacturers can meet the fuel-economy standards without producing any additional battery-electric vehicles, and the standards thus do not require the electrification of the vehicle fleet. If manufacturers choose to produce additional battery-electric vehicles because it is cost effective to do so, that is a result

of the manufacturers' own choices and the statutory incentives that Congress established for producing such vehicles.

**e.** Petitioners' additional contentions are similarly unavailing. They stress (Indus. Br. 28-29), for example, that Section 32902(h) uses mandatory terms. The question, however, is what is being mandated. The statute provides that "[i]n carrying out subsections (c), (f), and (g) of this section"—which direct NHTSA to establish maximum feasible fuel-economy standards and identify the four forward-looking factors NHTSA must consider in doing so—NHTSA "may not consider the fuel economy of dedicated automobiles," "shall consider dual fueled automobiles to be operated only on gasoline or diesel fuel," and "may not consider … the trading, transferring, or availability of [compliance] credits." 49 U.S.C. § 32902(h). The statute thus precludes NHTSA from considering battery-electric vehicles or compliance credits in determining "the maximum feasible average fuel economy level that … manufacturers can achieve" in a future model year. *Id.* § 32902(a). It does not require NHTSA to disregard the actual composition of existing fleets or the fuel-economy level that manufacturers have already achieved in a previous year.

In a similar vein, petitioners point out (Indus. Br. 42-43) that Congress sometimes instructs an agency to make a decision without regard to a particular factor that the agency might otherwise find relevant. Congress did so here. As NHTSA recognized, Congress foreclosed consideration of an otherwise relevant factor: the extent to which manufacturers could produce additional dedicated automobiles to

comply with the fuel-economy standards. In the absence of Section 32902(h), NHTSA might well find manufacturers' ability to produce new battery-electric vehicle models relevant to the agency's determination of feasibility and practicability. Congress did not, however, implicitly require the agency to adopt an inaccurate account of the fuel economy of a manufacturer's pre-existing fleet.

Petitioners repeatedly cite (Indus. Br. 32, 36) a statement from Representative John Dingell on the House floor that the language now in Section 32902(h) was intended to ensure that the incentives for automakers to produce dedicated automobiles are not erased by NHTSA setting the fuel-economy standards "at a level that assumes a certain penetration of alternative fueled vehicles." 134 Cong. Rec. 25,124 (1988). As explained, NHTSA's decision-making began with an actual, not assumed, analysis fleet that accurately represented the battery-electric vehicle models already on the market. When NHTSA then modeled how automakers could apply technology to comply with more stringent fuel-economy standards in model years 2027 to 2031, it excluded the possibility that they would increase the penetration of battery-electric vehicles to comply with those standards. The agency thus excludes consideration of dedicated automobiles when determining the maximum fuel-economy level that manufacturers can achieve. That approach protects the incentives that motivated Representative Dingell's statement. Were NHTSA to consider manufacturers' ability to meet new standards by producing new battery-electric vehicles, it would establish more demanding standards than it has done. *See supra*

pp. 33-34; 89 Fed. Reg. at 52,834 (JA___). Petitioners' approach, by contrast, would eliminate the incentive to produce new battery-electric vehicles as the number of existing battery-electric vehicles in the existing fleet rises. *See supra* pp. 31-32. In any event, were petitioners' interpretation of Representative Dingell's statement correct, it would be at odds with the House committee report quoted above (*supra* p. 33), which is the "more authoritative" indicator of congressional intent. *Garcia v. United States*, 469 U.S. 70, 76 (1984) (quotation marks omitted).

Petitioners also misconstrue (Indus. Br. 32) NHTSA's reasoning in issuing the 2022 fuel-economy rule, which interpreted Section 32902(h) the same way as the rule under consideration here. NHTSA explained that the provision prohibits it from considering the extent to which automakers could improve their fuel economy by creating battery-electric or dual-fueled vehicles or using compliance credits, and thereby "ensures that those statutory credits remain true compliance flexibilities." 87 Fed. Reg. 25,710, 25,994 (May 2, 2022). The agency emphasized that, under its approach, the standards do not "effectively require" manufacturers to produce new battery-electric vehicles or use compliance credits because it has determined that the standards are technologically feasible and economically practicable without regard to manufacturers' decisions whether to employ those compliance options. *Id.* As NHTSA concluded in 2022, the agency's approach thus gives effect to the statutory prohibition.

### B. NHTSA Properly Considered Certain New Battery-Electric Vehicle Models That Automakers Are Expected To Produce After The Model Year 2022 Fleet

As explained, Section 32902(h) is not relevant to NHTSA's calculation of pre-existing fuel-economy levels. Instead, it constrains the manner in which NHTSA determines how much manufacturers can improve upon those levels by prohibiting the agency from considering the extent to which manufacturers could achieve compliance by producing new dedicated automobiles in the model years being regulated.

Petitioners also challenge the limited inclusion in the CAFE Model of some battery-electric vehicles that would be newly produced after the model year 2022 fleet—vehicles that automakers are expected to produce in response to state zero-emission vehicle programs even in the absence of NHTSA's new standards or in model years after 2031. NHTSA's inclusion of such vehicles in the modeling was entirely reasonable and consistent with the statute.

In any event, NHTSA's consideration of the state regulatory programs and battery-electric vehicles produced after 2031 ultimately had no effect on the fuel-economy standards established by NHTSA's final rule. The agency explained that excluding those vehicles from its assessment would not have led it "to make a different decision on maximum feasible [average fuel-economy] standards." 89 Fed. Reg. at 52,894 (JA___).

### 1. NHTSA properly accounted for battery-electric vehicles that automakers will independently produce in response to state regulatory requirements

**a.** California has enacted a zero-emission vehicle program to control the emission of certain pollutants, including greenhouse gases. 89 Fed. Reg. at 52,610 (JA___). The Clean Air Act generally preempts States from adopting emission-control standards for new motor vehicles, *see* 42 U.S.C. § 7543(a), but Congress created an exemption program that allows California to seek a waiver of that preemption in certain circumstances, *see id.* § 7543(b); 89 Fed. Reg. at 52,610 (JA___). Other States can then adopt and enforce standards identical to those approved under a Clean Air Act preemption waiver granted to California. 42 U.S.C. § 7507; 89 Fed. Reg. at 52,610 (JA___). At the time the final rule was issued, California had two operative zero-emission vehicle regulations that had been granted preemption waivers—one applicable to light-duty vehicles through model year 2025 (called Advanced Clean Cars I) and one applicable to heavy-duty vehicles from model years 2024 to 2035 (called Advanced Clean Trucks). 89 Fed. Reg. at 52,610 (JA___). California had also adopted a third program applicable to light-duty vehicles from model year 2026 to 2035 (called Advanced Clean Cars II), for which a preemption waiver had been requested. *Id.* Seventeen States in addition to California had signed

onto, or were in the process of adopting, these zero-emission vehicle programs. *Id.* at 52,611 (JA___).[7]

California's zero-emission vehicle programs require manufacturers who sell vehicles in California to earn a certain number of zero-emission vehicle credits each year. *See* 89 Fed. Reg. at 52,611 (JA___) (explaining, for example, that manufacturers will need to earn credits equal to 22% of the number of vehicles sold in the State in model year 2025). Automakers earn credits primarily by producing battery-electric vehicles and plug-in hybrid electric vehicles. *Id.*; *see also* JA___[TSD.2-81to2-85].

NHTSA noted that "manufacturers have indicated that they intend to deploy electric vehicles consistent with the requirements" of the zero-emission vehicle programs. 89 Fed. Reg. at 52,611 (JA___); *see also id.* at 52,705-52,706 (JA___-___) (noting commitments from Kia, Stellantis, General Motors, Ford, Volkswagen, BMW, Honda, and Volvo, among others). NHTSA thus accounted for these manufacturer commitments by modeling the production of electric vehicles on a scale that would be necessary to comply with the state programs. The agency explained that considering these vehicles in establishing the new standards allowed it to make realistic projections of how the nation's vehicle fleet will change in the coming years independent of the fuel-economy standards, "which is foundational to [NHTSA's] ability to set [fuel-

[7] EPA granted a preemption waiver for California's Advanced Clean Cars II program on December 17, 2024, after the final rule issued. *See* 90 Fed. Reg. 643, 644 (Jan. 6, 2025).

economy] standards that reflect the maximum feasible fuel economy level achievable through improvements to internal combustion vehicles." *Id.* at 52,895 (JA___). NHTSA explained that the CAFE Model should "reflect legal obligations other than [EPCA's fuel-economy] standards that automakers will be meeting and additional non-regulatory deployment of electric vehicles during this time period so that the regulatory analysis can identify the distinct effects of [EPCA's fuel-economy] standards." *Id.* at 52,705 (JA___).

NHTSA's consideration of state zero-emission vehicle programs is consistent with Section 32902(h), which precludes the agency from accounting for the possibility that manufacturers will produce additional dedicated vehicles as a means of complying with EPCA's fuel-economy standards. The statute does not "prevent[] NHTSA from being aware of" and accounting for "the existence of dedicated alternative fueled vehicles that are already being produced for other reasons besides [those] standards." 89 Fed. Reg. at 52,832 (JA___).

As explained above, Congress's intent in enacting the limitations of Section 32902(h) was to prevent NHTSA from promulgating fuel-economy standards that would be so stringent that those standards would require automakers to introduce new dedicated automobiles. *See supra* p. 28. That intent would not be furthered by prohibiting NHTSA from modeling the extent to which automakers intend to introduce new dedicated automobiles due to *other* considerations. To the contrary, failing to accurately reflect the fleet that would exist in the absence of NHTSA's

standards would make it impossible for NHTSA to accomplish its congressionally mandated task of identifying the maximum feasible fuel-economy level that can be achieved without introducing additional alternative-fuel vehicle models and setting a fuel-economy standard that requires that level of improvement.

**b.** The state and industry petitioners urge (Indus. Br. 46-55) that it was arbitrary and capricious for NHTSA to model automakers' plans to produce electric vehicles consistent with the state zero-emission vehicle programs without considering those programs' legal validity, and they argue at length that the programs are preempted by EPCA or the Renewable Fuel Standard. NHTSA explained that it was unnecessary to assess the legality of the state programs "because the automakers have repeatedly stated their intent to comply with th[e] requirements [of those programs] during the rulemaking time frame" regardless of whether they are legally valid. 89 Fed. Reg. at 52,825 (JA___); *see also id.* at 52,943 (JA___) (explaining that "the agency's decision to incorporate the … program[s] is not based on an assessment of [their] legality, but rather the agency's empirical observation that the program[s] seem[] likely to have an actual impact on the compositions of vehicle fleets").

Indeed, contrary to the premise of petitioners' argument, NHTSA recognized that the Advanced Clean Cars II program—which would apply during the model years for which NHTSA was establishing fuel-economy standards in the final rule—was "unenforceable" "because it ha[d] not been granted a Clean Air Act preemption waiver," and NHTSA did not account for that program "as a legal requirement." 89

Fed. Reg. at 52,610, 52,895 (JA___, JA___). Rather, the agency explained that "manufacturers have indicated their intent to deploy electric vehicles consistent with what would be required under [Advanced Clean Cars II], regardless of whether it becomes a binding legal obligation." *Id.* at 52,705 (JA___); *see also, e.g.*, *id.* at 52,825 (JA___). NHTSA therefore modeled compliance with the program "as a proxy for the[] additional electric vehicles that manufacturers ha[d] committed to deploying" even if Advanced Clean Cars II never took effect. *Id.* at 52,610 (JA___).

In other words, NHTSA modeled the effects of the state zero-emission vehicle programs not because it assumed that those programs would remain legally valid, but rather because manufacturers had declared their intent to produce electric vehicles consistent with what those programs would require, even if the programs were not legally binding. Furthermore, because of the complexity of the vehicle development cycle and supplier sourcing, automakers plan their vehicles many years in advance; thus, automakers' commitments regarding vehicles to be sold several model years in the future reflect their present preparations and product planning, which, once in place, are difficult and costly to change.

**c.** Petitioners also contend (Indus. Br. 55-58) that NHTSA erred by failing to show that it is feasible for automakers to produce enough electric vehicles to meet the state zero-emission vehicle requirements. The automakers themselves have expressed no support for this argument, which is unsurprising inasmuch as "automakers have publicly signaled their commitment to the [electric-vehicle] transition at levels that

well exceed the 28 percent [battery-electric vehicle] market share in [model year] 2031" that is reflected in NHTSA's no-action analysis. 89 Fed. Reg. at 52,705 (JA___).

Petitioners err in suggesting that NHTSA did not address this issue in the rulemaking. NHTSA relied on the automakers' own statements, noting that "major automakers including GM, Ford, Stellantis, BMW, Honda, Volkswagen, and Volvo pledged their support to achieve 40 to 50 percent sales of electric vehicles by 2030," 89 Fed. Reg. at 52,705 (JA___)—far in excess of the 25.1% penetration rate that NHTSA was modeling for that year, *see id.* at 52,732 (JA___). NHTSA further noted that these commitments were consistent with previous and ongoing corporate statements. *Id.* at 52,705 (JA___). In particular, several manufacturers had announced plans to fully transition to electric vehicles, including General Motors by 2035, Volvo by 2030, Mercedes by 2030 ("where possible"), and Honda by 2040. *Id.* at 52,705-52,706 (JA___-___). Other automakers had made "incremental commitments to electrification that … still exceed the equivalent national [electric-vehicle] market share" reflected in NHTSA's no-action projection, such as Ford's announcement that it expected 40% of global sales to be all-electric by 2030, Volkswagen's expectation that half of its U.S. sales will be all-electric by 2030, Subaru's global target to achieve 50% battery-electric sales by 2030, and Toyota's plans to introduce 30 battery-electric vehicle models by 2030. *Id.* at 52,706 (JA___).

These and many other statements from the automakers were more than adequate to support NHTSA's finding that automakers will produce electric vehicles at a level consistent with the state programs regardless of whether those programs remain in effect. Petitioners nevertheless contend (Indus. Br. 55) that it is not "feasible" for automakers to meet state zero-emission vehicle requirements. By this, petitioners presumably mean to question the economic practicability of producing electric vehicles at the projected quantities. NHTSA reasonably relied on the statements of the automakers themselves in concluding to the contrary. Submissions from other commentators likewise indicated that NHTSA's estimates were conservative. *See, e.g.*, 89 Fed. Reg. at 52,709 (JA___) (summarizing comments); JA___[StatesAndCities.AppendixA.40] (comment of States and cities); JA___[ConsumerReports.15] (comment of Consumer Reports). And one commenter observed that NHTSA's forecast of electric-vehicle penetration (25% of the light-duty fleet in 2030, 89 Fed. Reg. at 52,732 (JA___)) was lower than most other projections, including those of S&P Global Mobility (40% by 2030), the Congressional Budget Office (42% by 2032), Bloomberg New Energy Finance (52% by 2030), the International Council on Clean Transportation (56% to 67% by 2032), EPA (67% by 2032), and Goldman Sachs (79% by 2032), *see* JA___[ConsumerReports.14].

**d.** In any event, even assuming NHTSA erred in modeling manufacturers' expected future production of battery-electric vehicles at levels consistent with state

zero-emission vehicle programs, the error did not affect the agency's ultimate decision and resulted in no prejudice to petitioners.

The APA provides that the Court shall take "due account … of the rule of prejudicial error." 5 U.S.C. § 706. Under that rule, "a mistake that has no bearing on the ultimate decision or causes no prejudice shall not be the basis for reversing an agency's determination." *Sierra Club v. Slater*, 120 F.3d 623, 637 (6th Cir. 1997). "The rule eliminates the necessity of remand following judicial review when the error that the agency has made was not prejudicial and did not impinge on fundamental rights." *Coalition for Gov't Procurement v. Federal Prison Indus., Inc.*, 365 F.3d 435, 468 (6th Cir. 2004). Petitioners bear the burden of showing that an error is harmful. *Shinseki v. Sanders*, 556 U.S. 396, 409-411 (2009).

In response to comments, "NHTSA performed an analysis considering an alternative baseline," in which it did "not assume manufacturers will consider, or preemptively react to, or voluntarily deploy electric vehicles consistent with any of the" state zero-emission vehicle programs "during any of the model years simulated in the analysis, … regardless of manufacturer commitments" to do so. 89 Fed. Reg. at 52,545 n.6 (JA___ n.6); *see also id.* at 52,710 (JA___). In other words, NHTSA conducted a completely separate analysis in which it removed any consideration of the state zero-emission vehicle programs "to test whether the standards remain consistent with the statutory factors regardless of the level of electrification that [would] occur[]" in the absence of new fuel-economy standards, *id.* at 52,611 (JA___), and to "address[]

uncertainty about the level of penetration of electric vehicles," *id.* at 52,826 (JA___). As with the primary analysis, NHTSA considered technology penetration rates, projected automaker compliance and civil penalties, estimated average price changes for vehicles, and incremental benefits and costs of the final standards under the alternative baseline. *See, e.g.*, *id.* at 52,796-52,799, 52,804-52,805, 52,809-52,810, 52,820-52,822 (JA___-___, JA___-___, JA___-___, JA___-___). NHTSA found that, even when it used this alternative baseline, the passenger-car fleet was expected to "overcompl[y] handily" in every year covered by the standards, and the light-truck fleet was expected to overcomply in model years 2027 to 2030 and then meet the standard exactly in 2031. *Id.* at 52,835 (JA___). On the basis of this robust analysis, NHTSA concluded that the "difference between including [battery-electric vehicles]" that would be introduced for reasons unrelated to EPCA's fuel-economy standards "and excluding them are not great." *Id.* NHTSA thus concluded that it "would make the same determination of what standards are maximum feasible under any of the analyzed scenarios." *Id.*; *see also id.* ("[T]his lack of dispositive difference in the alternative baseline and sensitivity cases shows that the interpretive concerns raised by commenters, even if correct, would not lead to a different decision by NHTSA on the question of what is maximum feasible."). The final rule thus makes clear that any error in including projected electric-vehicle production at levels consistent with the state zero-emission vehicle programs was harmless because it did not change NHTSA's determination as to the appropriate fuel-economy standards.

Contrary to petitioners' assertion (Indus. Br. 58), NHTSA's statement that it would have reached the same result even under the alternative baseline was not a "blithe assertion"; rather, it rested on extensive data analysis and consideration of all relevant factors. Nor does petitioners' selective citation of data undermine NHTSA's conclusion. Petitioners note, for example, that the per-vehicle regulatory cost is significantly higher under the alternative baseline than under the reference baseline for a particular manufacturer (Mazda) in a particular year (2031), but they fail to note, for example, that the per-vehicle regulatory cost is actually lower under the alternative baseline for that same manufacturer in other years (2027 and 2028). *Compare* 89 Fed. Reg. at 52,802 (JA___), *with id.* at 52,804 (JA___). NHTSA also recognized, as petitioners point out (Indus. Br. 58-59), that automakers were projected to pay higher civil penalties under the alternative-baseline analysis than under the reference baseline, but NHTSA acknowledged this fact and explained that "[e]ven the total [civil penalties] under the … alternative baseline analysis [are] still considerably lower than the penalties estimated" in the proposed rule or in NHTSA's prior fuel-economy rulemaking. 89 Fed. Reg. at 52,810 (JA___). NHTSA thus stated that "the use of the … alternative baseline rather than the reference case baseline does not result in costs that alter the agency's determination that the rule is economically feasible." *Id.*

Because NHTSA would have reached the same final standards regardless of the analysis, any error was harmless. *See Appalachian Power Co. v. EPA*, 135 F.3d 791, 815 (D.C. Cir. 1998) (per curiam) (holding that an agency's sensitivity analysis

demonstrated that consideration of a particular factor did not alter the agency's conclusion).

### 2. NHTSA properly accounted for battery-electric vehicles that automakers will produce, and compliance credits they will use, outside of the rulemaking timeframe

**a.** As explained above, Section 32902(h) prohibits NHTSA from considering the possibility that automakers will produce new battery-electric or dual-fueled vehicles in order to comply with higher fuel-economy standards, but it does not prohibit NHTSA from considering that manufacturers will produce such vehicles for reasons unrelated to those standards. *See supra* pp. 42-44. NHTSA complied with the restrictions of this provision by restricting the CAFE Model from simulating the production of new battery-electric vehicles during the standard-setting years—other than as required to produce electric vehicles at quantities consistent with the state zero-vehicle emissions programs—and by treating dual-fueled vehicles as powered only by gasoline during those years. But NHTSA did allow the model to consider the production of new battery-electric vehicles after the standard-setting years (that is, after 2031), as well as the true fuel economy of dual-powered vehicles and the use of compliance credits outside of the standard-setting years (that is, before 2027 and after 2031). *See supra* pp. 15-16; 89 Fed. Reg. at 52,832 (JA___).

NHTSA explained that fully accounting for battery-electric vehicles, dual-fueled vehicles, and compliance credits outside the standard-setting years "improve[d]

the accuracy and realism of [its] analysis." 89 Fed. Reg. at 52,635 (JA___). In particular, NHTSA's approach allowed the agency to more accurately model how automakers might further change their fleets after achieving compliance with the revised fuel-economy standards in model years 2027 to 2031, and it allowed NHTSA to project the long-term price, fuel-savings, and public health and safety impacts of the rule. NHTSA's approach thus improved the accuracy of its projections about the state of the nation's vehicle fleet and the consequences of regulatory action. *See id.* At the same time, however, by applying restrictions during the standard-setting years, NHTSA ensured that it was not accounting for automakers' potential use of those compliance flexibilities to achieve compliance with the fuel-economy standards. *See, e.g.*, *id.* at 52,832 (JA___) ("Modeling the application of [battery-electric vehicle] technology in model years outside the standard-setting years allowed NHTSA to account for [battery-electric vehicles] that manufacturers may produce for reasons other than the [fuel-economy] standards, without accounting for those [battery-electric vehicles] that would be produced *because of* the [fuel-economy] standards.").

Petitioners assert (Indus. Br. 38-39) that NHTSA's consideration of battery-electric vehicles, dual-fueled technologies, and compliance credits outside the standard-setting years may have affected the costs and benefits of the rule outside of those standard-setting years. But Section 32902(h) does not prohibit NHTSA from considering the costs and benefits of the standards in the most realistic way possible, including by accounting for automakers' production of battery-electric vehicles or use

of compliance credits, so long as NHTSA ensures that its standards are set at the maximum feasible fuel-economy level that manufacturers can achieve without using those compliance flexibilities.

**b.** Even if NHTSA did err, however, any such error was harmless. *See supra* p. 48. NHTSA ran sensitivity analyses in which it applied the "[s]tandard-setting conditions"—*i.e.*, prohibiting the production of battery-electric vehicles or the use of compliance credits, and considering dual-fueled vehicles to be operated on gasoline alone—in additional years. 89 Fed. Reg. at 52,767 (JA___). One sensitivity analysis applied those settings in model years 2027 to 2035, another applied them in 2027 to 2050, and a third applied them in 2023 to 2050. *Id.*; *see also id.* at 52,833 (JA___). NHTSA reviewed those sensitivity analyses and "concluded that none of the results … were significant enough to change [its] position on what regulatory alternative was maximum feasible." *Id.* at 52,833 (JA___). NHTSA thus expressly found that it would have reached the same conclusion—and promulgated the same fuel-economy standards—even if it had applied the Section 32902(h) restrictions outside of the standard-setting years. Because it is clear "that the end result would have been the same" regardless of NHTSA's approach to this issue, any error was harmless. *Hargett v. Commissioner of Soc. Sec.*, 964 F.3d 546, 554 (6th Cir. 2020); *see also Appalachian Power Co.*, 135 F.3d at 815 (an agency's sensitivity analysis demonstrated that the agency's consideration of a particular factor was harmless).

### C. The Maximum Feasible Fuel-Economy Level Is Determined By The Capacity Of The Industry As A Whole

Consistent with EPCA's text and purpose, NHTSA set the light-duty fuel-economy standards at a level that manufacturers can achieve. The agency recognized that achieving compliance may be harder for some manufacturers than for others, that some manufacturers' ability to achieve compliance may vary from year to year, and that some manufacturers may find it more profitable to pay civil penalties than to devote resources to achieve compliance. But the statute directs NHTSA to set the standards at the maximum feasible fuel-economy level achievable by the industry as a whole and does not require the standards to be keyed to the abilities of the least capable manufacturer. Accordingly, NHTSA did not err in setting the standards at a level that some manufacturers may not achieve in all years.

**1.** NHTSA estimated that the industry-wide average fuel-economy level of both the passenger-car and light-truck fleets will exceed the standards in each model year, and it estimated that the passenger-car fleet will exceed the standard by more than 8.5 miles per gallon in 2027 and by more than 5.5 miles per gallon in 2031. 89 Fed. Reg. at 52,549 (JA___).

NHTSA recognized that "maximum feasible standards may be harder for some automakers [to achieve] than for others," 89 Fed. Reg. at 52,814 (JA___), and that some automakers are likely not to achieve compliance with the standards, *id.* at 52,871 (JA___). Consistent with its approach since the very beginning of the fuel-economy

program, however, the agency explained that the standards "need not be keyed to the capabilities of the least capable manufacturer." *Id.* at 52,814 (JA___). Rather, NHTSA's consideration of economic practicability "focuse[s] on the capability of the industry" as a whole "and seeks to avoid adverse consequences such as … a significant loss of jobs or unreasonable elimination of consumer choice." *Id.* If NHTSA were to take the contrary approach, setting standards "at or near the level of the manufacturer whose fleet mix was" the least fuel-efficient, it would "disincentivize innovation by rewarding laggard performance," and the standards "could very foreseeably result in less energy conservation than an approach that looked at the abilities of the industry as a whole." *Id.* Such an approach would risk stagnating the entire industry based on a single manufacturer who may choose for its own reasons not to comply with standards that are otherwise achievable.

**2.** In arguing to the contrary, the state and industry petitioners advance contentions at odds with the statute's text, structure, purpose, and legislative history, and the agency's longstanding practice.

EPCA provides that each fuel-economy standard shall be set at "the maximum feasible average fuel economy level that the Secretary decides the manufacturers can achieve" in a given model year. 49 U.S.C. § 32902(a). The statute does not require NHTSA to set the standards at a level that "every manufacturer" or "each manufacturer" can achieve; rather, NHTSA must consider the ability of "the manufacturers" as a whole, *id.* NHTSA must therefore determine the maximum

feasible average fuel-economy level that the automotive industry can achieve in the aggregate, and it may set the fuel-economy standard at a level that some individual manufacturers may not be able to meet.

A later subsection of the statute confirms that NHTSA need not set the fuel-economy standard at a level that every manufacturer can meet. The statute provides that a small manufacturer (one that produces fewer than 10,000 automobiles per year) can obtain an exemption from a fuel-economy standard "only if the Secretary … finds that the applicable standard … is more stringent than the maximum feasible average fuel economy level that the manufacturer can achieve." 49 U.S.C. § 32902(d)(1). If NHTSA were required to set the standard at a level that every manufacturer could achieve, the provision allowing for exemptions would be unnecessary. Under petitioners' view, the fact that a manufacturer could not achieve the standard would mean that NHTSA should have set a lower standard (or that it should amend a previously established standard to a lower level, *see id.* § 32902(g)(1)), not that the manufacturer should receive an exemption. "When a statutory construction … renders an entire sub[section] meaningless, … the canon against surplusage applies with special force." *Pulsifer v. United States*, 601 U.S. 124, 143 (2024) (alteration and quotation marks omitted).[8]

[8] Although only small manufacturers are eligible for an exemption under 49 U.S.C. § 32902(d)(1), there is nothing in the statutory text that would allow for a construction that distinguishes between large and small manufacturers such that

*Continued on next page.*

Although NHTSA considers feasibility and practicability with regard to the industry as a whole, it also considers the possibility that standards might have significant economic effects on individual manufacturers. *See* 89 Fed. Reg. at 52,810 (JA___) ("NHTSA has long interpreted economic practicability as meaning that standards should be 'within the financial capability of the industry, but not so stringent as to lead to adverse economic consequences.'"). That is plainly not the case here. NHTSA explained that some manufacturers are likely to pay civil penalties when doing so is "more cost-effective … than add[ing] technology" to their vehicles. *Id.* at 52,871 (JA___). And some manufacturers are expected to fall short of the standards in only one or two years because some of their lower-performing vehicles are not scheduled for redesign until a subsequent year. Nissan, for example, is projected to fall short of the light-truck standard in 2027 because it has no vehicles with conventional engines eligible for redesign in that year, but it is projected to exceed the standards in each subsequent year due to anticipated design changes in those following years. *Id.* at 52,793 (JA___).

Furthermore, the projected shortfalls are relatively minor. With regard to the passenger-car fleet, every one of the eight largest manufacturers, which together produce 80% of all passenger-car sales volume, is projected to achieve compliance

---

NHTSA would be required to set fuel-economy standards at a level that every large manufacturer can achieve but that some small manufacturers may not be able to achieve.

with the standards by the end of the regulatory period in 2031. 89 Fed. Reg. at 52,794 (JA___). In each of model years 2027, 2029, and 2030, only one of those manufacturers is projected not to achieve compliance, and in one case (Volkswagen, in 2030), the shortfall is expected to be as low as 0.1 mile per gallon. *Id.* And in 2028, only two of the eight largest manufacturers are expected not to achieve compliance. *Id.* Similarly, in the light-truck fleet, every one of the seven largest manufacturers, which together produce 80% of sales, is expected to achieve compliance in 2028. *Id.* at 52,793 (JA___). And in the remaining years, only one or two manufacturers are expected to fall short, in some cases (again) by as little as 0.1 mile per gallon. *Id.*[9]

NHTSA's approach is also consistent with the statute's purpose. NHTSA can best pursue the overarching goal of energy conservation by establishing standards at a level that will push the industry to an overall higher average fuel-economy level, even if it means that a small number of manufacturers may end up falling short of the standards and paying civil penalties in some years. Petitioners' statutory construction, in contrast, would undermine the goals of EPCA by weakening the fuel-economy

[9] Petitioners' focus on the years in which automakers are expected to pay penalties is misleading because some of those penalties are for projected shortfalls in complying with the minimum fuel-economy standard for *domestically* manufactured automobiles. *See* 49 U.S.C. § 32902(b)(4). The domestic fuel-economy standard is derived from the overall standard but is not directly determined based on the Secretary's consideration of the maximum feasible average fuel-economy level. Thus, there are several years in which manufacturers are expected to achieve compliance with the average fuel-economy standard but still pay penalties for falling short with regard to the domestic minimum. *See* 89 Fed. Reg. at 52,794 & n.1041 (JA___ & n.1041).

standards for the entire industry—and thus reducing energy conservation—based on the laggard performance of a few manufacturers. *See* 89 Fed. Reg. at 52,814 (JA___).

EPCA's legislative history also confirms the agency's consistent understanding. The conference report explains that, in determining fuel-economy standards, the Secretary of Transportation should "take industrywide considerations into account." S. Rep. No. 94-516, at 154. The report further explains that "a determination of maximum feasible average fuel economy should not be keyed to the single manufacturer which might have the most difficulty achieving a given level of average fuel economy." *Id.* at 154-155. "Rather, the Secretary must weigh the benefits to the nation of a higher average fuel economy standard against the difficulties of individual automobile manufacturers." *Id.* at 155. The conference committee recognized that this approach would mean that some manufacturers will end up paying civil penalties, but it noted "that provision has been made for granting relief from penalties under Section 508(b)"—now 49 U.S.C. § 32913—"in situations where competition will suffer significantly if penalties are imposed." *Id.*

NHTSA has thus long recognized—indeed, since it first established fuel-economy standards in 1977—that "[t]he law permits [fuel-economy] standards exceeding the projected capability of any particular manufacturer as long as the standard is economically practicable for the industry as a whole." 68 Fed. Reg. 16,868, 16,873 (Apr. 7, 2003); *see also* 50 Fed. Reg. 40,528, 40,545-40,546 (Oct. 4, 1985) ("[S]tandards may at times be set at a level above that of the least capable

manufacturer and that some manufacturers may find it necessary to pay penalties.… The focus, thus, must be on the manufacturers' collective ability to meet a standard, rather than any particular manufacturer's ability to meet it."); 42 Fed. Reg. at 33,547-33,549 (establishing fuel-economy standards above the level achievable by one of four domestic manufacturers and explaining that "in certain circumstances the standards must not be set at levels which every manufacturer will be able to achieve in every year" but "[r]ather … should be set at some point above those levels"). Although Congress has amended EPCA multiple times in the intervening years and added provisions that continue to use the same language of "maximum feasible average fuel economy standard," *see* EISA § 102, 121 Stat. at 1498-1501, it has never suggested disapproval of NHTSA's approach. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 382 n.66 (1982) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change ….").

### D. Even If There Were Any Prejudicial Error, The Proper Remedy Would Be Remand Without Vacatur

For the reasons discussed, petitioners have demonstrated no ground for setting aside the challenged fuel-economy standards.[10] Were the Court to conclude, however,

[10] Growth Energy filed an amicus brief arguing that the final rule failed to consider mechanisms to incentivize biofuel use. That is an argument not raised by any party, and this Court has long held that "[w]hile an amicus may offer assistance in resolving issues properly before a court, it may not raise additional issues or

*Continued on next page.*

that some part of the rule warranted remand, it would be proper to remand without vacatur.

A rule found to be arbitrary and capricious or contrary to law "need not necessarily be vacated." *Allied-Signal, Inc. v. U.S. NRC*, 988 F.2d 146, 150 (D.C. Cir. 1993). "In general, whether vacatur is appropriate depends 'on the seriousness of the agency error and the disruptive consequences of vacatur.'" *Sierra Club v. U.S. EPA*, 60 F.4th 1008, 1022 (6th Cir. 2023).

Both of those factors would support remand without vacatur in this case. With regard to the first factor, petitioners do not dispute NHTSA's authority to establish average fuel-economy standards, nor NHTSA's authority to establish those standards at the levels set in the final rule. They argue only that NHTSA considered impermissible factors in setting those standards. The agency may be able to correct any error by undertaking a new analysis and still arrive at the same conclusion as to the maximum feasible average fuel-economy level. Where, as here, a statute confers "broad discretionary authority" on an agency and there is "at least a realistic possibility" that the agency will be able to substantiate its decision on remand, vacatur is unwarranted. *Clean Wis. v. EPA*, 964 F.3d 1145, 1177 (D.C. Cir. 2020) (per curiam) (quotation marks omitted); *see also Sierra Club*, 60 F.4th at 1022 ("When an agency may

arguments not raised by the parties." *Cellnet Commc'ns, Inc. v. FCC*, 149 F.3d 429, 443 (6th Cir. 1998). Because this Court "may not consider" the issues raised only by an amicus, *id.*, respondents also do not address them.

be able readily to cure a defect in its explanation of a decision, the first factor counsels remand without vacatur." (alteration and quotation marks omitted)).

With regard to the second factor, vacatur of the final rule would have significant disruptive consequences. EPCA requires that NHTSA establish fuel-economy standards "[a]t least 18 months before the beginning of each model year." 49 U.S.C. § 32902(a). Because model year 2027 begins in October 2026, NHTSA must promulgate standards for model year 2027 by April 2025. 89 Fed. Reg. at 52,780 & n.959 (JA___ & n.959). Vacatur could thus prevent NHTSA from fulfilling its statutory obligation to establish fuel-economy standards for model year 2027. In such circumstances, where vacating a rule would prevent an agency from promulgating new regulations concerning the time period at issue, courts have declined to order vacatur. *See, e.g.*, *Davis Cty. Solid Waste Mgmt. v. U.S. EPA*, 108 F.3d 1454, 1458-1459 (D.C. Cir. 1997) (per curiam) (declining to vacate emissions standards where doing so would "permanently lower the emissions limits applicable to some" municipal waste combustors and "result in significantly greater pollution emissions"); *Allied-Signal*, 988 F.2d at 151 (declining to vacate an agency's regulatory program where the agency would have had to pay refunds and could not have regulated retroactively).

In contrast, if the Court remands without vacatur, and NHTSA ultimately decides that less stringent fuel-economy standards are warranted, the agency would be free to issue such a rule because the statute's 18-month lead-time requirement applies only to rules establishing new fuel-economy standards or making existing standards

more stringent. *See* 49 U.S.C. § 32902(a), (g)(2). And if automakers had already designed and produced more fuel-efficient vehicles in the meantime, they would receive compliance credits that could be used to offset their obligations in future years.

In short, even assuming that remand was warranted with regard to some part of the final rule, any deficiencies in the final rule are curable on remand, and vacatur would permanently prevent NHTSA from amending the fuel-economy standards at issue, causing substantial harm to the fuel-conservation policy underlying EPCA, the environment, and the public health. If the Court were to find any prejudicial error in the final rule, it should remand to NHTSA without vacatur.

## II. NHTSA'S HEAVY-DUTY STANDARDS ARE LAWFUL

As explained above, NHTSA establishes fuel-efficiency standards for the heavy-duty-vehicle fleet under a statutory framework that is related to but different than the framework that governs fuel-economy standards for light-duty vehicles. In the 2024 final rule, NHTSA established standards for a portion of the heavy-duty fleet—heavy-duty pickup trucks and vans—for model years 2030 to 2035. Those standards are entirely consistent with the statute.[11]

[11] The Buckeye Institute filed an amicus brief challenging NHTSA's cost-benefit analysis of the heavy-duty fuel-efficiency standards. None of the petitioners raised this issue, however, so respondents do not address it here. *See supra* p. 60 n.10.

### A. NHTSA Properly Accounted For Electric Vehicles In The Heavy-Duty Fuel-Efficiency Program

**1.** The limitations of Section 32902(h) do not apply to NHTSA's consideration of standards for the heavy-duty fleet, and the agency appropriately considers electric vehicles both in establishing fuel-efficiency standards for that fleet and in determining manufacturers' compliance with those standards.

Congress directed the Secretary of Transportation to "implement a commercial medium- and heavy-duty on-highway vehicle and work truck fuel efficiency improvement program" and to "adopt and implement appropriate test methods, measurement metrics, fuel economy standards, and compliance and enforcement protocols … for commercial medium- and heavy-duty on-highway vehicles and work trucks." 49 U.S.C. § 32902(k)(2). The statute thus makes clear that the vehicles to be included in this fuel-efficiency program and subject to the standards promulgated under Section 32902(k) are "commercial medium- and heavy-duty on-highway vehicles and work trucks." *Id.*; *see also id.* § 32902(b)(1) (directing the Secretary to prescribe "average fuel economy standards for … work trucks and commercial medium-duty or heavy-duty on-highway vehicles in accordance with subsection (k)").

The statute does not distinguish between gas-powered vehicles and battery-electric vehicles. The statute defines "commercial medium- and heavy-duty on-highway vehicle" as "an on-highway vehicle with a gross vehicle weight rating of 10,000 pounds or more," 49 U.S.C. § 32901(a)(7), and defines "work truck" as "a

vehicle that … is rated at between 8,500 and 10,000 pounds gross vehicle weight; and … is not a medium-duty passenger vehicle," *id.* § 32901(a)(19). The statute does not define "vehicle," but the ordinary definition includes "[a] device or structure for transporting persons or things" and "[a] self-propelled conveyance that runs on tires." *Vehicle*, American Heritage Dictionary 1906 (4th ed. 2006); *see HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*, 594 U.S. 382, 388 (2021) ("Where Congress does not furnish a definition of its own, we generally seek to afford a statutory term 'its ordinary or natural meaning.'").

A battery-electric vehicle plainly fits within the ordinary definition of "vehicle," and, provided it is capable of being driven on the highway and meets the relevant weight criteria, it is also a commercial medium- or heavy-duty on-highway vehicle or a work truck as those terms are defined by statute. And in case there were any doubt, other statutory definitions confirm that a battery-electric vehicle is indeed a "vehicle." The statute defines "automobile" to include certain "4-wheeled vehicle[s] that [are] propelled by fuel, or by alternative fuel." 49 U.S.C. § 32901(a)(3). And the definition of "alternative fuel" includes "electricity." *Id.* § 32901(a)(1)(J). Thus, an electricity-propelled conveyance would qualify as a "vehicle." Other provisions of EISA also make clear that a "vehicle" may be powered by electricity. *See, e.g.*, EISA § 131(a)(5), 121 Stat. at 1509 (defining "plug-in electric drive vehicle" to include heavy-duty "vehicle[s]" that "draw[] motive power from a battery"); EISA § 133, 121 Stat. at 1512 (referencing "medium- or heavy-duty electric vehicle[s]"). Accordingly, battery-

electric vehicles are properly included in the fuel-efficiency program and subject to the fuel-economy standards referenced in Section 32902(k).

**2.** Petitioners correctly note that the statute defines "fuel" to mean "gasoline," "diesel oil," or "other liquid or gaseous fuel that the Secretary decides … to include in th[e] definition." 49 U.S.C. § 32901(a)(10). But this does not mean that vehicles that do not consume a liquid or gaseous fuel should not be included in the fuel-efficiency improvement program. And petitioners err in arguing (Indus. Br. 65) that "electric vehicles have no 'fuel efficiency' because they do not use 'fuel.'" To the contrary, electric vehicles have maximal fuel efficiency because they perform work without consuming any fuel.

A principal goal of the statute is to reduce dependence on the types of fuel included in the statutory definition. Furthermore, it is clear that the statute is not focused on improving the fuel efficiency of individual vehicles, but rather on improving the fuel efficiency of the heavy-duty fleet. This is apparent because, as with the light-duty fuel-economy standards, the statute directs NHTSA to promulgate "average" fuel-economy standards for heavy-duty vehicles. 49 U.S.C. § 32902(b)(1). As used in EISA, therefore, a "fuel efficiency improvement program" is one that maximizes the work that can be performed by the heavy-duty-vehicle fleet relative to the amount of fuel consumed. *Id.* § 32902(k)(2). The production of battery-electric heavy-duty vehicles plainly improves the fuel efficiency of the heavy-duty fleet and reduces the fleet's consumption of the specified fuels.

Petitioners' argument also runs contrary to common sense: Suppose a company directs its employees to be more efficient with the use of printer paper. An employee who prints documents double-sided or with multiple pages per sheet obviously complies with the directive. So does an employee who decides not to print documents at all but instead to read them on her computer. Furthermore, if the company wanted to track its progress by measuring the amount of paper used per employee (its "paper efficiency"), it would certainly account for the employee who uses no paper at all, and her practices would help bring down the average paper usage. Under petitioners' reasoning, however, the employee who decides to read documents only on her computer is not being more efficient with the use of paper because she is not using paper at all, and the company should ignore that employee when determining its paper efficiency. Such reasoning is nonsensical.

Petitioners' reliance (Indus. Br. 66) on *Truck Trailer Manufacturers Ass'n v. EPA*, 17 F.4th 1198 (D.C. Cir. 2021), is misplaced. There, the court held that trailers that cannot move under their own power are not commercial medium-duty or heavy-duty on-highway vehicles. But electric heavy-duty vehicles do move on their own power. Furthermore, the D.C. Circuit explained that the meaning of the term "commercial medium- and heavy-duty on-highway vehicles" should be determined in light of the words appearing around that term in the statute—in particular "passenger automobiles," "non-passenger automobiles," and "work trucks." *Truck Trailer Mfrs.*, 17 F.4th at 1206. The court stated that "[t]railers have no meaningful similarity to

passenger and non-passenger automobiles" or to work trucks "because trailers are not 'propelled by fuel, or by alternative fuel.'" *Id.* This reasoning does not apply to NHTSA's conclusion that battery-electric vehicles are subject to regulation under Section 32902(k) because such vehicles *are* propelled by alternative fuel. *See* 49 U.S.C. § 32901(a)(1)(J) (defining "alternative fuel" to include "electricity").

Pointing to a provision applicable to the fuel-economy program for light-duty vehicles, petitioners argue (Indus. Br. 68) that if Congress had intended for NHTSA to include electric vehicles in the heavy-duty fuel-efficiency program, it would have provided a mechanism for estimating their fuel usage. But the absence of such a provision does not suggest that NHTSA may not consider electric vehicles part of the heavy-duty fleet; rather, it means that Congress left it to NHTSA to establish a fuel-efficiency value for such vehicles. Indeed, the statute makes this explicit, directing the Secretary to "adopt and implement appropriate test methods[ and] measurement metrics." 49 U.S.C. § 32902(k)(2); *see also id.* § 32902(k)(1)(B) (directing the Secretary to determine "the appropriate metric for measuring and expressing commercial medium- and heavy-duty on-highway vehicle and work truck fuel efficiency performance"). As explained below, NHTSA followed the statute's direction, prescribing that battery-electric heavy-duty vehicles would have a fuel-efficiency value of zero gallons of fuel per 100 miles. *See infra* pp. 74-75.

That EISA created a program for making grants "to encourage the use of … electric vehicle technologies," 42 U.S.C. § 17011(b)(1)—including on heavy-duty

vehicles, *id.* § 17011(a)(5)(C)—only confirms that Congress thought of electric vehicles as an important part of the broader fleet. Contrary to petitioners' suggestion (Indus. Br. 68-69), the fuel-efficiency program is in no way inconsistent with the grant program.

**3.** The major-questions doctrine also provides no support for petitioners' position. As an initial matter, the statute expressly charges NHTSA with establishing a fuel-efficiency improvement program for the heavy-duty fleet, 49 U.S.C. § 32902(k)(2), and there is thus "'clear congressional authorization' to regulate" in this area, *West Virginia*, 597 U.S. at 732.

In any event, petitioners start from a mistaken premise in suggesting (Indus. Br. 74) that the final rule would "force electrification" of the nation's heavy-duty vehicle fleet. And petitioners are simply incorrect when they assert that NHTSA has "announced what the market share of its favored technologies must be and then required producers to meet those targets." Indus. Br. 70 (alterations and quotation marks omitted). The rule does not force the implementation of certain technologies or announce required market shares for those technologies. The final rule establishes a fuel-efficiency standard expressed in terms of gallons of fuel consumed per 100 miles. Manufacturers can comply with the fuel-efficiency standards using any fuel-improving technologies they want, and electrification is only one option in that toolbox.

The heavy-duty-vehicle standards also do not implicate the major-questions doctrine because, contrary to petitioners' suggestion (Indus. Br. 69), those standards will not "unilaterally" cause the adoption of electric-vehicle technology. NHTSA explained that "[t]he transition to electric vehicles" is already "taking place among heavy-duty pick-up trucks and vans, with much of the initial focus on last mile delivery vans." 89 Fed. Reg. at 52,706 (JA___). The agency noted that "[s]everal models" of electric "parcel delivery vans have already entered the market" and "[c]ommercial fleets have announced commitments to purchase zero emission delivery trucks and vans, including FedEx, Amazon, and Walmart." *Id.* (footnotes omitted). Indeed, by the time the rule issued, Amazon already had "10,000 electric delivery vans operating in over 18,000 U.S. cities." *Id.* This electrification is happening quickly and would continue even in the absence of the final rule. Thus, while NHTSA recognized that there were no battery-electric heavy-duty pickup trucks or vans in the model year 2022 fleet, the agency estimated that such vehicles would comprise 27% of the fleet in 2030 and 38% of the fleet in 2035—even if NHTSA took no action to strengthen fuel-efficiency standards in the final rule. *Id.* at 52,739 (JA___). NHTSA further estimated that with the final standards for heavy-duty pickup trucks and vans, electric vehicles would comprise 27% of that fleet in 2030 and 38% of the fleet in 2035—exactly the same percentages as in the no-action scenario. *Id.*; *see also id.* at 52,906 (JA___) (showing that the final standards ("HDPUV108")

would have no effect on the penetration of battery-electric-vehicle technology compared to the no-action baseline).

The CAFE Model showed that the effect of the final standards would be not to increase the prevalence of battery-electric technology, but rather to increase the prevalence of plug-in hybrid vehicles, 89 Fed. Reg. at 52,906 (JA___), which even petitioners would presumably concede are properly included in the heavy-duty fuel-efficiency program because they consume gasoline. The standards thus account for automakers' existing and ongoing shift toward implementing electric-vehicle technologies in heavy-duty pickups and vans, but they are not themselves the cause of that shift.

Petitioners make a similar mistake in describing (Indus. Br. 71-72) the projected change in consumption of various fuels. NHTSA estimated that heavy-duty diesel consumption was expected to fall from 40.6% of fuel consumption in 2022 to 4.1% in 2050 and that electricity consumption would increase from 0% to 19.1% in the same timeframe, under the baseline, no-action scenario. *See* Annual Societal Effects Summary Worksheet – HDPUV, rows 2-6, 142-146, col. K.[12] With NHTSA's standards, fuel consumption would look very similar: Diesel use would constitute

---

[12] The Annual Societal Effects Summary Worksheet – HDPUV is located at HDPUV_ref/reports-csv/annual_societal_effects_summary_report.csv within the HDPUV_ref.zip file located at https://www.nhtsa.gov/file-downloads?p=nhtsa/downloads/CAFE/2024-FRM-LD-2b3-2027-2035/Central-Analysis/ (last updated June 7, 2024).

4.2% of fuel consumption in 2050 (actually more than under the baseline scenario), and electricity use would be at 20.9%. *See id.* at rows 432-436, col. K.[13] Thus, the projected changes in fuel consumption would largely occur even in the absence of the final standards and are not caused by those standards. In short, the fuel-efficiency standards for heavy-duty pickups and vans will not have nearly as significant an impact on the penetration of battery-electric technologies or on energy markets as petitioners suggest.

Petitioners contend (Indus. Br. 72) that if NHTSA can include battery-electric vehicles in the fuel-efficiency program for heavy-duty vehicles, it would have the authority "to phase out conventional heavy-duty vehicles entirely." As the discussion above demonstrates, there is no indication that NHTSA intends to use its authority in such a manner, and the final standards do not force any manufacturer to electrify its fleet. Conjectures regarding the relative mix of electric and gasoline-powered vehicles at some indefinite future point do not advance petitioners' argument. In any event, the statute's goal is to compel manufacturers to implement more fuel-efficient technologies and to phase out less-efficient ones. For example, even if NHTSA could not include battery-electric vehicles in the program, NHTSA could still set standards that would likely lead automakers to greatly decrease the number of diesel-powered

[13] Petitioners' brief identifies (Indus. Br. 71) slightly different percentages for diesel consumption because petitioners refer to a chart that used a different method of calculating the gasoline-equivalency of diesel usage.

models and increase the number of hybrid-electric models. But petitioners do not contend that NHTSA's authority to establish standards that could drive the obsolescence of diesel-powered and non-hybrid vehicles implicates the major-questions doctrine. And even if it did, EISA provides "clear congressional authorization" for NHTSA to establish a fuel-efficiency program and standards that will force automakers to use more efficient technologies. *West Virginia*, 597 U.S. at 723.

Finally, petitioners contend (Indus. Br. 73-74) that NHTSA did not treat electric vehicles as a "necessary technology" in prior rulemakings. As noted above, the current rule still does not treat electric vehicles or any other technology as "necessary"; manufacturers are free to comply with the standards using any mix of technology that they choose. Furthermore, NHTSA did not account for electric vehicles in the heavy-duty fleet in the prior rulemaking, in 2016, because that technology was still in "early development" and "not yet commercially available" in heavy-duty vehicles. 81 Fed. Reg. 73,478, 73,818 (Oct. 25, 2016). But NHTSA's regulations have, since 2011, included battery-electric vehicles in the calculation of the fuel efficiency of an automaker's heavy-duty fleet. *See* 49 C.F.R. § 535.6(a)(3)(iii) (addressing the fuel-efficiency calculation for a fleet that includes "electric vehicles"); 76 Fed. Reg. 57,106, 57,501 (Sept. 15, 2011).

**4.** Even if there were any ambiguity in the statute, the Court should defer to NHTSA's informed decision to include battery-electric vehicles in the fuel-efficiency

program for heavy-duty vehicles. In EISA, Congress expressly "empower[ed]" NHTSA "to prescribe rules to 'fill up the details' of a statutory scheme" and "to regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility.'" *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). Congress instructed the Secretary of Transportation to "determine in a rulemaking proceeding how to implement a commercial medium- and heavy-duty on-highway vehicle and work truck fuel efficiency improvement program designed to achieve the maximum feasible improvement" and to "adopt and implement" such a program. 49 U.S.C. § 32902(k)(2). Congress left it to the Secretary to determine the contours of the fuel-efficiency program as the Secretary deemed "appropriate." *Id.* Thus, even if the statute did not clearly contemplate the inclusion of electric vehicles in the heavy-duty vehicle program, NHTSA had the discretion to make the choice it did.

### B. NHTSA Properly Treats Electric Vehicles As Having A Fuel-Consumption Value Of Zero Gallons Per 100 Miles

When NHTSA first established a heavy-duty-vehicle fuel-efficiency program in 2011, it promulgated procedures for measuring fuel consumption and calculating manufacturers' fuel-efficiency level. 76 Fed. Reg. at 57,501. Those procedures provide that the "fuel consumption" value of electric vehicles is "zero gallons per 100 miles." *Id.*; *see* 49 C.F.R. § 535.6(a)(3)(iii). That rule is consistent with the statute, and the agency did not err in retaining that provision of the regulation in the final rule.

EISA directs NHTSA to establish a "fuel efficiency improvement program" and adopt "fuel economy standards." 49 U.S.C. § 32902(k)(2). The statute defines "fuel economy" as "the average number of miles traveled by an automobile for each gallon of gasoline (or equivalent amount of other fuel) used." *Id.* § 32901(a)(11). The calculation of heavy-duty pickups' and vans' fuel economy thus properly accounts for their use of "fuel." And, as already noted, the statute defines "fuel" as "(A) gasoline; (B) diesel oil; or (C) other liquid or gaseous fuel that the Secretary decides by regulation to include in this definition." *Id.* § 32901(a)(10). Electricity—which is not gasoline, diesel, or another liquid or gaseous fuel—is not a "fuel" as defined by the statute. NHTSA thus acted consistent with the statute in maintaining a regulation providing that battery-electric heavy-duty pickup trucks and vans consume "zero gallons" of "fuel" "per 100 miles." 49 C.F.R. § 535.6(a)(3)(iii), and the regulation provides for an appropriate calculation of electric vehicles' fuel efficiency.

Petitioners contend that the fuel-efficiency value assigned to battery-electric vehicles "is not an 'appropriate … measurement metri[c]' in light of EISA's focus on *energy* conservation." Indus. Br. 74 (alterations in original) (quoting 49 U.S.C. § 32902(k)(2)). But, contrary to petitioners' assertion (Indus. Br. 75), NHTSA's approach does not "pretend[] that electric vehicles use no energy." NHTSA recognized that battery-electric vehicles use energy even though they do not use fuel, and it considered the energy consumed by electric vehicles in establishing the fuel-efficiency standards. *See* 89 Fed. Reg. at 52,562 (JA___) (noting that "NHTSA does

consider upstream effects of electricity use in its effects modeling"). For example, NHTSA recognized the pollution caused by electricity production, *id.* at 52,902 (JA___), and the cost of recharging electric vehicles, JA___[TSD.6-15]; and these effects are accounted for in the modeling that NHTSA used to determine what standards are appropriate. Therefore, although they are expressed in terms of fuel consumption, the fuel-efficiency standards nonetheless account for the energy used to power battery-electric heavy-duty vehicles.

It is true that the statute leaves NHTSA discretion to assign a non-zero fuel-efficiency value to electric vehicles. *See* 49 U.S.C. § 32902(k)(2) (instructing the Secretary to adopt "appropriate test methods, measurement metrics, fuel economy standards, and compliance and enforcement protocols that are appropriate, cost-effective, and technologically feasible" for heavy-duty vehicles). But, unlike with regard to the light-duty fuel-economy standards, Congress did not mandate such an approach. *See id.* § 32904(a)(2)(B) (instructing the EPA Administrator, when determining the average fuel economy of an automaker's light-duty fleet, to include "equivalent petroleum based fuel economy values determined by the Secretary of Energy for various classes of electric vehicles").

NHTSA explained in the final rule that it would not use a petroleum equivalency factor to assign heavy-duty electric vehicles a non-zero fuel-efficiency value "at this time." 89 Fed. Reg. at 52,562 (JA___). NHTSA explained that it was doing so "in coordination with EPA's" vehicle-emissions rule. *Id.* But the agency

also noted that it might take "future action" on the issue "in a standalone future rulemaking after NHTSA has a more thorough opportunity to consider the costs and benefits of" assigning heavy-duty electric vehicles a non-zero fuel-efficiency value "and all stakeholders can present feedback on the issue." *Id.* It was reasonable for NHTSA to defer action on this issue when the record did not contain sufficient information for the agency to act at the present time. An "agency need not solve every problem before it in the same proceeding," *Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211, 231 (1991), and may "defer consideration" of an issue to a different "docket" that is "designed to obtain additional relevant information," *American Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027, 1032 (D.C. Cir. 2008).

### C. The Final Rule Complies With The Statute's Regulatory-Stability Requirement Because It Establishes Fuel-Efficiency Standards For Six Years

**1.** EISA requires that the heavy-duty fuel-efficiency standards "provide not less than" "4 full model years of regulatory lead-time" and "3 full model years of regulatory stability." 49 U.S.C. § 32902(k)(3). NHTSA's heavy-duty vehicle standards comply with these requirements.

NHTSA promulgated its first set of standards for heavy-duty vehicles (which it now calls the "Phase 1" standards) in 2011, and those standards became mandatory in model year 2016. 76 Fed. Reg. at 57,110. In 2016, NHTSA promulgated Phase 2 standards that took effect in model year 2021. 81 Fed. Reg. at 74,245. And in 2024,

NHTSA promulgated the final rule at issue in this case, which establishes Phase 3 standards that take effect in model year 2030 and will last through 2035. 89 Fed. Reg. at 52,545 (JA___). Each of the rules was promulgated at least four model years before the standards took effect (or will take effect), satisfying the statute's lead-time requirement; and each phase lasted (or will last) at least three model years, satisfying the statute's regulatory-stability requirement.

The statute's lead-time requirement ensures that manufacturers have sufficient time to plan, design, and build heavy-duty vehicles that comply with the standards. *See* 89 Fed. Reg. at 52,780 (JA___). The regulatory-stability requirement ensures that "manufacturers will not be subject to new standards in repeated rulemakings too rapidly" so that they can develop multi-year plans to comply with the standards over a period of time. *Id.*

To illustrate the function of these requirements, consider a situation in which NHTSA establishes fuel-efficiency standards in year one. Those standards will govern years five, six, and seven and will increase in stringency in each of those three years. A manufacturer planning to redesign a popular heavy-duty pickup in year five will—because of the lead-time requirement—have enough advance notice to introduce fuel-saving technologies meeting the standards for year five. Furthermore, because of the regulatory-stability requirement, the manufacturer can plan its compliance over the entire three-year timeframe, perhaps making additional fuel-saving improvements to the pickup in year five in order to achieve compliance with the more stringent

standards that it knows will apply in year seven, even though that may mean exceeding the standards in year five. Alternatively, the manufacturer could decide not to make the fuel-saving improvements to the pickup in year five and to instead wait until year six to make more cost-effective improvements to a van in its fleet, knowing that it will then exceed the standards and be able to carry back compliance credits to avoid paying penalties for under-compliance in year five. The lead-time and regulatory-stability requirements thus together make it easier for automakers to comply with the fuel-efficiency standards.

**2.** The state and industry petitioners contend (Indus. Br. 76-82) that EISA requires that the heavy-duty fuel-efficiency standards remain flat, or constant, for at least three years and not increase year-over-year during the period governed by the final rule. That view relies on a mistaken understanding of the statute's text and purpose.

The ordinary meaning of "stability" is "[t]he state or quality of being stable," "[r]esistance to change, deterioration, or displacement," and "dependability." *Stability*, American Heritage Dictionary 1687. "Stable," in turn, means "[r]esistant to change of position or condition," "[n]ot subject to sudden or extreme change or fluctuation," and "[e]nduring or permanent." *Stable*, *id.* The phrase "regulatory stability," 49 U.S.C. § 32902(k)(3), thus means that the regulations must remain unchanging and dependable, not sudden to sudden change, for the specified period (three years). The

final rule complies with this directive because it establishes fuel-efficiency standards that will endure for six years.

Petitioners argue (Indus. Br. 77) that what must remain stable is "the specific fuel-economy standard," but that is not what the statute says. The statute requires "3 full model years of *regulatory* stability"; in other words, what must remain stable is the "regulat[ion]," not the level at which the fuel-efficiency standard is set. 49 U.S.C. § 32902(k)(3) (emphasis added). Petitioners contend that "[o]ne wouldn't say that 'interest rates have stabilized' if the Fed said they'd increase year over year." Indus. Br. 78 (quotation marks omitted). That might be true, but one would say that the "regulation" or "policy" has stabilized if the Federal Reserve announced exactly how much it would raise interest rates over the next few years and then refused to deviate from that pronouncement. Similarly, NHTSA has ensured "regulatory stability" because it has laid out exactly how the fuel-efficiency standards will change between 2030 and 2035.

This plain reading is consistent with NHTSA's construction of the statute since it promulgated the first heavy-duty standards shortly after EISA was enacted. NHTSA explained at that time that "the 'regulatory stability' requirement exists to ensure that manufacturers will not be subject to new standards in repeated rulemakings too rapidly." 76 Fed. Reg. at 57,110. "[T]he phrase 'regulatory stability'" thus "requir[es] that the standards remain in effect for three years before they may be

increased by amendment"; "[i]t does not prohibit standards which contain pre-determined stringency increases." *Id.*

Petitioners' citation to a Clean Air Act provision only confirms NHTSA's construction of the statute. The Clean Air Act provides that "[a]ny standard promulgated or revised under this paragraph … shall apply for a period of no less than 3 model years beginning no earlier than the model year commencing 4 years after such revised standard is promulgated." 42 U.S.C. § 7521(a)(3)(C). That statute makes clear that the particular "standard" established by the EPA must "apply" for at least three years; it may not increase in stringency over that time. *Id.* EISA, in contrast, requires "regulatory" stability. Courts "generally 'presume differences in language … convey differences in meaning,'" *Rudisill v. McDonough*, 601 U.S. 294, 308 (2024), and the Court should give effect to Congress's choice to use different language in EISA than it did in the Clean Air Act.

Contrary to petitioners' assertion (Indus. Br. 79-80), NHTSA's application of the statute's text does not render the regulatory-stability requirement superfluous or put it in conflict with the lead-time requirement. As explained above, the lead-time requirement ensures that NHTSA promulgates standards at least four years before the model year when those standards take effect. The regulatory-stability requirement requires NHTSA to establish the standards for at least three model years at a time, thus enabling automakers to do multi-year planning. The provisions work together but are distinct.

Finally, petitioners also err in asserting (Indus. Br. 82) that Congress intended to keep standards flat for three years at a time because heavy-duty vehicles have longer redesign cycles. The fact that automakers cannot implement fuel-saving technologies in heavy-duty vehicles as quickly due to less frequent redesigns means that they need to engage in multi-year planning, determine how they can implement technology over time, and plan to use credits to achieve compliance over a set of years. That requires knowing up front what the standards will be for a multi-year period; it does not require that the standards stay flat during that period.

## III. THE ENVIRONMENTAL PETITIONERS' CHALLENGES ARE WITHOUT MERIT

### A. NHTSA Reasonably Explained That It Is Not Feasible To Model "Production Shifting" As An Available Compliance Pathway

**1.** NHTSA uses the CAFE Model to "estimate[] how vehicle manufacturers might respond to a given regulatory scenario," considering available technologies and vehicle-redesign constraints. 89 Fed. Reg. at 52,580 (JA___). As explained above, the model begins with data regarding the production volumes, technologies, and fuel-economy levels in the existing fleet. *See supra* pp. 13-14. The CAFE Model then applies fuel-improving technologies based on their relative cost-effectiveness until the manufacturer achieves compliance with a given regulatory scenario—or falls short of compliance because the standards are not economically practicable or technologically feasible. The model thus gives a picture of how manufacturers can—or cannot—

comply with different regulatory scenarios by applying available technologies to the existing fleet.

NHTSA recognized that manufacturers can, and sometimes do, use alternative mechanisms to achieve compliance. For example, manufacturers can improve their fleet's fuel economy by "shifting sales from one vehicle model or trim level to another," which they might accomplish by "increas[ing] the[] production" and reducing the price of vehicle models that have a higher fuel-economy level. 89 Fed. Reg. at 52,594 & n.194 (JA___ & n.194). In this rulemaking, as in the past, commenters suggested that NHTSA "simulate responses such as strategic pricing strategies by manufacturers intended to alter the mix of models they sell and enable them to comply with new [fuel-economy] standards." *Id.* at 52,663 (JA___). NHTSA responded to those suggestions by explaining that it cannot model such shifts because it lacks reliable models to predict how profit-maximizing automakers may choose to adjust their pricing and how consumers would respond to such adjustments. And without a reliable model of vehicle sales, NHTSA cannot evaluate the economic practicability of any given regulatory scenario as required by statute. *See* 49 U.S.C. § 32902(f).

First, NHTSA recognized that manufacturers are "profit maximizing firms" with "a strong interest in producing vehicles with the attributes that consumers will most value." 89 Fed. Reg. at 52,662 (JA___). Other than their existing sales, NHTSA has no basis to reliably estimate what strategic decisions various manufacturers will

make to maximize profits in their fleet going forward. The final rule explains that the model "assumes that manufacturers are currently pricing individual vehicle models within market segments in a way that maximizes their profit," *see id.* at 52,666 (JA___), and manufacturers could not have increased profits by reducing the price of any particular vehicle model in order to sell a higher quantity of that vehicle. The model similarly projects that manufacturers will keep that same profit-maximizing distribution of vehicle model sales going forward. *See id.* (explaining that "each vehicle within a manufacturer's volume of that body-style is assigned the same percentage share of that manufacturer's sales as in model year 2022"). As the final rule explains, "[w]ithout more information about each manufacturer's true cost of production, including its fixed and variable components, and its target profit margins for its individual vehicle models, there is no basis to assume that strategic shifts within a manufacturer's portfolio will occur in response to standards." *Id.*

Second, as NHTSA also explained in the final rule, it is not currently possible for NHTSA's model to accurately predict consumers' responses to production-shifting by manufacturers, and thus it is not possible for NHTSA to accurately predict how such shifts would affect new vehicle sales. For example, NHTSA has no basis to predict whether, and at what price point, a consumer would be willing to buy a hybrid-electric model of a particular vehicle as opposed to the conventional, non-hybrid model. Predicting whether—and in what numbers—consumers would buy various vehicle models at different relative price points would require a "more detailed

representation of the new vehicle market" that would "enable the agency to incorporate the effect of additional vehicle attributes on buyers' choices among competing models." 89 Fed. Reg. at 52,663 (JA___). In other words, the agency would need to know the full set of reasons *why* consumers purchase the specific vehicles that they do, such that it would know whether consumers would make a different choice if a different vehicle were comparatively more or less expensive. The final rule explains that the agency "has previously invested considerable resources in developing such a discrete choice model of the new automobile market" and that "those investments have not yet produced a satisfactory and operational model." *Id.* Although existing consumer-choice models can be used "for analysis of the determinants of historical variation in sales patterns," they "often produce unreliable forecasts for future periods, which the agency's regulatory analyses invariably require." *Id.* The existing models "are often unresponsive to relevant shifts in economic conditions or consumer preferences," and it is difficult to account for "factors such as the introduction of new model offerings—particularly those utilizing advances in technology or vehicle design—or shifts in manufacturers' pricing strategies." *Id.*

This explanation reflects the same concerns that NHTSA has discussed in the past in declining to model shifts in production of specific vehicle models. In the 2012 rulemaking, for instance, the agency explained that consumer-choice modeling can "[i]n principle" be "used to estimate the effects of these rules on vehicle sales and fleet mix." 77 Fed. Reg. 62,624, 62,714 (Oct. 15, 2012). "In practice," however, "past

analyses using such models have not produced consistent estimates of how buyers might respond to improved fuel economy, and it is difficult to decide whether one data source, model specification, or estimation procedure is clearly preferable over another." *Id.* Therefore, in that final rule as in this one, NHTSA continued to use the existing "market shares of individual models." *Id.*

**2.** The environmental petitioners urge that manufacturers could comply with more stringent fuel-economy standards simply by selling more of their existing fuel-efficient models and fewer of their existing less-efficient models. But petitioners fail to address the difficulties of modeling such an approach, as well as the real-world difficulties of implementing it.

As an initial matter, there is no apparent basis for petitioners' assumption that manufacturers could sell additional fuel-efficient models. To conclude otherwise would assume that manufacturers were disregarding an excess demand for fuel-efficient vehicles as currently priced. As NHTSA observed, however, "[i]f fuel economy was valued by consumers at a significantly higher rate than manufacturers believe that they value it, then presumably these high fuel economy vehicles would have severe excess demand and inventory for them would be incredibly scarce, which NHTSA does not observe in the data." 89 Fed. Reg. at 52,662 (JA___). Petitioners thus assume that manufacturers are unwittingly leaving substantial profits on the table—or that they would be willing in the future to sell more-efficient vehicles at a loss. Neither assumption is well-founded. *See id.* ("NHTSA would need more

compelling evidence about the market failures that would lead manufacturers to consistently incorrectly assess the willingness to pay of consumers for fuel savings.").

Furthermore, by focusing entirely on shifts in production, petitioners ignore the other half of the equation: the willingness of consumers to purchase whatever vehicle models manufacturers might decide to shift their production towards. *See* Envt'l Br. 27-28. In doing so, petitioners fail to address NHTSA's explanation of the difficulties involved in modeling such an approach. As already noted, automakers would need to adjust their pricing in order to sell more fuel-efficient models—either by reducing the price of more-efficient models or by raising the price of less-efficient models—and NHTSA does not have a reliable model that can predict how consumers will react to such relative price changes among available vehicles. Furthermore, the more-fuel-efficient models do not always possess the same attributes as the less-efficient models; for example, they may have different towing capacities. Despite an investment of significant resources, NHTSA has been unable to create a model that can reliably predict whether consumers would be willing to shift their consumption between vehicles or at what price point they would be willing to do so.[14] The agency

[14] That task is very different than the one NHTSA does perform in its analysis, namely modeling the effect of a uniform price increase on all vehicle models on total new vehicle sales. That analysis requires measuring consumers' willingness to consume the same good at a higher price—known as the price elasticity of demand—while holding other variables constant. 89 Fed. Reg. at 52,667 (JA___) ("NHTSA estimates the change in sales from its baseline forecast during future years under each regulatory alternative by applying an assumed price elasticity of new vehicle demand

*Continued on next page.*

thus uses the sales distribution in the model year 2022 reference fleet as a proxy for how vehicle sales will be distributed in future years. This is precisely the sort of "technical" judgment peculiarly within the province of the agency, and petitioners have offered no reason to doubt NHTSA's conclusion. *Troy Corp. v. Browner*, 120 F.3d 277, 289 (D.C. Cir. 1997).

Petitioners contend (Envt'l Br. 31) that production shifting is a particularly attractive option for compliance given limitations on manufacturers' ability to redesign vehicles to add technology. In the model, NHTSA recognized that "manufacturers nearly universally make the technological improvements prompted by [fuel-economy] standards at times that coincide with existing product 'refresh' and 'redesign' cycles." 89 Fed. Reg. at 52,548 n.18 (JA___ n.18). Petitioners characterize production shifting as a way around those redesign cycles. But production shifting imposes similar costs on manufacturers as redesigning a vehicle model before completion of a redesign cycle. As the final rule explains, "[i]f a manufacturer launches or updates a product with fuel-saving technology, and then later replaces that technology with an unrelated or different fuel-saving technology before the equipment and research and development investments have been fully paid off, there will be unrecouped, or stranded, capital costs." *Id.* at 52,619 (JA___). The same is true, however, if a manufacturer simply stops selling—or reduces sales of—a

---

to the percent difference in average price between that regulatory alternative and the baseline.").

particular vehicle model: It is then not recouping the costs it spent on that vehicle, resulting in stranded capital costs. Nor, as petitioners seem to believe, could a manufacturer simply produce more of a given vehicle without incurring capital costs to prepare its facilities to produce more of the desired vehicle model.

Finally, petitioners do not advance their argument by noting (Envt'l Br. 28-29) that Toyota appears to have shifted its RAV4 sales from one configuration to a more efficient version of that same model. Petitioners provide no evidence that such a shift was a result of Toyota's efforts to shift production as opposed to an unexpected shift in consumer demand to which Toyota was responding. Furthermore, it is not clear what planning Toyota undertook in advance of that shift or what costs Toyota incurred to facilitate it. In any event, NHTSA's position is not that consumer demand can never support a production shift, but rather that it is currently not feasible for NHTSA to accurately predict such consumer demand. 89 Fed. Reg. at 52,663 (JA___). Petitioners provide no reason to believe that production-shifting is a generally available approach that manufacturers can use, nor do they identify a model that NHTSA can employ to predict the effects of production shifting.

### B. NHTSA Properly Determined That Its Light-Truck Standards Are Set At The Maximum Feasible Fuel-Economy Level That Manufacturers Can Achieve

#### 1. NHTSA determined that automakers could not feasibly comply with more stringent fuel-economy standards

NHTSA determined that the fuel-economy standards for light trucks are set at "the maximum feasible average fuel economy level that the Secretary decides the manufacturers can achieve" considering "technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on fuel economy, and the need of the United States to conserve energy." 49 U.S.C. § 32902(a), (f). As noted above, in its rulemaking analysis, NHTSA considered five potential fuel-economy standards. *See supra* p. 16. NHTSA determined that the standards adopted by the final rule are technologically feasible because "sufficient technology and timely opportunities to apply that technology exist to meet the final standards," 89 Fed. Reg. at 52,795 (JA___), and that they are "economically practicable in the rulemaking time frame," *id.* at 52,877 (JA___). NHTSA further determined that the alternative standards it had considered—which were more stringent than the final standards—were "beyond maximum feasible in the rulemaking time frame." *Id.* at 52,854 (JA___). NHTSA found those alternatives to be out of reach because of limitations on manufacturers' opportunities to apply fuel-efficient technology, as well as the substantial and widespread civil penalties that would result when technological upgrades were not available.

The final rule explained that "running out of available technology is the fundamental issue that distinguishes the regulatory alternatives" from the chosen standards. 89 Fed. Reg. at 52,855 (JA___). For the more stringent alternatives, "manufacturers attempting to comply with future [fuel-economy] standards" tended to "run out of technology" because "opportunities were lacking to redesign enough of their vehicles" with more fuel-efficient technology "consistent with their normal redesign schedule." *Id.* at 52,861 (JA___). As explained above, "manufacturers nearly universally make the technological improvements prompted by [fuel-economy] standards at times that coincide with existing product 'refresh' and 'redesign' cycles" because "[i]t is significantly more cost-effective to make fuel economy-improving technology updates when a vehicle is being updated." *Id.* at 52,548 n.18 (JA___ n.18). Vehicle redesigns occur on average only every six to seven years. *Id.* at 52,620 (JA___). Thus, if a manufacturer redesigned a particular vehicle model in 2024, it would be unable to add significant new technology to further improve that model's fuel economy until 2030. *See id.* at 52,871 (JA___) (observing that where a "manufacturer has redesigned vehicles in order to meet reference baseline obligations and does not have another (or many) redesign opportunity during the rulemaking time frame, then the manufacturer may be unable to meet its [fuel-economy] standard and may face civil penalties"). NHTSA found that this problem was particularly pronounced in this rulemaking because manufacturers had widely updated the core features of their light-truck models in recent years to meet the increasingly stringent

standards established in the prior rulemaking that covered model years 2024 to 2026. *See, e.g.*, *id.* at 52,862 (JA___) (describing limited opportunities to apply technology "due to earlier redesigns that responded to the model years 2024-2026 standards"); *see also* 87 Fed. Reg. at 25,720 (increasing stringency of light-truck standards "by 8 percent per year for [model years] 2024-2025, and by 10 percent per year for [model year] 2026").

NHTSA illustrated the "lack of redesign opportunity" through the example of powertrain upgrades that could be applied to the fleets of several manufacturers, and it noted the consequence that the lack of redesign opportunity had on non-compliance, or "shortfall," rates. 89 Fed. Reg. at 52,861 (JA___). "[I]n the light truck fleet," the final rule explained, "BMW, GM, Jaguar, Mercedes, Stellantis, and Volkswagen shortfall repeatedly given redesign cycle constraints under all alternatives except" the final standards. *Id.* at 52,862 (JA___). And "[f]or nearly every instance where a manufacturer" was projected to be "unable to achieve" those regulatory alternatives, it was because the manufacturer's "fleet ha[d] already been converted to" the highest efficiency powertrain or was ineligible to improve the powertrain due to redesign cycles. *Id.* at 52,861 (JA___). Put simply, manufacturers had insufficient opportunities to improve the technology on their light trucks to meet the more stringent alternatives. As a result, NHTSA found "that there is no technology path for the majority of manufacturers to meet the most stringent [fuel-economy-standard]

alternatives, considering expected redesign cycles, without shortfalling and resorting to penalties." *Id.* at 52,788 (JA___).

The shortfalls that NHTSA observed in modeling the regulatory alternatives—in contrast to the final standards NHTSA selected—were widespread, and NHTSA found that the more stringent alternatives were "challenging, if not simply unattainable," for "a large portion of the light truck sales volume." 89 Fed. Reg. at 52,877 (JA___). Indeed, excluding those manufacturers that produce only battery-electric vehicles, nearly half of the manufacturers failed to comply in over half of the five model years under any alternative other than the final rule. *See id.* at 52,874 (JA___) (table describing shortfall for each manufacturer by alternative).

NHTSA also explained that such widespread shortfalls have serious economic consequences that undermine the economic practicability of the alternatives more stringent than the final rule. The final rule's analysis demonstrated that "civil penalties increase rapidly as the stringency of regulatory alternatives increase, with some manufacturers facing … penalties of over $2,000 per vehicle for some fleets by model year 2031 under" the most stringent alternative. 89 Fed. Reg. at 52,870 (JA___). Indeed, even the lowest of the more stringent alternatives created substantial non-compliance and regulatory costs: "nearly half of light truck manufacturers [would] fac[e] shortfalls under [the least stringent alternative]," and "over 30 percent of [the] regulatory costs" under that alternative would be "attributable to civil penalties" rather than the cost of efficiency-improving technology. *Id.* Thus, NHTSA

"conclude[d] that the more stringent regulatory alternatives considered in this analysis land[ed] past the point of economic practicability in this time frame." *Id.* at 52,854 (JA___).

NHTSA acknowledged that, "when considered in isolation, the more stringent alternatives better satisfy th[e statutory] objective" of conserving energy. 89 Fed. Reg. at 52,897 (JA___). But, the agency explained, "[i]t is within NHTSA's discretion to forgo the potential prospect of additional energy conservation benefits if NHTSA believes that more stringent standards would be economically impracticable, and thus, beyond maximum feasible." *Id.* at 52,877 (JA___). Further, NHTSA observed that "taking the widespread penalty payment that is projected to occur under the more stringent alternatives into account, and the resulting diversion of resources from the electrification transition to penalty payments, the more stringent alternatives would not likely further energy conservation in implementation." *Id.* at 52,897 (JA___).

**2. Petitioners misunderstand the final rule's reasoning on economic practicability**

Petitioners contend (Envt'l Br. 33) that NHTSA declined to adopt more stringent standards because it found that manufacturers "could not invest … in fuel-efficient conventional light trucks without diverting resources from other environmental priorities like the transition to electric vehicles" and that NHTSA failed to provide adequate support for any such finding. Both pieces of that argument are mistaken: NHTSA evaluated multiple considerations in determining that the more

stringent alternatives were not economically practicable, and NHTSA properly relied on extensive comments from manufacturers explaining that paying substantial civil penalties would impair their ability to invest in the transition to electric vehicles.

As explained above, NHTSA's determination that the more stringent light-truck alternatives were not economically practicable was driven in large part by the fact that manufacturers would struggle to comply with them for reasons other than the availability of resources. The final rule made clear that, whereas in "past analyses" "the cost of converting the vehicles to the new technologies was the limiting factor," the constraint here was of a different sort. 89 Fed. Reg. at 52,795 (JA___). Specifically, the "percentages of fleets that can be modified" with upgraded technology "consistent with redesign and refresh cycles … now limits what is achievable by the manufacturers in the time frame of the rule." *Id.* As the rule states, "NHTSA's final standards, which are less stringent than the proposal, respond to these considerations." *Id.* at 52,871 (JA___).

The agency was also persuaded by comments arguing "that compliance shortfalls that result in civil penalties and no additional fuel savings benefit neither manufacturers, nor consumers, nor energy conservation." 89 Fed. Reg. at 52,853 (JA___). In line with those comments, the rule explained that "fuel economy standards set at a level that resulted in widespread payment of penalties rather than compliance would be counterproductive to the core aim of the statute," namely "improving energy conservation." *Id.* at 52,897 (JA___). In the more stringent

regulatory alternatives, where manufacturers were projected to broadly choose to pay fines rather than upgrade their fleets, the "standards [would] not meet[] the need of the U.S. to conserve energy as originally expected." *Id.* at 52,872 (JA___). NHTSA accordingly determined that the more stringent regulatory alternatives would be inappropriate.

In that context, NHTSA recognized the commonsense proposition that manufacturers have only limited resources. As the rule explained, "[s]uch widespread payment of penalties at the precise time when manufacturers are concentrating available resources on a transition to electrification[,] which will itself dramatically improve fuel economy and energy conservation[,] would be at cross purposes with the statute." 89 Fed. Reg. at 52,897 (JA___). As petitioners note, NHTSA "agree[d]" with automaker comments "that diverting manufacturer resources to paying [EPCA] non-compliance penalties … would not aid manufacturers in the transition and would not ultimately improve energy conservation, since noncompliance means that manufacturers are choosing to pay penalties rather than to save fuel." *Id.* at 52,848 (JA___). NHTSA acted well within its discretion in reaching that conclusion. *See, e.g.*, *Center for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1195 (9th Cir. 2008) (The statute "gives NHTSA discretion to decide how to balance the statutory factors—as long as NHTSA's balancing does not undermine the fundamental purpose of the EPCA: energy conservation.").

Petitioners also go astray in urging that NHTSA erred by crediting comments from manufacturers regarding the availability of resources. "A degree of agency reliance on [comments from affected parties] is not only permissible but often unavoidable." *American Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 516 (D.C. Cir. 2020) (alteration in original) (quoting *National Ass'n of Regulatory Util. Comm'rs v. FCC*, 737 F.2d 1095, 1124 (D.C. Cir. 1984) (per curiam)). That is particularly the case where the affected parties are in a "unique[] … position to know" the relevant information, as is the case here. *National Ass'n of Regulatory Util. Comm'rs*, 737 F.2d at 1125.

### 3. The final rule appropriately established different standards for passenger cars and light trucks

**a.** Petitioners further contend (Envt'l Br. 36-45) that the final rule is arbitrary and capricious because it increases the disparity between the fuel-economy standards that apply to passenger vehicles and those that apply to light trucks. But NHTSA's choice of final standards followed from its determination of what fuel-saving improvements automakers could practicably make to each of those fleets, and not from any determination about whether manufacturers should invest limited resources in improving the fuel economy of one fleet at the expense of the other.

The statute requires NHTSA to establish "separate average fuel economy standards for" passenger automobiles and light trucks. 49 U.S.C. § 32902(b)(1). The final rule adheres to this directive, adjusting the standards for the two fleets differently

based on NHTSA's conclusion about the maximum feasible average fuel-economy level that each fleet can achieve. As explained above, NHTSA determined that more stringent fuel-economy standards for light trucks were not feasible because automakers would not have sufficient opportunities to apply fuel-saving technology during the model years in which the standards would apply, and manufacturers would therefore widely fail to comply with light-truck standards more stringent than those adopted in the final rule. *See supra* pp. 90-94. Under the same analyses, however, manufacturers were able to achieve widespread compliance with the final passenger-car standards. 89 Fed. Reg. at 52,873 (JA___).

Based on NHTSA's assessment of the results from the CAFE Model, NHTSA adopted the maximum feasible standards for cars and light trucks that increased at different rates. The agency explained that "[w]hile there have been instances in recent rulemakings where NHTSA raised passenger car and light truck standard stringency at the same numerical rate year over year, NHTSA also has precedent for setting passenger car and light truck standards that increase at different numerical rates year over year, as in the 2012 final rule." 89 Fed. Reg. at 52,781 (JA___). This approach is consistent with "NHTSA's obligation … to set maximum feasible standards separately for each fleet, based on [its] assessment of each fleet's circumstances." *Id.*

Petitioners contend (Envt'l Br. 37-43) that NHTSA erred by justifying the lower rate of stringency increases applicable to light trucks on the basis of the "work-like" features of light trucks, such as their "cargo-transporting capabilities" or their

"capacity for off-highway operation." But petitioners identify no place in the rule where NHTSA explained its selection of standards on that basis. Petitioners point (Envt'l Br. 39) to a statement in the Technical Support Document for the rule that references the work-like features of light trucks. But, in that section, NHTSA explained its decision to keep the "shape" of the footprint curves for passenger cars and light trucks the "same," rather than to change them. JA___[TSD.1-24]. That section has nothing to do with NHTSA's decision to adopt different stringency increases for passenger cars and light trucks. Stringency increases shift the footprint curve in or out, but they do not change the shape of the curve.

Nor do petitioners advance their argument by observing (Envt'l Br. 39) that "the disparity between the car and truck standards is not reflective of any incremental fuel economy loss caused by more 'work-like' features of trucks." NHTSA did not justify the disparate changes to the fuel-economy standards on that basis. Rather, NHTSA started with the existing fleet of passenger cars and light trucks that manufacturers produce and assessed whether and when manufacturers could feasibly improve the fuel-economy of those existing fleets by adding technology without significantly altering the vehicles' performance and utility.

Petitioners' reference (Envt'l Br. 40) to existing individual vehicle models only underscores their error. The fuel-economy standards apply at the level of a manufacturer's entire fleet of light trucks or passenger cars. And NHTSA concluded that manufacturers, on average, would fail to comply with light-truck standards that

increased at any rate greater than those adopted in the final rule. The fuel economy of an individual light truck does not demonstrate that manufacturers are, in fact, able to achieve greater fuel economy across their entire light-truck fleet.

**b.** Petitioners also reframe their mistaken argument about resource constraints as one about the disparity between the standards. They argue that, even if manufacturers had limited resources to devote to upgrading the fuel economy of their fleet, NHTSA erred by requiring manufacturers to spend the limited resources on passenger-car upgrades rather than light-truck upgrades. That argument fails, principally for the reasons already explained. NHTSA did not base its light-truck standards solely on a finding of resource constraints. NHTSA concluded that manufacturers could not comply with the more stringent light-truck standards and that widespread resort to civil penalties ran counter to the aims of the statute. Likewise, NHTSA selected the standards that it did because manufacturers could improve the fuel-economy level of their passenger-car fleets at more rapid rates while maintaining compliance, not because of any view that resources were better spent on passenger-car upgrades.

In fact, NHTSA did model a regulatory alternative in which the passenger-car standard would have increased more slowly and the light-truck standard would have increased faster. Under the final standards, the passenger-car standard increases in stringency two percent per year, and the light-truck standard stays the same in model years 2027 and 2028 and then increases two percent per year in model years 2029

through 2031. 89 Fed. Reg. at 52,547 (JA___). NHTSA modeled a regulatory alternative in which the passenger-car standard would have increased only one percent per year, and the light-truck standard would have increased three percent per year. *Id.* at 52,710 (JA___). Even under that scenario, however, NHTSA found that there would be widespread non-compliance with the light-truck standard and that the industry average fuel-economy level for light-trucks would fall short of the standard in model years 2030 and 2031. *Id.* at 52,874 (JA___). This analysis demonstrates that the reason manufacturers would not be able to comply with more stringent light-truck standards is not because the passenger-car standards were increasing too rapidly, but rather because, as NHTSA found, there simply were not enough redesign opportunities in the light-truck fleet for manufacturers to improve the fuel economy of their light trucks.

Petitioners' arguments regarding the agency's cost-benefit results are similarly misplaced. NHTSA is under no statutory obligation to pick the alternative presented with the highest net benefits in its cost-benefit analysis; rather, the statute directs NHTSA to assess the statutory factors in Section 32902(f) and select the maximum feasible fuel economy that manufacturers can achieve. As the agency explained, "it is well within [NHTSA's] discretion to deviate from the level at which modeled net benefits appear to be maximized if we conclude that the level would not represent the maximum feasible level for future [fuel-economy] standards, given all relevant and statutorily-directed considerations." 89 Fed. Reg. at 52,815 (JA___). Whatever their

net benefits, the more stringent light-truck alternatives were beyond maximum feasible for all the reasons explained, and NHTSA acted properly in selecting the final standards.[15]

**CONCLUSION**

For the foregoing reasons, the petitions for review should be denied.

Respectfully submitted,


BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

MARK B. STERN

*s/ Joshua M. Koppel*
JOSHUA M. KOPPEL
KEVIN J. KENNEDY
*Attorneys, Appellate Staff*
*Civil Division, Room 7212*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4820*
*joshua.m.koppel@usdoj.gov*

*Of Counsel:*

SUBASH IYER
*Acting General Counsel*

CHARLES E. ENLOE
*Assistant General Counsel*

HUNTER OLIVER
*Attorney, National Highway Traffic Safety Administration*

*Department of Transportation*


January 2025

[15] The federal government respondents agree with environmental petitioners (Envt'l Br. 45-47) that, if there is any error, the court should remand without vacatur. *See supra* pp. 60-63.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit in this Court's October 29, 2024, briefing order because it contains 24,247 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Joshua M. Koppel*
Joshua M. Koppel

# ADDENDUM

**TABLE OF CONTENTS**


49 U.S.C. § 32901 .......... A1

49 U.S.C. § 32902 .......... A4

49 U.S.C. § 32903 .......... A9

49 U.S.C. § 32904 .......... A10

49 U.S.C. § 32905 .......... A11

**49 U.S.C. § 32901**

**§ 32901. Definitions**

**(a) General.** In this chapter--

**(1)** "alternative fuel" means--

**(A)** methanol;

**(B)** denatured ethanol;

**(C)** other alcohols;

**(D)** except as provided in subsection (b) of this section, a mixture containing at least 85 percent of methanol, denatured ethanol, and other alcohols by volume with gasoline or other fuels;

**(E)** natural gas;

**(F)** liquefied petroleum gas;

**(G)** hydrogen;

**(H)** coal derived liquid fuels;

**(I)** fuels (except alcohol) derived from biological materials;

**(J)** electricity (including electricity from solar energy); and

**(K)** any other fuel the Secretary of Transportation prescribes by regulation that is not substantially petroleum and that would yield substantial energy security and environmental benefits.

**(2)** "alternative fueled automobile" means an automobile that is a--

**(A)** dedicated automobile; or

**(B)** dual fueled automobile.

**(3)** except as provided in section 32908 of this title, "automobile" means a 4-wheeled vehicle that is propelled by fuel, or by alternative fuel, manufactured primarily for use on public streets, roads, and highways and rated at less than 10,000 pounds gross vehicle weight, except--

**(A)** a vehicle operated only on a rail line;

**(B)** a vehicle manufactured in different stages by 2 or more manufacturers, if no intermediate or final-stage manufacturer of that vehicle manufactures more than 10,000 multi-stage vehicles per year; or

**(C)** a work truck.

* * *

**(5)** “average fuel economy” means average fuel economy determined under section 32904 of this title.

**(6)** “average fuel economy standard” means a performance standard specifying a minimum level of average fuel economy applicable to a manufacturer in a model year.

**(7)** “commercial medium- and heavy-duty on-highway vehicle” means an on-highway vehicle with a gross vehicle weight rating of 10,000 pounds or more.

**(8)** “dedicated automobile” means an automobile that operates only on alternative fuel.

**(9)** “dual fueled automobile” means an automobile that--

**(A)** is capable of operating on alternative fuel or a mixture of biodiesel and diesel fuel meeting the standard established by the American Society for Testing and Materials or under section 211(u) of the Clean Air Act (42 U.S.C. 7545(u)) for fuel containing 20 percent biodiesel (commonly known as “B20”) and on gasoline or diesel fuel;

**(B)** provides equal or superior energy efficiency, as calculated for the applicable model year during fuel economy testing for the United States Government, when operating on alternative fuel as when operating on gasoline or diesel fuel;

**(C)** for model years 1993-1995 for an automobile capable of operating on a mixture of an alternative fuel and gasoline or diesel fuel and if the Administrator of the Environmental Protection Agency decides to extend the application of this subclause, for an additional period ending not later than the end of the last model year to which section 32905(b) and (d) of this title applies, provides equal or superior energy efficiency, as calculated for the applicable model year during fuel economy testing for the Government, when operating on a mixture of alternative fuel and gasoline or diesel fuel containing exactly 50 percent gasoline or diesel fuel as when operating on gasoline or diesel fuel; and

**(D)** for a passenger automobile, meets or exceeds the minimum driving range prescribed under subsection (c) of this section.

**(10)** “fuel” means—

**(A)** gasoline;

**(B)** diesel oil; or

**(C)** other liquid or gaseous fuel that the Secretary decides by regulation to include in this definition as consistent with the need of the United States to conserve energy.

**(11)** "fuel economy" means the average number of miles traveled by an automobile for each gallon of gasoline (or equivalent amount of other fuel) used, as determined by the Administrator under section 32904(c) of this title.

* * *

**(17)** "non-passenger automobile" means an automobile that is not a passenger automobile or a work truck.

**(18)** "passenger automobile" means an automobile that the Secretary decides by regulation is manufactured primarily for transporting not more than 10 individuals, but does not include an automobile capable of off-highway operation that the Secretary decides by regulation—

**(A)** has a significant feature (except 4-wheel drive) designed for off-highway operation; and

**(B)** is a 4-wheel drive automobile or is rated at more than 6,000 pounds gross vehicle weight.

**(19)** "work truck" means a vehicle that—

**(A)** is rated at between 8,500 and 10,000 pounds gross vehicle weight; and

**(B)** is not a medium-duty passenger vehicle (as defined in section 86.1803–01 of title 40, Code of Federal Regulations, as in effect on the date of the enactment of the Ten-in-Ten Fuel Economy Act).

* * *

**49 U.S.C. § 32902**

**§ 32902. Average fuel economy standards**

**(a) Prescription of standards by regulation.**--At least 18 months before the beginning of each model year, the Secretary of Transportation shall prescribe by regulation average fuel economy standards for automobiles manufactured by a manufacturer in that model year. Each standard shall be the maximum feasible average fuel economy level that the Secretary decides the manufacturers can achieve in that model year.

**(b) Standards for automobiles and certain other vehicles.**--

**(1)** In general.--The Secretary of Transportation, after consultation with the Secretary of Energy and the Administrator of the Environmental Protection Agency, shall prescribe separate average fuel economy standards for--

**(A)** passenger automobiles manufactured by manufacturers in each model year beginning with model year 2011 in accordance with this subsection;

**(B)** non-passenger automobiles manufactured by manufacturers in each model year beginning with model year 2011 in accordance with this subsection; and

**(C)** work trucks and commercial medium-duty or heavy-duty on-highway vehicles in accordance with subsection (k).

**(2) Fuel economy standards for automobiles.**--

**(A) Automobile fuel economy average for model years 2011 through 2020.**--The Secretary shall prescribe a separate average fuel economy standard for passenger automobiles and a separate average fuel economy standard for non-passenger automobiles for each model year beginning with model year 2011 to achieve a combined fuel economy average for model year 2020 of at least 35 miles per gallon for the total fleet of passenger and non-passenger automobiles manufactured for sale in the United States for that model year.

**(B) Automobile fuel economy average for model years 2021 through 2030.**--For model years 2021 through 2030, the average fuel economy required to be attained by each fleet of passenger and non-passenger automobiles manufactured for sale in the United States shall be the maximum feasible average fuel economy standard for each fleet for that model year.

**(C) Progress toward standard required.**--In prescribing average fuel economy standards under subparagraph (A), the Secretary shall prescribe annual fuel economy standard increases that increase the applicable average fuel economy standard ratably beginning with model year 2011 and ending with model year 2020.

**(3) Authority of the Secretary.**--The Secretary shall--

**(A)** prescribe by regulation separate average fuel economy standards for passenger and non-passenger automobiles based on 1 or more vehicle attributes related to fuel economy and express each standard in the form of a mathematical function; and

**(B)** issue regulations under this title prescribing average fuel economy standards for at least 1, but not more than 5, model years.

**(4) Minimum standard.**--In addition to any standard prescribed pursuant to paragraph (3), each manufacturer shall also meet the minimum standard for domestically manufactured passenger automobiles, which shall be the greater of--

**(A)** 27.5 miles per gallon; or

**(B)** 92 percent of the average fuel economy projected by the Secretary for the combined domestic and non-domestic passenger automobile fleets manufactured for sale in the United States by all manufacturers in the model year, which projection shall be published in the Federal Register when the standard for that model year is promulgated in accordance with this section.

**(c) Amending passenger automobile standards.**--The Secretary of Transportation may prescribe regulations amending the standard under subsection (b) of this section for a model year to a level that the Secretary decides is the maximum feasible average fuel economy level for that model year. Section 553 of title 5 applies to a proceeding to amend the standard. However, any interested person may make an oral presentation and a transcript shall be taken of that presentation.

**(d) Exemptions.**—

**(1)** Except as provided in paragraph (3) of this subsection, on application of a manufacturer that manufactured (whether in the United States or not) fewer than 10,000 passenger automobiles in the model year 2 years before the model year for which the application is made, the Secretary of Transportation may exempt by regulation the manufacturer from a standard under subsection (b) or (c) of this section. An exemption for a model year applies only if the manufacturer manufactures (whether in the United States or not) fewer than 10,000 passenger automobiles in the model year. The Secretary may exempt a manufacturer only if the Secretary--

**(A)** finds that the applicable standard under those subsections is more stringent than the maximum feasible average fuel economy level that the manufacturer can achieve; and

**(B)** prescribes by regulation an alternative average fuel economy standard for the passenger automobiles manufactured by the exempted manufacturer that the

Secretary decides is the maximum feasible average fuel economy level for the manufacturers to which the alternative standard applies.

**(2)** An alternative average fuel economy standard the Secretary of Transportation prescribes under paragraph (1)(B) of this subsection may apply to an individually exempted manufacturer, to all automobiles to which this subsection applies, or to classes of passenger automobiles, as defined under regulations of the Secretary, manufactured by exempted manufacturers.

**(3)** Notwithstanding paragraph (1) of this subsection, an importer registered under section 30141(c) of this title may not be exempted as a manufacturer under paragraph (1) for a motor vehicle that the importer--

**(A)** imports; or

**(B)** brings into compliance with applicable motor vehicle safety standards prescribed under chapter 301 of this title for an individual under section 30142 of this title.

**(4)** The Secretary of Transportation may prescribe the contents of an application for an exemption.

* * *

**(f) Considerations on decisions on maximum feasible average fuel economy.**--When deciding maximum feasible average fuel economy under this section, the Secretary of Transportation shall consider technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on fuel economy, and the need of the United States to conserve energy.

**(g) Requirements for other amendments.—**

**(1)** The Secretary of Transportation may prescribe regulations amending an average fuel economy standard prescribed under subsection (a) or (d) of this section if the amended standard meets the requirements of subsection (a) or (d), as appropriate.

**(2)** When the Secretary of Transportation prescribes an amendment under this section that makes an average fuel economy standard more stringent, the Secretary shall prescribe the amendment (and submit the amendment to Congress when required under subsection (c)(2) of this section) at least 18 months before the beginning of the model year to which the amendment applies.

**(h) Limitations.**--In carrying out subsections (c), (f), and (g) of this section, the Secretary of Transportation--

**(1)** may not consider the fuel economy of dedicated automobiles;

**(2)** shall consider dual fueled automobiles to be operated only on gasoline or diesel fuel; and

**(3)** may not consider, when prescribing a fuel economy standard, the trading, transferring, or availability of credits under section 32903.

* * *

**(k) Commercial Medium- and Heavy-Duty On-Highway Vehicles and Work Trucks.--**

**(1) Study.--**Not later than 1 year after the National Academy of Sciences publishes the results of its study under section 108 of the Ten-in-Ten Fuel Economy Act, the Secretary of Transportation, in consultation with the Secretary of Energy and the Administrator of the Environmental Protection Agency, shall examine the fuel efficiency of commercial medium- and heavy-duty on-highway vehicles and work trucks and determine—

**(A)** the appropriate test procedures and methodologies for measuring the fuel efficiency of such vehicles and work trucks;

**(B)** the appropriate metric for measuring and expressing commercial medium- and heavy-duty on-highway vehicle and work truck fuel efficiency performance, taking into consideration, among other things, the work performed by such on-highway vehicles and work trucks and types of operations in which they are used;

**(C)** the range of factors, including, without limitation, design, functionality, use, duty cycle, infrastructure, and total overall energy consumption and operating costs that affect commercial medium- and heavy-duty on-highway vehicle and work truck fuel efficiency; and

**(D)** such other factors and conditions that could have an impact on a program to improve commercial medium- and heavy-duty on-highway vehicle and work truck fuel efficiency.

**(2) Rulemaking.--**

Not later than 24 months after completion of the study required under paragraph (1), the Secretary, in consultation with the Secretary of Energy and the Administrator of the Environmental Protection Agency, by regulation, shall determine in a rulemaking proceeding how to implement a commercial medium- and heavy-duty on-highway vehicle and work truck fuel efficiency improvement program designed to achieve the maximum feasible improvement, and shall adopt and implement appropriate test methods, measurement metrics, fuel economy standards, and compliance and enforcement protocols that are appropriate, cost-effective, and technologically feasible

for commercial medium- and heavy-duty on-highway vehicles and work trucks. The Secretary may prescribe separate standards for different classes of vehicles under this subsection.

**(3) Lead-time; regulatory stability.--**The commercial medium- and heavy-duty on-highway vehicle and work truck fuel economy standard adopted pursuant to this subsection shall provide not less than—

**(A)** 4 full model years of regulatory lead-time; and

**(B)** 3 full model years of regulatory stability.

**49 U.S.C. § 32903**

**§ 32903. Credits for exceeding average fuel economy standards**

**(a) Earning and period for applying credits.**--When the average fuel economy of passenger automobiles manufactured by a manufacturer in a particular model year exceeds an applicable average fuel economy standard under subsections (a) through (d) of section 32902 (determined by the Secretary of Transportation without regard to credits under this section), the manufacturer earns credits. The credits may be applied to--

**(1)** any of the 3 consecutive model years immediately before the model year for which the credits are earned; and

**(2)** to the extent not used under paragraph (1)1 any of the 5 consecutive model years immediately after the model year for which the credits are earned.

* * *

**49 U.S.C. § 32904**

**§ 32904. Calculation of average fuel economy**

**(a) Method of calculation.—**

**(1)** The Administrator of the Environmental Protection Agency shall calculate the average fuel economy of a manufacturer subject to--

**(A)** section 32902(a) of this title in a way prescribed by the Administrator; and

**(B)** section 32902(b)-(d) of this title by dividing--

**(i)** the number of passenger automobiles manufactured by the manufacturer in a model year; by

**(ii)** the sum of the fractions obtained by dividing the number of passenger automobiles of each model manufactured by the manufacturer in that model year by the fuel economy measured for that model.

**(2)** **(A)** In this paragraph, "electric vehicle" means a vehicle powered primarily by an electric motor drawing electrical current from a portable source.

**(B)** If a manufacturer manufactures an electric vehicle, the Administrator shall include in the calculation of average fuel economy under paragraph (1) of this subsection equivalent petroleum based fuel economy values determined by the Secretary of Energy for various classes of electric vehicles. The Secretary shall review those values each year and determine and propose necessary revisions based on the following factors:

**(i)** the approximate electrical energy efficiency of the vehicle, considering the kind of vehicle and the mission and weight of the vehicle.

**(ii)** the national average electrical generation and transmission efficiencies.

**(iii)** the need of the United States to conserve all forms of energy and the relative scarcity and value to the United States of all fuel used to generate electricity.

**(iv)** the specific patterns of use of electric vehicles compared to petroleum-fueled vehicles.

* * *

**49 U.S.C. § 32905**

**§ 32905. Manufacturing incentives for alternative fuel automobiles**

**(a) Dedicated automobiles.**--Except as provided in subsection (c) of this section or section 32904(a)(2) of this title, for any model of dedicated automobile manufactured by a manufacturer after model year 1992, the fuel economy measured for that model shall be based on the fuel content of the alternative fuel used to operate the automobile. A gallon of a liquid alternative fuel used to operate a dedicated automobile is deemed to contain .15 gallon of fuel.

**(b) Dual fueled automobiles.**--Except as provided in subsection (d) of this section or section 32904(a)(2) of this title, for any model of dual fueled automobile manufactured by a manufacturer in model years 1993 through 2019, the Administrator of the Environmental Protection Agency shall measure the fuel economy for that model by dividing 1.0 by the sum of--

**(1)** .5 divided by the fuel economy measured under section 32904(c) of this title when operating the model on gasoline or diesel fuel; and

**(2)** .5 divided by the fuel economy--

**(A)** measured under subsection (a) when operating the model on alternative fuel; or

**(B)** measured based on the fuel content of B20 when operating the model on B20, which is deemed to contain 0.15 gallon of fuel.

* * *

**(e) Electric dual fueled automobiles.**--

**(1) In general.**--At the request of the manufacturer, the Administrator may measure the fuel economy for any model of dual fueled automobile manufactured after model year 2015 that is capable of operating on electricity in addition to gasoline or diesel fuel, obtains its electricity from a source external to the vehicle, and meets the minimum driving range requirements established by the Secretary for dual fueled electric automobiles, by dividing 1.0 by the sum of--

**(A)** the percentage utilization of the model on gasoline or diesel fuel, as determined by a formula based on the model's alternative fuel range, divided by the fuel economy measured under section 32904(c); and

**(B)** the percentage utilization of the model on electricity, as determined by a formula based on the model's alternative fuel range, divided by the fuel economy measured under section 32904(a)(2).

**(2) Alternative calculation.**--If the manufacturer does not request that the Administrator calculate the manufacturing incentive for its electric dual fueled automobiles in accordance with paragraph (1), the Administrator shall calculate such incentive for such automobiles manufactured by such manufacturer after model year 2015 in accordance with subsection (b).

* * *